CONNECTICUT RIVER LUMBER CO. & a. v. OLCOTT FALLS CO.

The right of using a river as a highway for floating logs is measured by the capacity of the stream in its natural condition.

The riparian owners may alter the channel by constructing dams and flumes, and diverting the water for manufacturing purposes, so far as such changes are possible without an infringement of the public right to a way as free and convenient as would be afforded by the river in its natural condition.

An intention to discontinue the way is not shown by a public grant of the land under and around it.

A mere charter of a manufacturing company, authorizing the grantees, as a corporation, to exercise the rights of riparian owners, is not a discontinu-

ance or modification of the right of way, nor a grant of discontinuing power.

A bill in equity may be maintained by riparian owners or by the attorney-general for the establishment of the boundary line between the public and the private right operating like a partition, or a laying out of the way.

BILL IN EQUITY, to restrain the defendants from maintaining a dam across the Connecticut river for manufacturing purposes at Olcott Falls in Lebanon, without providing suitable sluiceways for the passage of logs floated by the plaintiffs down said river. The facts sufficiently appear in the arguments of counsel and the opinion of the court.

*Aldrich & Remich* and *Drew & Jordan*, for the plaintiffs. I. The Connecticut river is by nature a public highway. *Scott* v. *Willson*, 3 N. H. 321; *Thompson* v. *Co.*, 54 N. H. 548; *Barnes* v. *Heath* (unpublished opinion); Gould Waters, ss. 107–109; Ang. High., ss. 55, 56, 67–72.

Recognizing the public character of its waters, the legislature provided (*s.* 19, *c.* 135, G. L.) that no owner or occupier of any mill-dam or water-power shall acquire by prescription any right against the state or *the public* to impede or in any way injure navigation, etc., *in any of the waters of the state.* For the purpose of showing the policy of the state with reference to the rights of the public in its navigable waters, we would call attention to *s.* 15 of *c.* 141, Gen. Laws, which provides that any person or corporation, authorized by its charter so to do, may erect and maintain dams upon and across any stream *not navigable*—thus placing a negative upon any supposed claim or authority to obstruct navigable waters.

Again: By *s.* 19 of the same chapter, it is expressly provided that the provisions of the mill act authorizing the construction of dams "shall not be applicable to any navigable waters in this state." The legislature has repeatedly protected its water highways by negatives of the character cited, and has thereby indicated its policy to preserve the rights of the public therein for the purposes of commerce and navigation. We shall claim, further on, that the policy so declared has an important bearing against the defendants' position as to the construction of the act of 1848.

II. The Connecticut river being a natural public highway, the individual or private rights along its banks are "held subject to the risks (and uses) incident to the exercise of the public right." In other words, property near a water highway is subject to the paramount right of passage of the public. *Thompson* v. *Co.*, 54 N. H. 558; *Barnes* v. *Heath* (unpublished opinion); *Knox* v. *Chaloner*, 42 Me. 150; *Treat* v. *Lord*, 42 Me. 552; *Dwinel* v. *Veazie*, 44 Me. 167; *Parks* v. *Morse*, 52 Me. 260; *Lancey* v. *Clifford*, 54 Me. 487; *Veazie* v. *Dwinel*, 50 Me. 479.

The Massachusetts cases hold the same principle. *Stoughton* v. *Baker*, 4 Mass. 522; *Commonwealth* v. *Alger*, 7 Cush. 100; *Commonwealth* v. *Essex Co.*, 13 Gray 248. The owner of a mill-dam on such a river is bound to provide a suitable and reasonably convenient passage-way for commerce; and if he fails to do so his dam becomes a nuisance, and may be abated by any member of the public having occasion to use the same. *Dwinel* v. *Veazie*, 44 Me. 167; *Parks* v. *Morse, supra; Lancey* v. *Clifford, supra;* Wood Nuis., s. 756, *p.* 858—also *ss.* 483, 484, 753, 757–762.

III. The bill alleges the public character of the river;—that the plaintiffs have occasion to use the same for the purpose of passing their property to the markets of other states; that the defendants' dam, which was in process of construction at the time of the filing of the bill, when completed, would be an obstruction; that at the time of the hearing the dam had been completed, and was an obstruction which, if maintained, would absolutely prevent the passage of logs, ruin the plaintiffs' business enterprise, and cause irreparable injury and interminable litigation. The defendants, by their demurrer, say that the bill shows no ground for relief, and for one special cause of demurrer, say that the right infringed is a public right and the grievance a public nuisance; and that, by the laws of the land, courts of equity will not interfere at the instance of a private person.. English courts of equity, from a very early day, have granted relief at the instance of private individuals, who were suffering special injury from the maintenance of a public nuisance. While the jurisdiction of the court of equity in New Hampshire may not be coextensive with that of the English court of chancery, yet, as to all subjects over which jurisdiction has been expressly conferred, as well as all subjects cognizable in equity, during the colonial period, its powers and jurisdiction are identical with those of the English court of chancery, and of the American courts having general equity powers. In other words, as to all matters within its scope, its jurisdiction includes all the incidental and auxiliary details, powers, and remedies belonging to the general system of equity jurisprudence as used in the administration of justice according to the methods and usages of equity. See 1 Pom. Eq., s. 299.

We maintain that the New Hampshire courts of equity have jurisdiction of matters of nuisance independent of the statute; but whether this be true or not, in one sense, becomes immaterial in view of the fact that the legislature, in the revision of 1867, expressly conferred, upon courts of equity, jurisdiction over the subjects of *nuisance and waste.* When jurisdiction was conferred upon courts of equity to deal with matters of nuisance, power to deal with the subject according to the course of justice and equity, as administered by courts having general equity powers, attached as a matter of course. And when it comes to the question as to what relief shall be granted, we suppose that our courts will follow the

precedents of courts of equity, which have dealt with such subjects in the past. Courts of equity will interfere to restrain and prevent threatened public nuisances at the suit of a private person who may suffer a special injury thereby, as well as to abate those already existing. Cool. Black., Book 3, 219, 220, *n.* 7; Ad. Eq., 485, 487, *n.* 1; Jeremy's Mitf. Eq. Pl. 144, 145; 2 Sto. Eq. Jur., *ss.* 924, 926, also 101, 102; Gould Waters, *s.* 121, 218; High Inj., 760–763, 768, 769, 791, 794, 804, *n.* 2, 812–815, 818; Ang. High., *ss.* 283, 284; Wood Nuis. 777–779; Dan. Ch. 1635, 1636; Pom. Eq., *s.* 1349, *n.* 1; *Sampson* v. *Smith,* 8 Sim. 272; *Corning* v. *Nail Factory,* 40 N. Y. 191; *Penn.* v. *Bridge Co.,* 13 How. 518; *Lane* v. *Newdigate,* 10 Vesey 193; *Corning* v. *Lowerre,* 6 Johns. Ch. 439; *Pettibone* v. *Hamilton,* 40 Wis. 402; *Rosser* v. *Randolph,* 7 Por. 238; *Barnes* v. *Racine,* 4 Wis. 454; *Walker* v. *Shepardson,* 4 Wis. 486; *Georgetown* v. *Canal Co.,* 12 Pet. 91; *Bigelow* v. *Bridge Co.,* 14 Conn. 565; *Frink* v. *Lawrence,* 20 Conn. 117; *Sparhawk* v. *Railway Co.,* 54 Pa. St. 401; *Knox* v. *N. Y. City,* 55 Barb. 404; *Smith* v. *Lockwood,* 13 Barb. 209; *Ewell* v. *Greenwood,* 26 Iowa 377; *Hamilton* v. *Whitridge,* 11 Md. 128; *Soltau* v. *De Held,* 9 Eng. L. & Eq. 104; *Spencer* v. *Railway Co.,* 8 Sim. 193; *Mayor* v. *Baumberger,* 7 Robt. 219; *Railroad Co.* v. *Loeb,* 7 Robt. 418; *Railroad* v. *Shiels,* 33 Ga. 601; *Knox* v. *Chaloner,* 42 Me. 150. The supreme court of New Hampshire has asserted its full equitable jurisdiction to restrain or abate nuisances in all cases where legal remedies are impracticable or inadequate. Pom. Eq., *s.* 308; *Coe* v. *Co.,* 37 N. H. 254; *Webber* v. *Gage,* 39 N. H. 182; *Burnham* v. *Kempton,* 44 N. H. 78, 79, 92; *Eastman* v. *Co.,* 47 N. H. 71, 78; *Bassett* v. *Co.,* 47 N. H. 426, 437.

In *Coe* v. *Co.* the demurrer was sustained upon the ground that the bill did not state a case, not for want of jurisdiction. Indeed, the jurisdiction over such questions was distinctly asserted by the court in the following language: " It is well settled that both public and private nuisances may, under some circumstances, fall within the jurisdiction of a court of equity, both with reference to obtaining redress for injuries already sustained, and relief from further molestation by the abatement of the nuisance."

In *Webber* v. *Gage,* the demurrer was overruled, on the ground that the allegations of the bill made a case for equitable interference. Of course (as said in *Eastman* v. *Co.,* 47 N. H. 71), to justify the interference of a court of equity there must be pressing necessity, imminent danger of great and irreparable damage, for which an action at law would not furnish an adequate, speedy, and practicable remedy. The bill in the case at bar presents an emergency clearly and imperatively demanding the interference of a court of equity. It will be observed that all of the foregoing New Hampshire cases were decided prior to the revision of 1867, which expressly conferred jurisdiction over nuisance and waste.

IV. The question whether the bill presents ground for the inter-

position of a court of equity, is a question to be settled by the court at the trial term. *Dole* v. *Pike*, 64 N. H. 22. Prior to 1867, jurisdiction over nuisances did not depend upon any statute, but was exercised as independent, original, and common-law jurisdiction. In such cases the right of trial by jury does not exist. *Bellows* v. *Bellows*, 58 N. H. 60. See, also, opinion by *Ladd*, J. (*Copp* v. *Henniker*), 55 N. H. 210, where he adopts the language of Judge *Bell* that "Equity, as a great branch of the law of their native country, was brought over by the colonists, and has always existed as a part of the common law in its broadest sense in New Hampshire." It is very certain, if equity jurisdiction has always existed in its broadest sense in New Hampshire, that it has embraced the subject of nuisances ; and it is equally certain, if such power existed as a part of the original jurisdiction of courts of chancery, that the right of trial by jury was not given by the constitution. Judge *Ladd*, *id.*, 210, 211. There is every reason for holding that courts of equity should deal with a nuisance.

It is probably true, if the nuisance is of a public nature, that courts will not interfere upon the complaint of a private individual who has no interest except that in common with the general public, but will leave the matter to be regulated in a proceeding in the name of the prosecuting officer, or by indictment. But where the obstruction is peculiarly damaging to a party, he may abate upon the arbitrary power of self-protection, or he may resort to the summary power of a court of equity. The equity jurisdiction results from the necessity and peril of the situation. Speed is the essential element of the relief required. The reasons for the exercise of such powers by courts of equity are very well stated by Story, *ss.* 924, 926.

V. An individual suffering special injury may abate the nuisance. He may have his remedy with or without the aid of the attorney-general. He may have it by bill and information joined, if necessary. Gould Waters, *s.* 121, *n.* 3, *s.* 128 ; *Arundel* v. *M'Culloch*, 10 Mass. 70 ; Wood Nuis., *ss.* 794, 795, 800.

VI. The amendment joining the attorney-general was a precautionary amendment, and made with a view of bringing the proceeding, if necessary, within the provisions of the act of 1885, *p.* 284; but we view it as entirely immaterial and unnecessary.

VII. Where there is jurisdiction, there is always power to grant the necessary relief. The plaintiffs ask for an injunction against the defendants' maintaining a dam across the Connecticut river without providing suitable sluice-ways for the reasonable passage of timber. Such an injunction would be mandatory in character, but has been repeatedly granted by courts of equity. Pom. Eq., *s.* 1359, *n.* 2; *Robinson* v. *Lord Byron*, 1 Bro. Ch. 588 ; High In. (2d ed.), *ss.* 792–804, *n.* 2; *Rankin* v. *Huskisson*, 4 Sim. 13 ; *Spencer* v. *Company*, 8 Sim. 193 ; *Penn.* v. *Bridge Co.*, 13 Howard 518; *Lane* v. *Newdigate*, 10 Ves. 193 ; Gould Waters, *ss.* 552–

555. In *Penn.* v. *Bridge Co.* the injunction was mandatory, and compelled the removal of a bridge. In *Lane* v. *Newdigate,* the injunction was against impeding navigation by suffering locks to remain out of repair. In *Spencer* v. *Company* the injunction was against continuing the existing condition of affairs.

VIII. The defendants contend that under the act of 1848 they are authorized to construct and maintain all such works as are necessary and proper for their buisness, without any limitations or restrictions whatever; while the plaintiffs contend that the defendants are restricted to such works as are reasonable and proper with reference to the rights of the public in the river for purposes of interstate navigation and floatage and other uses. The construction claimed by the defendants would be contrary to the well defined policy of New Hampshire, as expressed by repeated acts of the legislature. A construction abridging a public right will not be given to a legislative act unless such intention is expressly and distinctly stated therein. No such intention is expressed in the act of 1848. The construction contended for is contrary to reason. In *Hooksett* v. *Company,* 44 N. H. 106, the defendants claimed a construction for the words "necessary and proper for the carrying on of their said works" similar to that claimed by the defendants here. The court held that the charter afforded the defendants no protection against a claim for damages. See, also, *Treat* v. *Lord,* 42 Me. 552.

IX. If the fair construction of the act of 1848 is such as the defendants claim, it presupposes the absolute control and obstruction of an interstate highway, and is therefore unconstitutional and inoperative. Gould Waters, ss. 32–67 ; *Penn.* v. *Bridge Co.,* 13 How. 518 ; *Welton* v. *Missouri,* 91 U. S. 275 ; *Mobile* v. *Kimball,* 102 U. S. 691 ; Wood Nuis. 542, s. 476.

X. The ownership of the Mills-Olcott charter is a material question. *Olcott* v. *Banfill,* 4 N. H. 545, 546.

*Jeremiah Smith* (with whom was *W. S. Ladd*), for the defendants. We maintain that there was not, at the time of the adoption of our constitution, and is not now, any remedy by private suit in equity in a case like the present ; that the only remedy was, and is, by a public proceeding in behalf of the state ; that in such public proceeding there was at the time of the adoption of the constitution an unquestioned right of trial by jury; and that the legislature has not attempted to take away this right, and could not if it would. The plaintiff corporation is not now (whatever it may be hereafter) in a position to maintain a private suit, either at law or equity, against the defendants. The question whether the bill could have been maintained as a preventive remedy to restrain the erection of the dam does not arise. The bill was not seasonably brought for that purpose. The dam was already completed. This is now, in effect, a bill to abate a completed structure, on the ground that it is a public nuisance.

The plaintiffs, at the time of filing the bill, could not have maintained an action at law. "An action at law does not lie against the author of a public nuisance without proof of special damage, not merely anticipated, but actually received." *Durfee*, C. J. *Bowden* v. *Lewis*, 13 R. I. 189—*S. C.*, 43 Am. Rep. 21, 24. ". . . a distinction must be made between actual present damages and those which rest in contemplation. While, in a proper case, the former may be recovered in a private action, the latter cannot." *Lyon*, J., in *Clark* v. *Company*, 36 N. W. Rep. 326, 328. There was, at the time of filing the bill, no present actual damage to the plaintiffs; "but only such as rested in contemplation, and such as was common to all similarly situated." "In all these cases," said *Erle*, C. J., speaking of the early English cases, "the plaintiff was exercising his right of way, and the defendants obstructed that exercise, and caused particular damage thereby directly and immediately to the plaintiff." 5 B. & Sm. 160. Not so here. The plaintiffs' logs had not been obstructed in their actual passage down the river. At the time of commencing this suit, the plaintiffs not only had suffered no damage, but apprehended no damage save the loss of a public right which they were privileged to enjoy only in common with the rest of the public. No private right of the plaintiffs' was infringed or in danger of being infringed. As riparian owners, the plaintiffs have a right of access from their land to the river; and this is not a right held in common with the rest of the public, for other members of the public have no access to or from the river at the particular place. Hence an obstruction in the river which cuts off the plaintiffs' access from their land to the river, infringes a private right of the plaintiffs'. See *Rose* v. *Groves*, 5 Man. & Gr. 613. But when the plaintiffs have once passed from their land to the river with their logs, and have commenced to float them down-stream, they are a traveller like the rest of the public, and are attempting to exercise a public right—the right of navigation—which they share in common with all other persons. Undoubtedly a riparian owner has, like every other citizen, the right of navigating the river as one of the public. "This, however, is not a right coming to him *qua* owner or occupier of any lands on the bank; nor is it a right which, *per se*, he enjoys in a manner different from any other member of the public." Lord *Cairns*, Chancellor, in *Lyon* v. *Company*, L. R. 1, App. Cas. 662, 671. These plaintiffs complain solely of injury to a public right, and the damage liable to be suffered by the plaintiffs differs only in degree, and not in kind, from that liable to be suffered by the rest of the community. *O'Brien* v. *Railroad*, 17 Conn. 372, 376; *Seeley* v. *Bishop*, 19 Conn. 128, 135; *Harvard College* v. *Stearns*, 15 Gray 1.; *Brayton* v. *Fall River*, 113 Mass. 218; *Blackwell* v. *Railroad*, 122 Mass. 1; *Houck* v. *Wachter*, 34 Md. 265—*S. C.*, 6 Am. Rep. 332; *San José Ranch Co.* v. *Brooks*, 74 Cal. 463; *Clark* v. *Company*, Sup. Ct. Wis., Jan. 31, 1888, 36 N. W. Rep. 326; *Chicago* v. *Association*,

102 Ill. 379—*S. C.*, 40 Am. Rep. 598–600.  The law is clearly stated in the concise opinion of *Gray*, C. J., in *Blackwell* v. *Railroad*, 122 Mass. 1, where it was held that no action lies to recover damages for the obstruction of a navigable stream by the building of a bridge across the same, whereby the owner of a parcel of land and a wharf above the bridge is prevented from coming to the wharf from the sea in vessels, although his wharf is the only one above the bridge used for business purposes, and he is thereby compelled to abandon the use of his wharf for such purposes, and to transport his goods by land at an enhanced expense.

In *Dover* v. *Portsmouth Bridge*, 17 N. H. 200, 215, 216, the question was raised whether the town of Dover, as the owner of wharves, could maintain a bill in equity to abate a bridge erected across navigable water below the wharves, and alleged to obstruct navigation.  The case was disposed of without an express decision on this point.  But *Parker*, C. J., said, ".  .  .  an individual could not maintain a bill for the abatement of a nuisance, even if the court has power to abate by injunction, unless he could allege some particular grievance beyond that sustained by the public generally.  .  .  .  As an owner of wharves, it does not appear that the plaintiffs sustained any injury by this bridge, other than such as is common to all other owners of property of that description affected by it; and it deserves consideration whether they sustained any such particular injury as entitles them to this mode of redress."

We comment briefly on some of the cases cited by the plaintiffs. In *Corning* v. *Factory*, 40 N. Y. 191, the defendants had infringed on the private right of the plaintiff as a riparian proprietor, viz., the right to have a stream flow in its natural channel along (*i. e.*, beside of) the plaintiff's land.  See 204.  In *Lane* v. *Newdigate*, 10 Ves. 192, the decree was made in enforcement of a contract between the parties; the defendant was restrained from doing acts contrary to his covenants in a lease to the plaintiff.  In *Georgetown* v. *Company*, 12 Pet. 91, the bill was dismissed.  So the bill was dismissed in *Bigelow* v. *Company*, 14 Conn. 565 ; and the general drift of the opinion in the latter case seems adverse to the present plaintiffs.  In *Frink* v. *Lawrence*, 20 Conn. 117, the defendants were about to entirely obstruct access by water to the north side of the plaintiff's wharf, and thereby infringe a private right.  In *Pennsylvania* v. *Company*, 13 How. 518, 587, 588, we call attention to the dissenting opinion of *Taney*, C. J.  We also note the fact, stated in the majority opinion (see 566), that there was then no remedy by indictment under the laws of the United States for such a public nuisance.  As to the Wisconsin cases cited by the plaintiffs, see comments in the recent opinion of that court, 36 N. W. Rep. 326, 328.  Even if the plaintiffs had averred such peculiar injury as would entitle them to maintain an action at law for damages (*e. g.*, that their land was flowed by the dam), it would not follow

that they could maintain this bill in equity.  The weight of New Hampshire authority, as we understand it, is decidedly against the maintenance of a bill in equity to restrain or abate an alleged nuisance, until after the right has first been established in a suit at law (where there would, of course, be a trial by jury upon all questions of fact).  See *Burnham* v. *Kempton*, 44 N. H. 78, 94, 95, 97, 101; *Eastman* v. *Company*, 47 N. H. 71, *p.* 78; *Perkins* v. *Foye*, 60 N. H. 496;—see, also, *Parker* v. *Company*, 2 Black 545, 552, 553.

The same doctrine is strongly sustained by the decisions of the English courts of equity, prior to recent legislation in that country. Thus, in *Motley* v. *Downman*, 3 Myl. & Cr. 1, 14 (a trade-mark case), Lord *Cottenham* said,—" I can hardly conceive a case in which the court will at once interfere by injunction, and prevent a defendant from disputing a plaintiff's legal title."  This is perhaps the remark referred to in 1 Hem. & Miller, 574, as Lord *Cottenham's* well known *dictum*, ' that there shall be no perpetual injunction without an action.' "  In *White* v. *Cohen*, 1 Drew. 312, 318, *Kinderley*, V. C., said,—" It is not disputed that the court cannot permanently restrain acts alleged to be a nuisance, until a court of law has declared that they do constitute a nuisance."  In *Dewhirst* v. *Wrigley*, Coop. Pr. Cas. 319, 327, Lord *Cottenham* said,—" . . . although it was right to continue the injunction, the Master of the Rolls ought, as in other cases where the court interposes its injunction to prevent nuisance, to have made provision for having the question between the parties tried at law." (The English practice has now been altered by the Statute of 25 and 26 Vict., *ch.* 52, known as " Sir John Rolt's Act.")  We do not understand that this case comes within any of the exceptions mentioned in *Burnham* v. *Kempton*, 44 N. H. 78.  The dam is already built; but if it were not, the mischief threatened by its erection is not practically irremediable, like the permanent filling up of a river channel with rocks and earth.  Nor is this a case of immediate danger to the health or safety of the community, such as the case of a slaughter-house or powder-house in a populous neighborhood. The damage liable to be caused by the destruction of the dam may be offset against the damage liable to be caused by its maintenance; and the damage to either party would seem susceptible of pecuniary compensation.  Whether the dam in its present form constitutes an infringement of the public right of passage is a question of fact, as to which there is no admission to estop the defendants.  The very utmost a court of equity could be expected to do, if the dam were still in the process of erection, would be to grant a temporary injunction, pending a jury trial.  See *Ingraham* v. *Dunnell*, 5 Met. 118, 126, 127; *Burnham* v. *Kempton*, 44 N. H. 78, 97.

" Where an injunction is granted without a trial at law, it is usually upon the principle of preserving the property until a trial at law can be had.  *Swayne*, J., in 2 Black 552.  See, also,

*Woodbury*, J., 9 How. 28, 29. But in the present case the application for the injunction is not intended to be merely auxiliary to a proceeding at law. The entire and final remedy is sought in a court of equity. And, moreover, the alleged nuisance already exists in a completed form. These plaintiffs can hardly claim a more favorable rule than that laid down by the supreme court of Maine: " When the alleged nuisance is prospective and threatened, a court of equity may interfere to prevent its being brought into existence. When what is claimed to be a nuisance already exists, the general rule is, that the fact that it is a nuisance must be established by a suit at common law before a court of equity will interfere to abate." *Appleton*, C. J.. in *Varney* v. *Pope*, 60 Me. 192, 194, 195.

The foregoing discussion as to the procedure in a case of a private suit in equity for a public nuisance is, however, entirely unnecessary in this case. The plaintiffs have no right to maintain such a suit; they have, at present, no private remedy at law or in equity. The only remedy against these defendants is by a public proceeding, in the name of the state or of the attorney-general; and in such proceeding, whether by indictment or by bill in equity, the defendants have a constitutional right of trial by jury.

When, and in what cases, is there a right of trial by jury under the New Hampshire constitution of 1792? We are not obliged to rely on the constitutional guaranty of trial by jury in criminal cases. Bill of Rights, Art. 15. We may safely concede for the moment, that the public prosecution for an alleged public nuisance, though criminal in form, is civil in substance, and that, hence, the case falls under Art. 20, relating to trial by jury in civil cases, which reads as follows:

"Art. 20. In all controversies concerning property, and in all suits between two or more persons, except in cases in which it has been heretofore otherwise used and practised, and except in cases in which the value in controversy does not exceed one hundred dollars and title of real estate is not concerned, the parties have a right to trial by jury; and this method of procedure shall be held sacred, unless, in cases arising on the high seas and such as relate to mariners' wages, the legislature shall think it necessary hereafter to alter it."

Under this article, trial by jury is the rule, " and trial without jury the exception." The burden of proof is on the plaintiffs, claiming the benefit of an exception, to bring the case fully within the exception. " If the question is left in doubt, that doubt must be resolved in the defendant's favor." The exception of " cases in which it has been heretofore otherwise used and practised" refers to cases " used and practised" in New Hampshire, and not to cases " used and practised" elsewhere. This is the natural meaning of the language, and is the only construction which does not involve serious difficulties. " It can scarcely be supposed that the founders of the New Hampshire constitution intended to make so radical a

change in their legal procedure as to deprive a party of a jury trial, if it should appear that, although trial by jury had, in a particular case, been used and practised in New Hampshire, a contrary practice prevailed in England or elsewhere. Yet such would be the logical deduction if the wide construction of the excepting clause, now objected to, shall be held the true one."

"If 'heretofore used and practised' meant used and practised anywhere, or even generally, the power given in Article 20 to the legislature to dispense with a jury, if it saw fit, in cases arising on the high seas and relating to mariners' wages, was superfluous. Admiralty powers already existed in England and in other states." (The foregoing quotations are taken, in substance, from the argument of the defendant's counsel in *Dole* v. *Wooldredge*, 142 Mass. 161, 174, 175. The case went off on the ground that the defendant had waived his right, if he had any; but the court pronounced the defendant's argument "excellent.") *C. Allen*, J., 142 Mass. 178. The whole difficulty in determining in what cases parties have a constitutional right of trial by jury "would seem to lie in settling the historical question as to what cases were, and what cases were not, tried by jury before the adoption of the constitution." Ald. Eq. Pl. & Pr. 161.

The answer to this "historical question" would seem decisive here. Probably no intelligent lawyer has ever supposed that, up to 1792, any other remedy than by indictment had ever been enforced in the case of an alleged public nuisance, or that any other tribunal than a jury had ever passed upon the facts in such a case. The remedy by indictment was then, as now, efficacious. Judgment could be given, not only for the punishment of the offender, but for the abatement and removal of the nuisance. 1 Bish. Cr. L., 7th ed., s. 1079 ; 2 *ib.*, s. 1285.

The maintenance of a bill in equity by the attorney-general to restrain a public nuisance was then almost an experiment in England. The instances of it were said, nineteen years later, to be "very confined and rare;" and, more than forty years later, it was said that the jurisdiction of courts of equity over nuisances by injunction "is of recent growth, has not till very lately been much exercised, and had at various times found great reluctance on the part of the learned judges to use it, even in cases where the thing or the act complained of was admitted to be directly and immediately hurtful to the complainant." Lord *Brougham*, Chancellor, in *Earl of Ripon* v. *Hobart*, 3 Myl. & K. 169. Chancellor *Kent*, in 1817, evidently regarded equity jurisdiction over public nuisances as a very doubtful matter. See 2 Johns. Ch. 381. In 1842, the supreme court of Connecticut, speaking of the practice in the English courts of equity of entertaining informations at the suit of the attorney-general for the purpose of abating public nuisances, said,—"That mode of proceeding has been, however, hitherto unknown here ; and whether it would be tolerated in any

case, it is unnecessary to consider." *Bigelow* v. *Company*, 14 Conn. 565, *p.* 579.

Does any one believe that this equity jurisdiction, then so hesitatingly assumed and so rarely exercised in England, had ever been used and practised on in New Hampshire before 1792? Or, to put the question in another form, Does any one believe that the members of the constitutional convention of 1791 intended to except cases of alleged public nuisance from the general constitutional provision requiring trial by jury?

Suppose, however, that the framers of our constitution intended to adopt the entire English equity practice of that day, and hence must be regarded as excepting from the right of jury trial all equity cases where a jury trial was not allowed by the then existing English practice: the result still remains that these defendants are entitled to a jury trial. They would then have been held entitled (as we shall presently show) to such a trial if proceeded against in the English chancery by bill in equity in the name of the attorney-general. They are, therefore, entitled to such a trial when proceeded against here in that manner. We are aware that this court has said, " In proceedings in equity, the parties have no constitutional right of trial by jury." *Bellows* v. *Bellows*, 58 N. H. 60. But the court could have intended only to state this doctrine as applying to the great bulk of equity cases. The general proposition thus enunciated was undoubtedly founded on the historical fact that a jury trial was not requisite in the great majority of equity cases. But when we find it to be also an historical fact that there were certain classes of cases in equity where a jury trial was then invariably had, it is impossible to maintain that the constitution did not intend to preserve a jury trial in those classes of cases. Such cases are triable by jury, because they are not " cases in which it has been heretofore otherwise used and practised," and hence do not fall within the constitutional exception.

We affirm that in 1792 it was the invariable practice of English courts of equity to require the question of fact to be tried by jury before granting a permanent injunction against an alleged public nuisance which did not involve an invasion of soil of which the fee was in the crown. A temporary injunction might be granted pending the jury trial, but no permanent injunction issued until after such trial. The court of exchequer sometimes granted permanent relief without a jury trial; but this was only in cases where the act complained of was a violation of the proprietary rights of the crown, an encroachment upon soil of which the fee was in the crown. The soil in tidal rivers, the seashore between high and low water-mark, and the soil of the harbors belonged to the crown. Gould Waters 7, 8.

A violation of or encroachment upon this soil of the crown was called a purpresture, while an act merely obstructing the public right of passage was called a nuisance. Of course, the same wrong-

ful act might be an invasion of both the *jus privatum* and the *jus publicum:* the same structure might be both a purpresture and a nuisance,—a purpresture, because it encroached on the soil belonging to the crown ; a nuisance, because it obstructed the public right of passage over that soil. In such a case the injury to the rights of the king and the rights of his subjects might be redressed in the same proceeding. And in this class of cases the court of exchequer, which had jurisdiction of suits for property belonging to the crown, seems to have granted permanent relief without a jury trial. But when the alleged offence consisted simply in obstructing the public passage, and did not involve an invasion of the proprietary right of the crown, the case was not finally disposed of until after a jury trial. To prove the existence of this distinction between the two classes of cases, and also to prove that a jury trial was invariably had in the latter class, we may safely rely on the testimony of Lord Chancellor *Eldon,* given in 1811, in his opinion in *Attorney-General* v. *Cleaver,* 18 Ves. 211, 217, 218 :

"The instances of the interposition of this court upon the subject of nuisance being very confined and rare, more is, I believe, to be collected from what has been done in the court of exchequer, upon discussion of the right of the attorney-general, by some species of information, to seek, on the equitable side of the court, relief as to nuisance ; and, if I may use those terms, preventive relief. The case cited by Lord *Hardwicke* as having occurred before Lord *King,* was an information here, by the attorney-general, against a public nuisance by stopping a highway. Analogous to that there have been many cases, in the court of exchequer, of nuisance to harbours, which are a species of highway ; and, if the soil belongs to the crown, there is one species of remedy for that : the crown may abate the obstruction, as it is upon the king's soil. Where it is not upon the king's soil, but merely a public nuisance to all the king's subjects, though the suit may be in the same form, the law is laid down in treatises, particularly by Lord Hale, *De Portibus Maris,* that upon the ground of a public nuisance, and not as an obstruction upon the king's soil, it is a question of fact, which must be tried by a jury ; and, though the suit may be entertained, the court would be bound to try the fact by the intervention of a jury." 18 Ves. 217, 218.

The same principles are laid down in 2 Sto. Eq., *s.* 923 : "If the soil belongs to the crown, there is a species of remedy for the purpresture above mentioned for that. If the soil does not belong to the crown, but it is merely a common nuisance to all the public, an information in equity lies. But the question of nuisance, or not, must in cases of doubt be tried by a jury, and the injunction will be granted, or not, as that fact is decided." So in *Attorney-General* v. *Company,* 2 Green Ch. 136, 142, *Vroom,* Chancellor, said,—"The fact whether it be a nuisance or not is proper to be tried by jury, whether the proceeding be in this court or else-

where; . . ." (These authorities far outweigh the inconsiderate statement of *Harlan*, J., in *Mugler* v. *Kansas*, 123 U. S. 623, 673.) The cases where the court of exchequer has granted permanent relief without a jury trial belong to the class we have referred to, viz., where the alleged public nuisance was also an invasion of the proprietary rights of the crown. Thus, *Attorney-General* v. *Richards*, 2 Anst. 603 (decided about 1795), was an information to abate certain buildings erected by the defendant between high and low water-mark in Portsmouth harbor. The decision was put upon the ground " that the soil is the property of the crown." *Macdonald*, C. B., said, 615, 616,—". . . it is contended that this court cannot give such a decree, or at least not without the intervention of a jury, the question of nuisance being, as laid down by Lord Hale, a question of fact and not of law. That may be where the question is of nuisance only, and the evidence doubtful. But the cases cited, and those which Lord Hale has given us in the treatise *De Portibus Maris*, clearly prove that where the king claims and proves a right to the soil, where a purpresture and nuisance have been committed, he may have a decree to abate it. . . . Supported by such authority, we do not hesitate to declare that the soil is the property of the crown; and of course to decree that these buildings be abated."

We call particular attention to the elaborate comments of Chancellor Kent on the above decision. 2 Johns. Ch. 381–383. *Attorney-General* v. *Burridge*, 10 Price 350 (where the question of fact was sent to a jury, but such a course was said to be unnecessary if there was no reasonable doubt), was an " information by English bill" on account of an obstruction in Portsmouth harbor, where the soil belonged to the crown.

*Bond's Case*, More 238, decided in the Exchequer 29 Elizabeth, is explainable on the same ground. The alleged nuisance in that case (a pigeon-house) was erected on crown land, the defendant being tenant for years of a parcel of a manor which belonged to the queen. *Attorney-General* v. *Forbes*, 2 Myl. & Cr. 123, was heard on demurrer; and no question was made as to the mode of ultimate trial of the facts. In *Attorney-General* v. *Johnson*, 2 Wils. Ch. 87, a temporary injunction was continued until after the trial of a pending indictment. In *Attorney-General* v. *Cohoes Co.*, 6 Paige 133, the wrongful act complained of was committed upon an embankment and lands belonging to the state, forming part of the Erie and Champlain canals.

It is very clear that the present case is not a case of purpresture, or invasion of the soil of the state, like the cases decided in the Exchequer, and cited above. The bed of the Connecticut river at Lebanon and Norwich belongs to the riparian owners, and not to the state. The doctrine of private ownership of the soil " has been held applicable to the Connecticut river above the tide, in Connecticut, Massachusetts, and New Hampshire . . ." Gould

Waters, *s*. 56, *p*. 118; *Kimball* v. *Schoff*, 40 N. H. 190. It follows, that if the bill in the name of the attorney-general is to take the same course it would have taken in an English court of equity in 1792, no permanent relief can be granted until after a trial of the facts by a jury.

If the foregoing views are correct, it is clear that, before recent statutory changes in the law of procedure, this controversy could not have been constitutionally decided adversely to the defendants until after a jury trial. In 1867, upon the revision of the statutes, an amendment was enacted expressly giving the court equity jurisdiction in cases of nuisance—G. S., *c*. 190, *s*. 1; and in 1885, *c*. 87 was passed, providing as follows: "Section 1. Any legal right, public or private, infringed by a change in the water level of any natural lake or pond, and the water-rights of riparian proprietors on any stream, may be ascertained and enforced in a constitutional manner on a bill in equity without ascertainment of the right by a suit at law, and rights of boating, fishing, and navigation may be enforced on a bill in equity brought by the attorney-general in the name of the state." Do these enactments have the effect of depriving the defendants of the constitutional right of trial by jury which they previously had? They do not, for the short reason that such a result is beyond the power of the legislature. If they can change to a certain extent the form of procedure, still they cannot take away the constitutional right of trial by jury. "The statute has changed the mode of procedure, but it would be trifling with the constitution to hold that, by changing the forms of procedure, the substantial rights declared by it can be taken away. In all controversies which are within the purview of that article of the declaration of rights, the 'method of procedure' of a trial by jury must be held sacred, whatever the other forms of procedure may be." *Field*, J., in *Powers* v. *Raymond*, 137 Mass. 483, 486;—see, also, 143 Mass. 545; *Coal Co.* v. *Snowden*, 42 Pa. St. 488. We must, however, do the legislature the justice to say that we do not believe that either of these statutes was designed to take away trial by jury. Indeed, the phraseology of the statute of 1885 ("in a constitutional manner") tends to show that the legislature were aware of the constitutional right, and did not intend to disturb it.

Statutes are, if possible, to be so construed as not to be repugnant to the constitution. Bish. Wr. L., *s*. 90. The statute of 1885 is to be construed as meaning that a court of equity should proceed in a constitutional manner, and allow a jury trial wherever it would have been allowed before the passage of that statute. In other words, the jurisdiction thereby conferred on the court of equity is subject to the implied provision that a jury trial is to be allowed wherever it is a matter of constitutional right. This principle of construction was applied in *Gage* v. *Ewing*, 107 Ill. 11. If we should admit that the defendants are bound to furnish reasonably convenient facilities for the passage of logs, still it is not required to

provide the same facilities as existed before the erection of the dam. *Foster* v. *Company,* 79 Me. 508. Nor are the defendants under obligation to provide a way for the passage of logs over the dam, better than would be afforded by the natural condition of the river unobstructed by the dam. The plaintiffs' right of passage is to the natural flow of the river as it was before any improvements by the defendants, or by any other parties under whom the defendants claim. A mill-owner is not under legal obligation to furnish any public passage for logs over his dam or through his mills at any time when the river at such place, in its natural condition, does not contain water enough to be floatable if unobstructed by mills, although the river is generally of a floatable character. *Pearson* v. *Rolfe,* 76 Me. 380. Even if the defendants are bound (which we do not admit) by the restrictions in the charter of 1807, the foregoing propositions would still be applicable. It is clear that the erection of the dam must necessarily cause *some* obstruction and inconvenience in the passage of lumber. The proviso in the act of 1807 (if considered as annexed to the charter of 1848) must be construed as prohibiting only the erection of such a dam as would unreasonably impede the passage of lumber, and not as requiring that lumber should be permitted to pass in precisely the same manner as before the erection of a dam. The opposite construction would render the grant of the right to erect a dam utterly nugatory ; and such a repugnant construction is not to be adopted.

*Jeremiah Smith,* for the defendants ;—second brief. The brief already furnished by the defendants related chiefly to the question of the right of trial by jury. The principal purpose of the present brief is to offer some suggestions as to the rules of law to be applied on the trial ; especially in reference to the rights of the defendants under their charter granted in 1848, and amended in 1881. Laws of 1848, *c.* 647 ; Laws of 1881, *c.* 183. The material portions of the charter are as follows:

" Laws of 1848. Chap. 674. An act to incorporate the White River Falls Corporation. Approved June 23, 1848.

" Section 1. *Be it enacted,* etc., that James Harris, Rufus Choate [and others], their associates, successors, and assigns, be and they are hereby made a body politic and corporate by the name of the White River Falls Corporation, for the purpose of making and maintaining a water-power and manufactories at White River falls on Connecticut river ; said water-power to be used by said corporation, or leased and conveyed to others, to be used for and in the manufacture of wool, cotton, wood, iron, and other metals and materials ; and for these purposes said corporation may make and establish all necessary rules, regulations, and by-laws, and shall have, use, and enjoy all the rights, powers, and privileges necessary and proper to carry these objects into full effect.

"Sec. 2. [Relates to property and capital stock.]

"Sec. 3. Said corporation is hereby authorized and empowered to make and maintain all such works as may be necessary and proper to carry into effect the objects aforesaid, on and across the Connecticut river, in any suitable place or places at White River falls, from the head thereof at the upper bar to the foot of the same at the Phelps bar, so called, and to make and maintain all such canals and slips as may be necessary and proper for the purpose aforesaid. *Provided,* That this grant shall not be held or construed to impair any rights, powers, and privileges heretofore granted by the legislature of this state, within the limits aforesaid.

"Sec. 4. Said corporation is hereby authorized and empowered to purchase, hold, and enjoy all the corporate and other rights, powers, and privileges heretofore granted and now enjoyed within the limits of this grant, subject to all the duties and liabilities now legally binding on said corporate rights, powers, and privileges."

"Laws of 1881. Chapter 183. An act to change the name and amend the charter of the White River Falls Company, passed at the June session, 1848. Approved July 21, 1881.

"Section 1. That the name of said corporation shall be the 'Olcott Falls Company,' instead of White River Falls Company as provided in said charter, and said corporation is hereby authorized to improve the water-power on the Connecticut river in the town of Lebanon in this state, and carry on such various manufactures as it may from time to time desire."

Except so far as restrained by the United States constitution, the state of New Hampshire possesses the power to authorize the obstruction of any navigable river within its limits. Every sovereign state has the power completely to obstruct the public passage over a public water-way. No private right of property is invaded by such governmental action, which is merely a public regulation of a public right. See *Lord,* J., in *Thayer* v. *Railroad,* 125 Mass. 253, 257; and compare *Field,* J., in *Miller* v. *New York,* 109 U. S. 385, 393, 395. Public navigation may be impeded when and so far as the sovereign power shall judge that the public good requires it; and if one immediate object of the impediment appears to be the profit of the grantee, it is the right and duty of the sovereign power to determine whether the public interest be so connected with the private benefit as to authorize the grant. To hold otherwise would be to prevent the union of public and private interests for the accomplishment of any object. The legislature has repeatedly granted authority to erect obstructions, not for the purpose of ultimately increasing the facilities for navigation, but for the promotion of a common benefit in a manner entirely disconnected with navigation,—such as the construction of dams to create a

water-power for different manufacturing purposes, or to control and withdraw the water to supply aqueducts, and the building of bridges and causeways to facilitate intercourse by land. That a sovereign state may thus authorize the obstruction of water-ways within its limits is a proposition fully sustained by authority. *Dover* v. *Portsmouth Bridge*, 17 N. H. 200, 219, 220 ; *Shepley*, J., in *Parker* v. *Company*, 20 Me. 353, 357 ; *May*, J., in *Treat* v. *Lord*, 42 Me. 552, 560 ; *Shaw*, C. J., in *Davidson* v. *Railroad*, 3 Cush. 91, 106 ; *South Carolina* v. *Georgia*, 93 U. S. 4, 10 ; Gould Waters, *s.* 132.

The present case is not affected by the fact that the state of New Hampshire has become a member of the Federal Union ; nor by the fact that the Connecticut river is not wholly confined within the limits of the state, but, after leaving the southern border of New Hampshire, flows through two other states, and ultimately runs into the ocean. Undoubtedly congress has paramount power to legislate in reference to the navigation of this river, but until congress shall see fit to exercise this power, the state may legislate in respect to so much of the river as is within its territory. "The states are free to legislate with respect to their internal waters, so long as the superior power of congress remains dormant." Gould Waters, *ss.* 130, 132. "Until congress intervenes in such cases and exercises its authority, the power of the state is plenary." *Field*, J., in *Hamilton* v. *Railroad*, 119 U. S. 280, 281. This view is sustained by several decisions of the supreme court of the United States, as well as by a decision of our state court. *Willson* v. *Company*, 2 Pet. 250 ; *Pound* v. *Turck*, 95 U. S. 459 ; *Gilman* v. *Philadelphia*, 3 Wall. 713 ; *Escanaba Co.* v. *Chicago*, 107 U. S. 678 ; *Dover* v. *Portsmouth Bridge*, 17 N. H. 200, 224–230.

The doctrine of the above cited United States cases cannot be distinguished from the present, upon the ground that the streams there under consideration were wholly within the limits of the state whose legislation was in question. Those streams were all tributaries of larger bodies of water, flowing through other states, or flowing ultimately into the ocean. Either by themselves or by their connection with other waters they formed a continuous channel over which commerce might be carried on with other states or with foreign countries. Thus the rivers under consideration, in 2 Peters 250 and 3 Wallace 715, are both tributaries of the Delaware river, which flows into the Atlantic ocean. So the Chippewa river (95 U. S. 459, 462) empties its waters into the Mississippi, and the Chicago river (107 U. S. 678) runs into Lake Michigan. All of these streams are capable of being used, and were used, for interstate or for foreign commerce ; and yet it was held, that, in the absence of congressional legislation, the different states had the power to regulate or obstruct the navigation of so much of the water-ways as were within their respective borders. The doctrine thus held must apply to the right of New Hampshire

to legislate in regard to the Connecticut river. If the foregoing views are correct, it follows that the state had the power to authorize the defendants completely to obstruct the public passage of logs down the Connecticut river.

The next question is, How far has the state seen fit to exercise this power? Two views, representing opposite extremes, may be suggested. On the one hand, it may be claimed that the legislature, by the terms of the charter, intended to authorize the defendants completely to obstruct the public passage of logs; or, in other words, to build the dam without any reference to the convenience of log-owners. On the other hand, it may be claimed that the legislature intended to subject the manufacturing company to the implied condition that the dam should be so constructed as to afford precisely the same facilities for the passage of logs as existed before its erection. Neither of these extreme views is correct.

The true doctrine is, that the grant of the right to build a dam necessarily implies the right to cause *some* obstruction to the passage of logs; but that the grant must be regarded as subject to the implied limitation that the dam shall be so built as to create no obstructions except such as are reasonably necessary to the beneficial maintenance and use of the dam for manufacturing purposes In determining this question of reasonable necessity, a jury is to take into account not only the requirements and convenience of floatation, but also the requirements and convenience of manufacturing. The latter is a public use, as well as the former. See *Perley*, C. J., in *Great Falls Mfg. Co.* v. *Fernald*, 47 N. H. 444, 457, 458, 460, 461. The legislature, in granting the manufacturing charter, have, in effect, " surrendered some part of the public right [of passage] to the mill occupiers for the supposed public good." " A part of the public right is granted to them for a supposed gain which the public obtains through the use of mills." *Peters*, C. J., 76 Me. 386. The legislative act authorizing the obstruction of the water-way " is in fact only an appropriation by the public of a public right, to a certain extent, to another public use." The fact that the last public use must necessarily, to some extent, impair the former public use, must be presumed to have been known to the legislature.

The jury, in passing on the question of the reasonable sufficiency of the sluice-way, are not to proceed upon the theory that the public right of floatation is superior to the public right of manufacturing. The reasonableness of the sluice-way is to be determined, not solely in view of the interest and convenience of the log-owner, but in view, also, of the interest and convenience of the manufacturer. The most favorable view that can be taken for the plaintiffs is to say that the two rights are correlative, and that each operates as a limitation on the other. See *Rindge* v. *Sargent*, 64 N. H. 294. Here are two uses for which the waters of the state are

available,—floatation and manufacturing. Of these, the latter is by far the more beneficial to the state; and the plaintiffs cannot complain if it be treated by the legislature or the court as of at least equal importance with the former. See *Perley*, C. J., in *Great Falls Mfg. Co.* v. *Fernald, supra.* Neither use can be fully enjoyed without some diminution of or obstruction to the exercise of the other. The legislature has power to say how far either shall give way to the other. When they expressly authorize the exercise of one use, they certainly are not to be understood as implying that this use shall, in all cases of conflict, give way entirely to the exercise of the other use. To say that the log-driver is entitled to the same facilities for running his logs after the erection of the dam as he had before, is to say that the grant of the right to erect a dam is practically nugatory. A dam built in such a form as to preserve these facilities could hardly admit of beneficial use by a manufacturer. A similar claim has been disallowed by the supreme court of Maine. The court said,—" The right to erect a dam upon a non-tidal stream (and we are speaking of no others) is a clear statutory right. The legislature in creating it must have foreseen that its exercise would to some extent necessarily interfere with the use of such streams as highways. It is impossible to believe that the legislature intended that this newly created right should be burdened with the expensive if not impossible obligation of providing for log-drivers the same facilities for running their logs as they had before. If the legislature had so intended, it would have said so. The statute imposes no such obligation. It is silent upon the subject." *Walton*, J., in *Foster* v. *Company*, 79 Me. 508, 511. The court may, by judicial construction, engraft upon the statute a condition in favor of log-drivers to the extent of requiring mill-owners to furnish such facilities for the passage of logs as are consistent with the maintenance and reasonable enjoyment of the dam. But this is the utmost extent to which construction can go in limiting the legislative grant, which is, in terms, wholly unlimited.

We may safely concede that the power conferred by the charter of the manufacturing company must be so exercised as not to injure the interests of others more than is reasonably necessary to accomplish the purpose for which the charter was granted. In other words, an act of the legislature should not be construed as authorizing any unnecessary infringement of existing public privileges. But this concession only shows that the harm likely to be caused by the dam was intended to be mitigated, so far as reasonably consistent with its erection and beneficial use, and not that the dam was to be so built as to present no material obstruction to navigation. See *Pound* v. *Turck*, 95 U. S. 459, 461. The legislature must have understood that a dam across the Connecticut river at Lebanon, with any kind of a sluice-way which could be made, would to some extent interfere with the passage of logs.

The legislature may fairly be supposed to have taken into account the fact that the stream at the place in question, though in a certain sense navigable, is not capable of general or extended navigation. The only useful purpose for which the public use its waters is the floatation of logs. "A floatable stream is the least important of the classes of streams called navigable." *Peters*, C. J., 76 Me. 385. "The rights of the public are not superior to private rights, in streams that are merely floatable, to the same extent as in rivers which are capable of more extended navigation. In the latter the public right extends equally to all navigable portions of the river. But the right of floating is not paramount to the use of water for machinery, and the rights of the public and those of the riparian owners are both to be enjoyed with proper regard to the existence and preservation of the other." Gould Waters, *s.* 110. Even in the case of riparian owners who are manufacturing without any special legislative authority, the right to use the water for machinery is not treated as subordinate to the right to use it for the passage of logs. In a Michigan case (not directly in point here), *Cooley*, J., said,—"Flat river is a stream valuable for floatage, but not for navigation in the more enlarged meaning of the term. On such a stream it cannot be said that the right of floatage is paramount to the use of the water for machinery. Each right should be enjoyed with due regard to the existence and protection of the other." *Middleton* v. *Company*, 27 Mich. 533, 535. Of course there is a sense in which the right of passage is the dominant or superior right, "and necessarily so from the very nature of things;" "because it is a right that cannot be very well exercised unless the other right temporarily yields to it." "It is a right to move on or by." It may sometimes be necessary that the stationary obstacle shall yield temporarily, in order to give it a chance to go by. But the right of passage "is not an exclusive right." "Its use must not be usurping, excessive, and unreasonable." "It is not a privilege of moving at all times, with any quantities, and without any delay, and under all circumstances. The two rights come in conflict. One does not destroy the other. Each influences the other." *Peters*, C. J., 76 Me. 390, 391.

The plaintiffs cite *Hooksett* v. *Company*, 44 N. H. 106, as to the construction of the charter; but the point there under discussion was, whether the charter authorized the defendants to damage private property—a question not here presented. In that case, and in *Eastman* v. *Company*, 44 N. H. 143, it was intimated that the charter protected the defendants from an indictment for a nuisance in obstructing the river. See 44 N. H. 110, 160. Even if the charter had contained an express provision against impeding the passage of logs, the proviso could not have received a literal enforcement; for that would defeat the main intent of the charter. The Pennsylvania statute for the building of dams on a certain class of streams contained a proviso that the dams should not

obstruct or impede the navigation of the streams. In *Ensworth* v. *Com.*, 52 Pa. St. 320, 323, *Strong*, J., said, as to this proviso,—"A literal construction would make it contrary to the grant itself, all dams causing some impediment to navigation. The act of assembly must be so construed that it shall mean something; and clearly the legislature intended to authorize the erection and maintenance of some dams. But if the proviso is construed literally, either it or the grant must yield; and the rule is, that a proviso or exception contrary to a grant is void. Both, however, may stand if the proviso be construed reasonably in connection with the authority given, as it was manifestly understood by the legislature. A dam is not, then, unauthorized by the act of 1803 merely because it is in some sense an obstruction." In the present case, the law (the charter) authorizing the building of the dam contains no express limitation as to obstructing the passage of logs. Whatever limitation is held to exist, can exist only by implication. And there is no ground for implying a limitation of such a nature as to defeat the main object of the charter.

The plaintiffs are understood to assert that the defendants have purchased the corporate rights of another company, and that they therefore can claim no greater authority to obstruct the river than belonged to that other company. This construction is based on *s.* 4 of the charter of 1848, and on the assumption that the defendants have purchased the corporate rights granted in 1807 to Mills Olcott and others. No evidence has yet been produced to show that the defendants have purchased the rights of any earlier corporation; but if it could be proved that they have bought out the rights conferred by the charter of 1807, the consequence claimed by the plaintiffs would not follow. The purchase of the rights conferred by the charter of 1807 would not diminish or destroy the rights conferred by the charter of 1848.

The rights of the defendants in regard to maintaining their dam for manufacturing purposes are not affected by anything contained in *s.* 4 of the act of 1848. The rights granted to the defendants in 1848 are not limited or restricted to the rights granted to Mills Olcott and others in 1807. A careful consideration of the purposes and objects of the respective acts of 1807 and 1848 sustains this view.

The act of 1807 creates a navigation company. The act of 1848 establishes a manufacturing company. The objects and requirements of the two corporations are widely different, and the powers conferred on each corporation are essentially diverse. In order to prevent a possible conflict of rights between the manufacturing company and any earlier corporation, the manufacturing company is expressly authorized "to purchase, hold, and enjoy all the corporate and other rights, powers, and privileges heretofore granted and now enjoyed within the limits of this grant, subject to all the duties and liabilities now legally binding on said corporate

rights, powers, and privileges." This provision was not inserted for the purpose of limiting or nullifying the rights granted by the previous sections of the charter. It was not added for the purpose of lessening, but rather increasing, the powers and rights of the company. If *s.* 4 is construed as limiting the manufacturing corporation to those rights only which had previously been conferred on the navigation company, the result is that *s.* 4 nullifies the rest of the charter. The charter of 1848, in that view, would simply amount to changing the name of the navigation company. If the manufacturing company is, by this section, restricted to the rights which previously belonged to the navigation company, then the so called manufacturing company has no power to carry on the business of manufacturing, but must confine itself strictly to the business of a navigation company. A construction which involves such repugnancy between *s.* 4 and the rest of the charter ought not to be adopted, unless the language of the legislature is too explicit to admit of any other interpretation. *A fortiori*, this repugnant construction ought not to be adopted if it does not accord with the natural meaning of the statutory expressions. The phrase " duties and liabilities " would not ordinarily be understood as referring to the absence of authority or to the lack of corporate power. The phrase would be understood as referring, not to restrictions on authority, but to obligations of an affirmative nature, the affirmative performance of which is incumbent on the corporation. The act of 1807 does not say that the grantees are under " a duty or liability" not to obstruct the passage of logs. It simply says that the legislative charter does not give them authority to create such obstructions. Want of authority is in no proper sense " a duty or liability." The navigation company, if in existence in 1848, was probably subject to various affirmative " duties and liabilities,"— such as the duty to permit the passage of logs through its locks and canals upon the payment of such tolls as might be established by the legislature, and the duty to pay its debts. It is to " duties and liabilities" such as these that the language of *s.* 4 refers.

The charter of 1848 contemplates the possession by the manufacturing company of two classes of rights,—one class being the powers expressly granted by *ss.* 1 and 3, the other class being the powers originally conferred on the navigation company, and purchaseable by the manufacturing company under *s.* 4. It could not have been the legislative intention that the purchase of the latter class of powers should essentially curtail and practically annihilate the former class of powers, which are essential to carrying out the purposes of the corporation. By buying out the navigation company, the manufacturing company would acquire the right to do, for the purpose of improving navigation, no more than the old navigation company could have done. But the manufacturing company would not, by reason of such purchase, forfeit the right already conferred by their own charter to do certain other acts and

exercise certain other powers, in order to improve the water-power and carry on the business of manufacturing. The defendants cannot resist this suit on the ground that they were authorized under the act of 1807 to build the present dam for the purpose of improving the navigation; but they can defend on the ground that they were authorized, under the act of 1848, to build this dam for the purpose of using the water-power in manufacturing. Even if the original charter of 1848 is construed as restricting the manufacturing company to the authority previously conferred on the navigation company, it does not follow that the amended charter of 1881 must receive the same interpretation. The amendment of 1881 contains no reference whatever to the powers or duties of any other company. On the contrary, the act of 1881 confers on the defendant corporation authority (in terms entirely unlimited) "to improve the water-power on the Connecticut river, in the town of Lebanon in this state, and carry on such various manufactures as it may from time to time desire."

Whatever view may be adopted as to the preceding points, it is very clear that the defendants are not under legal obligation to provide a public way for the passage of logs over their dam, *better* than would be afforded by the natural condition of the river unobstructed by their dam. The plaintiffs' utmost right of passage can be only to the natural flow of the river or its equivalent. A mill-owner is under no legal obligation to furnish any public passage for logs over his dam at a time when the river at such place, in its natural condition, does not contain water enough to be floatable if unobstructed by mills, although the river is generally of a floatable character. *Pearson* v. *Rolfe,* 76 Me. 380. Rolfe had a quantity of logs in the river which he was unable in the dry season to drive over the dam at Pearson's mills, unless Pearson would shut down his mill gates, thereby suspending his own business of manufacturing until water enough should accumulate in his mill-pond to float the logs over. This Pearson refused to do, basing his refusal upon the allegation that the drift-way in the dam, without shutting down his working-gates, afforded all the facility for floating logs by his mills that existed in the river at that place in its natural state, as much as there would be provided his mills and all of his structures were entirely out of the way. *Held,* that, upon the facts as alleged by Pearson, his refusal was justified. If it be said that the log-owner is entitled to use the water raised by the mill-dam, the answer is that he is entitled to use it only "to get *down to* the dam, and not to get over or past it." The mill-owner is not bound to allow log-owners the use of his dam and mills " to create, not a natural, but an unnatural, flow upon the river." Would not the mill-owner " be permitted to remove his structure, leaving the river in its natural state "? " If he can do that, cannot he hoist his mill-gates at his pleasure for business purposes, allowing the water to pass his mills in manner and quantity equivalent, as near as may

be, to its ordinary condition and natural flow?" *Peters,* C. J., 76 Me. 387, 388.

We add, by way of supplement to our first brief, some suggestions as to the right of trial by jury. In the former brief, it was taken for granted that up to 1792 cases of alleged public nuisance were triable by jury. We are now indebted to the industrious research of Hon. W. L. Foster, counsel for the defendant in *State v. Saunders,* for positive proof that our assumption was well founded. Judge Foster has unearthed a provincial statute, enacted in 1718, the material portion of which is as follows:

"An Act for Prevention of Common Nusances arising by Slaughter-Houses, Still-Houses, &c., and Curriers.

" *Be it Enacted by His Excellency the Governour, Council, and Representatives, Convened in General Assembly, and by the Authority of the same,* That when and so often from time to time, as it shall appear, that any Slaughter-Houses for killing of Meat, Still-Houses, and Houses for Trying of Tallow, and Currying of Leather to become a Nusance, by reason of offensive and ill Stenches proceeding from the same, or otherwise hurtful to the Neighborhood; It shall and may be lawful to and for the Court of General Sessions of the Peace, within this Province, to cause inquiry to be made therein by a Jury, and to suppress such Nusance by prohibiting, and restraining the further use thereof for the exercise of either of the aforesaid Trades, or Mysteries; under a fine not exceeding *Forty Shillings* a month, to be to the use of the Poor of such Town where the offence is committed; or otherwise as in their discretion, they shall think fit, by causing the said Nusance to be removed or prevented; or any other Nusance to be inquired of in manner aforesaid."

It may, perhaps, be argued, that notwithstanding the above statute, the provincial court of appeals, composed of the governor and council, had a theoretical equity jurisdiction in cases of nuisance, and was entitled to proceed without a jury. But even this theoretical equity jurisdiction (which had long been practically obsolete) terminated sixteen years before the adoption of the present constitution, the court of appeals having been abolished in 1776. In 1792, and for sixteen years prior thereto, there was no court competent to try the question of nuisance without a jury; and, on the other hand, there was during all that time a court in which this question was triable by jury. It seems too clear for argument, that the constitution of 1792 was not intended to *lessen* the right of trial by jury as it then existed. If any particular class of controversies was then triable by jury, and not triable by any other method, it was intended to preserve the right of trial by jury, in that class of controversies. The constitution did not intend to deprive any person of the right to try a controversy by jury, if such a controversy was triable by jury, and only by jury, in 1792. " The

constitutional provision does not create, nor enlarge, nor restrict the right of trial by jury, but retains and preserves it inviolate in all those classes of cases, civil and criminal, in which it existed at the time of the adoption of the constitution." "As a constitution speaks from the time of its adoption, the fact of the right to jury trial which is ascertained to have existed at that time, must necessarily determine the meaning of the clause which recognizes and preserves that right." "The ultimate test and limit of the constitutional guaranty is to be found in a historical fact. . . ." Pomeroy's Notes to Sedgwick Stat. & Const. Law 486–488.

This principle is illustrated in *Baker* v. *Holderness*, 26 N. H. 110, 114, though that case was, so far as facts are concerned, the converse of the present case. The controversy there in question was one of a class which had been triable by jury up to 1786, and triable without a jury from 1786 to 1792. It was held, that the constitution did not reserve the right of jury trial in such cases, inasmuch as at the time of the adoption of the constitution, and for six years next preceding, it was not the use and practice to submit such a question to a jury. That case is the converse of this. At the time of the adoption of the constitution, and for at least sixteen years next preceding, it was the use and practice to submit to a jury the question of fact here raised. Hence the right of trying such a question by jury is preserved by the constitution.

This view does not necessitate the conclusion that there is a constitutional right of trial by jury in *all* equity cases. There is a large class of controversies over which the jurisdiction of equity is exclusive. In the absence of a court of equity, controversies of this class were not triable at all. To hold that such controversies are now triable in equity without a jury, does not amount to taking away a right of jury trial which existed in 1792, for, as to this class of cases, there was not at that time any method of trial whatever. Take, for example, a dispute as to whether a written contract shall be reformed by parol evidence: there was not in New Hampshire in 1792, nor since 1776, any process by which such reformation could be brought about; there was no court competent to try and determine such a question. No common-law court had jurisdiction over such a question, and there was then no court of equity. If, therefore, a court of equity to-day decides such a question without a jury, the defendant is not deprived of a method of trial which he would have had at the time the constitution was adopted. See *Stockbridge Iron Co.* v. *Company*, 102 Mass. 45, 48. But it is an entirely different matter to deny the right of trial by jury in the case of an alleged public nuisance. That question was triable in 1792, and was triable by jury. There was then, as now, a perfectly efficacious remedy by indictment or information. Judgment could be given in such proceeding for the abatement and removal of a nuisance. 1 Bish. Cr. L., 7th ed., *s.* 1079; 2d *ib.*, *s.* 1285.

If it be suggested, that the remedy thus existing in 1792 was criminal and not civil, we reply that the remedy by indictment or information for an alleged public nuisance, though criminal in form, is in substance a civil proceeding. In discussing the general subject of nuisance, Mr. Bishop says,—" The doctrine already mentioned, that a criminal proceeding may be in substance and effect civil, and be governed in a degree by the rules of civil suits, has its most apt illustrations in this department." 1 Bish. Cr. L., 7th ed., *s.* 1074. Thus, upon the trial of an indictment for obstructing navigation, evidence that the defendant's servant, in creating the obstruction, acted contrary to his master's orders is not admissible, although such evidence would constitute a complete defence in an ordinary criminal case. *Reg.* v. *Stephens*, L. R. 1 Q. B. 702. *Mellor*, J., said,—" It is quite true that this in point of form is a proceeding of a criminal nature, but in substance I think it is in the nature of a civil proceeding . . . The only reason for proceeding criminally is, that the nuisance, instead of being merely a nuisance offending an individual, or one or two individuals, affects the public at large; and no private individual, without receiving some special injury, could have maintained an action. . . Inasmuch as the subject of the indictment is not to punish the defendant, but really to prevent the nuisance from being continued, I think that the evidence which would support a civil action would be sufficient to support an indictment." L. R. 1 Q. B. 708–710. The original attempt to maintain a suit in the name of a private plaintiff cannot be sustained (see reasons stated in our first brief). The amendment making the attorney-general a plaintiff is all that gives any vitality to this proceeding. The suit must be maintained as a public proceeding in the name of the attorney-general, or not at all. Now, so far as form is concerned, the present proceeding could be regarded as either criminal or civil, just as the attorney-general might choose to elect. Without changing a single material allegation of fact, that official might call the complaint an information and have it entered on the criminal docket; or he might call it a bill in equity, and have it entered on the civil docket. In either event, there would be the same public prosecutor, the same question of public right, and the same defence. Does the right of trial by jury depend upon form, or upon substance? We find no fault with the present attorney-general; but we ask whether the right of trial by jury is dependent on the name which he may choose to affix to a complaint. Shall it be optional with the attorney-general, by selecting one of two substantially similar remedies, to deprive a defendant of trial by jury? Does the constitution mean that trial by jury is preserved in such cases only as may seem fit to future attorney-generals?

Suppose, however, it should be held that the constitution did not intend to make the New Hampshire practice of 1792 the test of the right to trial by jury, but, rather, the English

chancery practice prevailing at that date; suppose, in other words, that the constitution intended to deny the right of trial by jury in all cases where it was at that time denied by the English courts of equity : even this doctrine would not deprive the defendants of a jury trial in the present case. In our former brief we have shown that, in 1792, a jury trial was allowed by the English chancery court, as a matter of right, in this class of cases. Whether this allowance was founded on legal truth or legal error, is immaterial. It is enough for us that it was the practice then prevailing in those courts. It is safe to say, that our constitution was not intended to deny the right of trial by jury in New Hampshire in any class of cases where such right was then recognized and allowed in England.

*Jeremiah Smith*, for the defendants, orally. So far as equity cases are concerned, there are two constructions which the plaintiffs may seek to give to the words " heretofore otherwise used and practised," in the Bill of Rights. They may construe the phrase as referring either (1) to the actual practice in New Hampshire, or (2) as referring to the actual practice in the English chancery, which would presumably have furnished the rule for New Hampshire chancery practice if any had existed. We are ready to meet the plaintiffs on either ground. If the plaintiffs prefer to construe the phrase as referring solely to the actual equity practice in New Hampshire at and immediately preceding the adoption of the constitution, our answer will be very short. The burden is not upon us to show that it was the New Hampshire use and practice in 1792 to decide equity cases with the aid of a jury, but upon the plaintiffs to show that it was then the New Hampshire use and practice to decide such cases without a jury. It is for the plaintiffs to show that in equity suits for nuisances it was, in New Hampshire, in 1792, the practice not to allow a jury trial. This the plaintiffs have not shown ; and they cannot show it, the fact being that no equity suits whatever were brought in New Hampshire in those days. There was in New Hampshire, in 1792, no court professing or undertaking to exercise chancery jurisdiction. There had been no such court for at least sixteen years. It is a fact, proved beyond all question, that there had been no chancery practice in this state for at least fifty years prior to 1792 ; and it is highly probable that there had been none for a much longer period. Clearly, if the phrase " otherwise used and practised" is to be interpreted as including equity cases, it can have little or no effect or application unless we are to look to the practice then existing in the English chancery courts as the practice intended.

This latter position is the ground which the plaintiffs will probably adopt. They will say that equity as then administered in England was understood to form part of the common law of New Hampshire ; and that the use and practice of the English equity

courts furnished the measure of this exception to the constitutional guaranty of trial by jury. In other words, the claim is, that the constitution intended to deny the right of jury trial in equity cases, so far as that right was then denied by the existing equity practice in England. We will, for the purposes of argument, temporarily admit this claim ; and we propose, in a few minutes, to show that, even upon this construction of the constitution, these defendants are clearly entitled to a jury trial. But we desire first to note that the plaintiffs can have no possible ground for making any *larger* claim than that just stated. They cannot have the hardihood to contend that the New Hampshire constitution was intended to *lessen* the right of trial by jury. They cannot maintain that the constitution intended.to authorize the'denial of a jury trial in New Hampshire in any class of controversies where it was then invariably allowed in England.

The plaintiffs cite *Bellows* v. *Bellows*, 58 N. H. 60, where this court said,—"In proceedings in equity the parties have no constitutional right of trial by jury." It was probably sufficient for the purposes of that case for the court to state a general rule which they deemed applicable to the great bulk of equity cases, without stopping to enumerate the exceptions to that rule. But the court could not have intended to lay down this doctrine as applicable to those well defined classes of equity cases in which trial by jury was invariably allowed, as matter of right, under established equity practice.

There were, in 1792, at least two classes of equity cases where a jury trial was regarded as indispensable before the granting of a final decree (and these classes are entirely distinct from those cases in which an issue was granted as a matter of discretion). One class consisted of those cases in which a court of equity allowed an issue to be sent directly to a jury as a matter of right. Examples of this class are the issue *devisavit vel non*, and a certain issue relative to tithes. See Ad. Eq. 249; *Paine* v. *Hall*, 18 Ves. 475; 2 Dan. Ch., 3d Am. ed., 1088, 1089; *Clark* v. *Society*, 45 N. H. 335; Ad. Eq. 236; *Revel* v. *Fox*, 2 Ves. Sr. 269. The other class comprised those numerous cases where equity declined to take final action in aid of a legal right, until after the question of the existence of the alleged legal right, and also the question of its infringement, had been settled by a suit at law,—in which suit at law a jury trial was an indispensable incident. As to the practice in these two classes of equity cases, and the consequent result that parties in such cases have here a constitutional right to jury trial, we call attention to Judge Aldrich's work on Equity Pleading and Practice in Massachusetts 160, *et seq.* The learned author (*p.* 161) asks,—"How, then, can it be doubted that there are equity cases in which, under our constitution, either or both parties have a right to *demand* a jury trial?" He also asks (*p.* 163),—"Why, under our system of laws, which are so scrupulously careful to preserve the sacred right of trial by

jury, should not every party to a suit in equity be held to háve a *prima facie* right to have issues of fact tried by a jury?"

Does the present case fall within the class where a jury trial was had? How were controversies of fact arising in equity suits relative to the prevention or abatement of nuisances triable in England in 1792? Was it the use or practice to decide the facts without submission to a jury? We answer, that, where there was a serious controversy of fact, no permanent relief was granted until after a trial of the controverted facts by a jury. Temporary relief was sometimes granted, an interlocutory injunction was sometimes issued, before any jury trial had been had. But if there was any serious controversy of fact, no permanent injunction was issued, no final decree was made in favor of the plaintiff, until after an adjudication by a court of law; and in such adjudication a jury trial was a necessary incident. "Equity had no more than a qualified jurisdiction; the qualification being a preliminary trial at law."

In this class of cases an equitable remedy was invoked in aid of a purely legal right. "There is no such thing as an equitable nuisance." *Soltan* v. *De Held*, 2 Sim. N. S. 151, 152. In other words, the plaintiff's right to equitable relief depended upon the existence of a legal title or right. And the court of equity therefore declined to take final action until the plaintiff's right had been established at law. See Lord *Cottenham*, Chancellor, in *Harman* v. *Jones*, 1 Cr. & Ph. 299, 301. That the plaintiff had the alleged legal right, and that the defendant's action had violated or was about to violate the right, were propositions indispensable to the granting of final equitable relief; and if either proposition was seriously disputed, it was required to be established at law. See 2 Dan. Ch., 3d Am. ed., 1119. The practical result came about, that the question of fact was tried in the way in which a court of law tries disputed facts, *i. e.*, by a jury. In all ordinary controversies of fact, it is a necessary incident to proceedings at law that there should be the verdict of a jury before judgment.

This practice of delaying final action in equity until after a trial at law was gradually changed in England by legislation subsequently to 1850. In that country there is, of course, no constitutional impediment to such legislation, and we refer to it merely as explanatory of some late English decisions founded on these modern statutes. But it is worthy of note, that even in England the pendulum is now swinging back the other way, and that very recent statutes and rules of court have gone far to restore the practice of trial by jury in this class of equity cases. For more than a century prior to that change, the testimony of judges and text-writers is overwhelming to the effect that the practice was what we have stated. The applicant for permanent equitable relief was bound to establish at law the fact that a nuisance existed, or was about to be created. "This court," said Lord *Cottenham*, "will not take upon itself to adjudicate upon the question of whether this is a nuisance

or not: that must be ascertained in a court of law . . ." *Elmhirst* v. *Spencer*, 2 Macn. & G. 45, 50, 51. "The rule," said Lord *Kingsdown*, "I take to be clearly this: If a plaintiff applies for an injunction to restrain a violation of a common-law right, if either the existence of the right or the fact of its violation be disputed, he must establish that right at law." *Imp. Gas Co.* v. *Broadbent*, 7 H. L. Cas. 600, 612.

The injunctive equity "attaches only on an admitted or legally adjudged right in the plaintiff, admitted or legally adjudged to be infringed by the defendant. The existence of the right and the fact of its infringement must be tried, if disputed, in a court of law." Adams Eq. 217.

These English authorities as to the practice in such cases have been quoted with approval by this court, and have been followed in this state from the time equity jurisdiction was created, or restored, in 1832, down to the recent statute of 1885, of which we shall speak hereafter. See *Parker*, C. J., in *Dover* v. *Portsmouth Bridge*, 17 N. H. 200, 214; *Coe* v. *Company*, 37 N. H. 254, 263, 264; *Burnham* v. *Kempton*, 44 N. H. 78; *Eastman* v. *Company*, 47 N. H. 71; *Perkins* v. *Foye*, 60 N. H. 496.

In New Hampshire, where the same judges presided both in equity and at law, the substantial reason for sending a case to be tried at law was, that the facts might be tried by jury. We have said, and we now reassert, that the authorities clearly show the practice to have been as we state it. But it is also true, that upon this subject, as upon every other subject, there are authorities which, upon a superficial examination, are open to misapprehension. It seems, therefore, desirable to call attention briefly to some distinctions, which, if kept in view, will prevent confusion.

We must bear in mind that courts of equity, though not granting *final* injunctions in such cases until after a jury trial, can and do grant *temporary* injunctions to preserve the property and prevent irreparable damage during the litigation. Because equity will not grant final relief until after a jury trial, it does not follow that equity will not take jurisdiction of the application before a jury trial has been had. On the contrary, a court of equity may take jurisdiction of such a case, grant a temporary injunction, retain the case on the equity docket to await the result of a trial at law, and then, if the plaintiff obtains a verdict at law, issue a permanent injunction. A hasty reading of some judicial opinions might give rise to misapprehensions. In discussing the propriety of granting an injunction, judges have not always stated in express terms which kind of injunction they were talking about—temporary, or final. Nor have they thought it necessary always to state that a court of equity's taking jurisdiction of a case does not necessarily imply that the court will finally decide for itself all questions of fact which may be deemed material to a final settlement of the controversy. But if we look to the actual motion before the court, we shall generally

find that in cases where there were disputed facts, and there had been no trial at law, the application was only for a temporary injunction. And we shall also find that the danger of irreparable mischief was not regarded as furnishing ground for the granting of *final* relief without a trial at law. It simply furnished a reason for granting a temporary injunction and retaining the bill to await the result of the trial at law, instead of turning the plaintiff completely out of the equity court. The correct doctrine is clearly stated in the opinion of this court in *Burnham* v. *Kempton*, 44 N. H. 97. So the supreme court of the United States said,—" The true distinction in this class of cases is, that in a prospect of immediate injury by what is apparently a nuisance, a temporary or preliminary injunction may at once issue, but not a permanent or perpetual one till the title, if disputed, is settled at law." *Irwin* v. *Dixon*, 9 How. 10, 29; see, also, 28. On this subject we refer, also, to Gould Waters 694; Ad. Eq. 217, 218.

There are nuisance cases where final injunctions have been granted without any previous jury trial of the questions of fact; but the explanation is, that in those cases there were no disputed questions of fact for a jury to try. The facts were not in controversy, and the case either was too clear for argument, or else turned on a question of law which would not have been submitted to a jury even if the case had been pending in a court of law. Thus, in *Lake Company* v. *Worster*, 29 N. H. 433, the bill was taken *pro confesso*, in consequence of the defendant's failure to file an answer. Hence there was no occasion to discuss the proper method of trying disputed questions of fact, or of establishing legal title. So *Webber* v. *Gage*, 39 N. H. 182, came before the court with the facts admitted. The defendant there demurred to the bill, and the demurrer of course operated as an admission of all the plaintiff's material averments.

Again : In various cases where there was no formal admission, a comparison of the allegations of the bill and answer, or even the most superficial statement of the position of counsel, rendered it perfectly apparent that there was no serious dispute of fact in the case ; it being clear either that there was no valid defence, or that the controversy turned entirely on matter of law, such as the construction or constitutionality of a statute, or the interpretation of a deed. Take, for instance, the often cited case of *Gardner* v. *Newburgh*. In that case Chancellor *Kent* said,—" There is no need, from what at present appears, of sending the plaintiff to law to have his title first established." 2 Johns. Ch. 162, 165.

*Wilcox* v. *Wheeler*, 47 N. H. 488, is an instance of a case where the defence set up in the answer raised no material question, except as to the legal construction of a deed. So in *Woollen Mills* v. *Tillman*, 2 Barb. Ch. 9, 19, 20, the complainants claimed certain water rights "under a recent conveyance from the defendant himself." *Walworth*, Chancellor, said,—" It is only where the right of the

complainant to the privilege claimed admits of doubt, that the court requires him to establish his right at law previous to the granting of an injunction. Here is no fact to be tried at law, to establish the right of the company to a participation in the use of the matters in question, in conformity with the terms of the grant from the defendant, except the simple fact of the due execution of the deed; as to which fact there is no question raised." And in *Lyon* v. *McLaughlin*, 32 Vt. 423, 426, *Barrett*, J., said, "In the present case there is no occasion to resort to a court of law for any purpose. The bill sets forth a clear right in the orators. The answer admits all the facts, but rests for defence on a question of construction only. That question can as well be determined in a proceeding in the court of chancery as in a court at law."

So, too, cases may occur where, although the facts are nominally in dispute, the court can see that a certain result is inevitable, and that a verdict for the plaintiff would be ordered by the judge presiding at the trial. "Where it is obvious that the finding of a jury can be in no other way but one;" where the court is of opinion that, were the evidence offered by the defendant presented to a jury, they would not be justified in finding the fact to be as claimed by the defendant; or that they would be constrained by some presumption or other legal doctrine to find the fact as claimed by the plaintiff;—in these and like instances a court of equity will not send the cases to a court of law in order to go through the idle ceremony of having a foregone conclusion certified back. Where the fact is seriously disputed, and the court can see that it is a matter of doubt, the case will be sent to a court of law. But if it is conceded that all the evidence which can be supplied is already adduced in the cause, is already before the court, and the court is of the opinion that upon this evidence a jury would not be justified in sustaining the defence set up, then the court will not send the case to a jury merely in order to have a verdict ordered at the trial. Thus, in the *Wheeling Bridge Case*, 13 How. 568, the fact that the bridge obstructed navigation was ascertained by measurements about which there could be no dispute. The height of the bridge, of the water, and of the chimneys of the steamboats, were facts not open to any real controversy. The court said,—"If the obstruction exists, it is a nuisance. To ascertain this a jury is not necessary. It is shown in the report by a mathematical demonstration. . . . A jury in such a case could give no aid to the court nor security to the parties."

For the purposes of the present question, it is entirely immaterial whether the universal practice of courts of equity in 1792 was scientifically correct or not. It is immaterial whether the then existing practice was founded on legal truth or legal error. It is enough for the present purpose that it was the practice then prevailing in the courts.

Thus far we have been speaking of the English equity practice

in 1792 in private equity suits for nuisance. We have now to consider the practice of the English court in public suits for nuisance, in bills in equity filed by the attorney-general. Instances of this proceeding were then rare; but it was the universal understanding, that, whenever this mode of procedure was resorted to, the disputed matters of fact must be tried by a jury before the granting of a permanent order of injunction or abatement.

So far we have been discussing this branch of the case as though there was no actual "use and practice" in New Hampshire in 1792, as to the method of trying the facts in a public proceeding to abate a nuisance; and we have been proceeding upon the supposition that the question whether a jury trial is to be allowed should be determined by looking at the then existing English chancery practice. And we think we have shown, by the highest possible testimony, that a jury trial would have then been requisite before a final decree could have been made by an English equity court.

But this inquiry into the English equity practice in cases of public nuisance was probably unnecessary. Even if it should be thought that Lord *Eldon* was mistaken, and that the practice in the court of chancery was exactly contrary to what the Lord Chancellor said it was, there is still a firm foundation on which we can rest our claim to a jury trial in this public proceeding. In this particular matter there undoubtedly was a settled "use and practice" in New Hampshire in 1792, and by that "use and practice" the questions of fact in public proceedings to abate nuisances were triable by jury. We had then no equity court, and hence no public equity suits to abate public nuisances. But we had the same thing in another form under another name. There was then, as now, a perfectly efficacious remedy at law for the abatement of public nuisance, viz., the remedy by indictment or information. In such a proceeding, judgment can be given for the abatement and removal of the nuisance. 1 Bish. Cr. L., 7th ed., *s.* 1079; 2 *ib.*, *s.* 1285. Such a proceeding differs from the present proceeding (a bill in equity in the name of the attorney-general) only in name or form, and not in substance. The remedy by information, though criminal in form, is in substance a civil proceeding. *Reg.* v. *Stephens*, L. R. 1 Q. B. 702, 708–710; 1 Bish. Cr. L., 7th ed., *s.* 1074.

In 1792, and for at least sixteen years prior thereto, there was no court competent to try the question of public nuisance without a jury; and, on the other hand, there was, during all that time, a court in which this question was triable by jury. How then can this question now be tried without the defendants' having a constitutional right to a jury? Those jurists who maintain that the constitution does not extend or enlarge the right of trial by jury, all admit that the constitution does at least preserve and guarantee this right in all controversies which it was the common practice to try by jury at the time of the adoption of the constitution.

We have been arguing that, even if there is no constitutional right of jury trial in equity causes in general, yet the case at bar stands on exceptional grounds and comes within the constitutional guaranty. We have contended that, although there may not be a constitutional right of jury trial in *all* equity cases, yet there is such a constitutional right in equity cases like the present. Now we propose to take a much broader ground, viz., that there is a constitutional right of jury trial in equity cases generally.

This question has been decided both ways by the courts of this state. There was no opportunity to raise the question until after the passage of the act of 1832, which was the first statute conferring general equity jurisdiction on our supreme court. That act was drawn by the late Hon. Joel Parker, and the question as to the right of a jury trial in equity was first raised when Judge *Parker* was chief-justice, and was decided in an opinion given by him. In 1838, in *Marston* v. *Brackett*, 9 N. H. 336, 349, it was held that a defendant in chancery has a constitutional right to have matters of fact tried by a jury. Nearly forty years later, in 1876, the contrary doctrine was held in *Bellows* v. *Bellows*, 58 N. H. 60. In neither opinion is there any statement of reasons. The later opinion refers to and is supported by various *dicta* of Judge *Ladd* in 55 and 57 N. H., but it does not refer to any decision in point. In view of the immense importance of the question, the conflict of judicial decisions, and the absence of any authoritative statement of the argument in favor of the later doctrine, we have felt at liberty to argue the matter at the present time. The constitution has not, like the General Laws, been reënacted as a whole, either in 1877 or 1889, and hence there is no ground for arguing that this clause must necessarily bear the latest judicial construction.

It is due to Judge *Ladd* (who is my associate in this case) to say that he did not suggest raising this particular point in the present litigation. The point is presented by me on my own responsibility, after ascertaining from Judge *Ladd* that he does not make any personal objection to this course.

The New Hampshire constitutional guaranty of jury trial has sometimes been read backwards. To use a homely phrase, it has been " turned t'other end to." The exception has been mistaken for the general rule, and the general rule has been mistaken for the exception. The 20th article of the Bill of Rights has been construed as if it read thus : " There shall be no right of trial by jury except in cases where that mode of trial has heretofore been commonly practised." Such, however, is not the language of the constitution. That instrument, in effect, says that there shall be trial by jury in all cases, except those which it has heretofore been the custom to try without a jury. In other words, trial by jury is the rule, and trial without jury the exception. A litigant in New Hampshire, who claims that a particular controversy is triable without a jury, must establish the historical fact that it was the

practice in New Hampshire, in 1792, to try such a controversy without a jury. On the other hand, the party claiming a jury trial need not show that it was the use and practice in New Hampshire, in 1792, to try such a contoversy by jury. The burden is on the party denying the right, to show that it was the use and practice here at that time to try such a case without a jury. He cannot bring himself within the exception, by showing that in New Hampshire, at the time of the adoption of the constitution, the case now at bar could not have been tried at all, neither at law or equity ; for, if the case were not then triable at all, it cannot be said that the practice and use were to try it without a jury. The case would fall within the general rule, and not within the exception.

The difference on this matter of jury trial between the New Hampshire constitution and the constitutions of most of the other states is very marked. Take, for instance, the constitution of New York : " The trial by jury in all cases in which it has been heretofore used shall remain inviolate forever." As to such a provision, it may be true that it does not create nor enlarge the right of trial by jury ; that it does not extend the right to cases not before within its operation. It simply retains and preserves it inviolate in those classes of cases in which it existed at the time of the adoption of the constitution. A clause almost identical with this New York provision was submitted to the people of New Hampshire in 1779, and disapproved. The constitution then submitted and rejected, contained the following clause : " The right of trial by jury in all cases as heretofore used in this state, shall be preserved inviolate forever." 9 Prov. Pap. 838. But the present constitution of New Hampshire was framed with an entirely different purpose. It reads very differently from the rejected constitution of 1779. It was the obvious intention of the present constitution to provide for the right of jury trial in all future controversies and in respect to all rights of action which might thereafter be created, just as fully as in all controversies where a jury trial was then customary. The constitution was intended to provide for the future as well as for the present. With the exception of those cases which it was then the use and practice to dispose of without a jury, the constitution guarantees a jury trial as to all rights thereafter in dispute, whether those rights existed in 1792 under the common law and the statutes then in force, or arose afterwards from time to time out of subsequent legislation. All such rights, whether then existing or thereafter arising, would come under the protection of this constitutional guaranty.

Do controversies triable in equity fall within the general rule, or within the exception ? We will consider the exception fully ;—but first let us ask, How would the case stand if there were no clause of exception ? The language of the general rule is exceeding broad : " All controversies concerning property," and " all suits between

two or more persons." These words were carefully chosen as describing and including all possible litigation of a civil nature,—proceedings *in rem* as well as proceedings *in personam*. A private suit in equity is generally a controversy concerning a right of property ; and it is always a suit between two or more persons. See 7 Pick. 368. If the framers of the constitution of 1792 had intended to guarantee the right only in suits at common law, they would naturally have expressed that meaning in distinct language. They would have copied the 7th amendment to the constitution of the United States, which reads thus : "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved," &c. This amendment was proposed by the first U. S. congress in 1789, and had just been adopted by the state legislatures. It must have been well known to the members of the New Hampshire constitutional convention, which met less than three years thereafter.

Place the two provisions in parallel columns, and let any man say whether the general rule in the New Hampshire constitution does not have a far wider range than the carefully limited language of the Federal constitution :

Amendment to U. S. constitution, Art. VII :

"In suits at common-law . . the right of trial by jury shall be preserved . ."

New Hampshire constitution, Bill of Rights, Art. XX:

"In all controversies concerning property, and all suits between two or more persons, . . the parties have a right to trial by jury . ."

So much for the construction which would be put upon the New Hampshire constitution, if the general rule stood alone, without the exception. And, by the way, we ought to mark the fact (stated by counsel in 142 Mass. 174) that in the convention framing the Massachusetts constitution, from which New Hampshire copied the substance of this provision, the first draft introduced entirely omitted the excepting clause, which was afterwards added by the committee. (Jour. Con. 1779–'80, 152, cited in 142 Mass. 174.)

The next question is, Does the exception include cases in equity? Note, at the outset, that there is no ground for putting any forced construction on the language of this exception. There is no room to argue that the exception will be meaningless or totally ineffectual, unless it shall be construed as including cases in equity. The exception has ample force and application in other directions. Without enumerating all the matters which fall within its scope, it is sufficient now to allude to probate causes as admittedly coming under it. Nor is there any reason to suppose that the people of 1792 entertained a prejudice against trial by jury, and must therefore have intended this seemingly narrow exception to have an

unnaturally wide scope. Such a supposition would be contradicted by the most solemn declarations of that generation. One of the grievances against the British crown, enumerated in the Declaration of Independence, was "for depriving us in many cases of the benefits of trial by jury." And in the constitution of 1792, the very next article to the one now under consideration speaks of "the inestimable privilege of trial by jury." See, also, the observations of *Ladd*, J., 57 N. H. 79. Our construction of the exception is, that it refers to the use and practice existing in New Hampshire in 1792,—not to the use and practice existing in some other jurisdiction in 1792, nor to the use and practice existing in New Hampshire at some antecedent date.

If this construction be correct (and we shall have something to say on that head by and by), the next question is, whether equity cases were among the cases which it was the practice in New Hampshire in 1792 to try without a jury. The answer to this historical question does not admit of doubt. Equity causes were not tried without a jury in New Hampshire in 1792, for they were not then triable at all in this state. The statute book shows that the last semblance of an equity court was abolished in 1776. If any court ever had equity jurisdiction, it was the old court of appeals, composed of the governor and council. This court was abolished June 28, 1776. (See 57 N. H. 67, and 1 Farmer's Belknap 368.) There had therefore been no possibility of trying equity causes in New Hampshire for sixteen years prior to the adoption of the constitution. And it is an historical fact, proved by the independent investigations of two competent lawyers, that there had been no actual exercise of equity jurisdiction in New Hampshire for at least half a century prior to 1792. We may add, that in our belief there had been no exercise of such jurisdiction for a much longer period.

So far as we are aware, no instance has been cited of the actual exercise of chancery jurisdiction in New Hampshire later than the year 1700. In the seventeenth century there was something of the sort. Robert Mason is understood to have been appointed chancellor, and bills in equity were heard before him. 1 Prov. Pap. 474, 502, 503. Later, in 1692, an act was passed giving equity jurisdiction to the governor and council, who composed the court of appeals, and constituting them a "high court of chancery." See 27 N. H. 512. But, so far as we know, there is no evidence that this jurisdiction was ever exercised after the year 1700, if indeed to so late a date as that. The latest document we have seen from which it could be inferred that chancery jurisdiction was actually exercised, is a letter from the Lords Commissioners for Trade and Plantations to the Earl of Bellomont, dated April 20, 1701. 2 Prov. Pap. 342. This letter refers to "diverse complaints of irregularities of the courts of chancery in his Majesty's Plantations." But inasmuch as Bellomont was governor of other

provinces besides New Hampshire (1 Farmer's Belknap 153), the complaint may have had regard to what took place in another province (*e. g.*, New York); and, at all events, the complaint probably related to facts transpiring not later than the year 1700. The name "court of chancery" was undoubtedly used in New Hampshire at dates subsequent to 1700. Thus, the provincial house of representatives, in 1727–'28, makes mention of " the court, sometimes called a court of appeals, and sometimes the court of chancery." 57 N. H. 64. And Mr. Shirley says that the records of the governor and council " were indifferently termed the records of the court of appeals and of the court of chancery." 57 N. H. 60. But the material question here is, not how long the governor and council continued to be styled a court of chancery, but how long did they actually exercise chancery jurisdiction. The actual use and practice is the essential point of inquiry.

Judge *Bell*, in 27 N. H. 512, says,—" It is supposed that the governor and council, who composed the court of appeals, continued to exercise chancery powers till the Revolution." But this " supposition" is the exact opposite of the actual fact. As to the long period from 1742 to the Revolution, we have positive knowledge that the governor and council did not exercise chancery powers. Their records during that period are extant. These records, from 1742 to 1774, have been examined by two New Hampshire lawyers, each investigating independently of the other. The result of both investigations is, that during this period there were no equity causes (in the proper sense of that term) heard before that tribunal. The two lawyers referred to are our recently deceased brother, John M. Shirley, Esq., and the late Chief-Justice Smith. Mr. Shirley's very explicit testimony is given in his argument in *Perkins* v. *Scott,* 57 N. H. 60. Chief-Justice Smith appears to have made an abstract of all noteworthy causes heard before the governor and council during those years ; and these abstracts were recorded by him in a volume which is now in my possession, and which is at the service of the plaintiffs' counsel and of the court. There is just one case (*Rex* v. *Sherburne,* 7 MS. Rep. 131 ; MS. Dig. 259, *s.* 4 ; 136*b*) in reference to which the word " equity " is applied by Judge Smith in his index; but the slightest examination of his abstract shows that it was not an equity case in the proper sense at all, and also shows how he came to apply that term to it. It was a suit to enforce a preference in favor of the crown, in collecting a debt alleged to be due the crown from the insolvent estate of a deceased person ; a claim which would have been cognizable on the so called " equity side " of the court of exchequer in England. 3 Black Com. 44–46. The suit was not brought before the governor and council in the first instance (as a chancery case must have been); but was originally brought before the superior court, on the theory that that court had the same jurisdiction in respect to demands due the crown as the court of exchequer

had in England.   The case was tried by jury in the superior court, and then taken before the governor and council on appeal, just as any other case might have been.   Mr. Shirley also examined the records of the governor and council from 1699 to 1716, and found a total absence of chancery proceedings.   He also notes the fact that the chancery court attempted to be established in Massachusetts in 1692 never exercised chancery jurisdiction.   In those days New Hampshire largely followed the lead of the more populous and wealthy province on its southern border.   It seems exceedingly improbable that a court of equity was kept in active existence here for a century after it ceased to exist in Massachusetts.   See 57 N. H. 68, 69.

But this is not all.   There is still more evidence to show that the chancery jurisdiction of the governor and council, if not in terms abolished, had become so entirely obsolete that nobody supposed it to be capable of exercise.   In 1773 a committee of the English privy council reported that no court of chancery existed in New Hampshire.   2 Belknap 279, ed. of 1812; 1 Farmer's Belknap 347.   And the governor and council themselves, the very next year, seemed to have practically affirmed the same doctrine. It must be remembered that if that tribunal had any equity jurisdiction, it was original jurisdiction.   No other kind of equity jurisdiction was attempted to be conferred on them by the act of 1692. Yet they held in 1774 that they had no original jurisdiction of any kind whatever.   At the May term, 1774, in *George Wentworth's Case* (a request to issue a mandate to the superior court), the governor and council decided that " this court have no jurisdiction of any causes but such as are brought before them by appeal."   See statement in 57 N. H. 64, and also in 7 MS. Rep. 145 ;—see, also, Mr. Shirley's statement of the case of *Livius* v. *Moffatt*, in 1768–'69; 57 N. H. 63, 64.

How thoroughly obsolete the nominal chancery jurisdiction had become is apparent from the circumstance that the ablest lawyers of the generation immediately following the Revolution were totally ignorant of the fact that any attempt had ever been made in New Hampshire to exercise such jurisdiction.   Hon. Samuel Bell, judge and governor, was certainly one of the leading members of the bar of that day.   In his gubernatorial message to the legislature in 1821, he said,—" Our ancestors, who adopted in general the laws of that country from which they originated as a basis of their code, omitted to introduce into practice that part of the system which appertains to chancery jurisdiction."   Up to the delivery of the opinion of Governor Bell's son (the late Judge Samuel D. Bell) in 1853, in the case of *Wells* v. *Pierce*, we are not aware that anybody had ever advanced a different opinion from that expressed by Governor Bell in his message in 1821, which we have just quoted.

The learned author of Dane's Abridgment, published in 1824,

says (vol. 7, 516) that " the equity or chancery system of Eng-
land . . . has ever been almost wholly excluded from New
England and Pennsylvania." So far, he says, " as any powers in
equity have ever been exercised in these colonies and states, they
have been sparingly granted in a very few cases by their several
legislatures to their courts of law." Again, *p.* 518, he says that
the early settlers were not much disposed to establish a code of
equity distinct from common law ; and that in New England noth-
ing was done."but only to vest in the law courts, with jealousy
and by little and little, powers in equity to soften the unyielding
spirit of the law." So *Bellows*, J., 45 N. H. 336, says that in
New England " courts of chancery have been, until a comparatively
recent period, regarded with jealousy."

The foregoing historical facts, as to the non-exercise of equity
jurisdiction in New Hampshire, render it very clear that equity
causes do not fall within the exception to the constitutional guar-
anty of jury trial, unless that exception is to receive a very sin-
gular interpretation. In order to bring equity cases within its
terms, it is necessary to contend that the phrase " heretofore other-
wise used and practised " refers to practice in some jurisdiction
other than New Hampshire ; or else that it refers to a former
practice in New Hampshire which had entirely ceased long before
the adoption of the constitution. Neither of these interpretations
is tenable. There can be no reasonable doubt as to the when and
the where, the time and the place, alluded to in the words " hereto-
fore otherwise used and practised." The place of practice was New
Hampshire, not New York or England. The time of practice was
the date when the constitution was submitted for adoption, not a
date fifty or a hundred years anterior. As to place, the natural
construction of the exception would refer it to the local practice in
New Hampshire. Any construction which refers it to the practice
in England, or to the practice in other states of the Union, would
involve serious difficulties. Suppose, for instance, that in a partic-
ular kind of controversy trial by jury had been practised in New
Hampshire, but that in England it had been the practice to try
that class of cases without a jury : now if the exception of cases
" heretofore otherwise used and practised " refers to and includes
the English practice, this case falls within the exception, and the
constitution does not guarantee a jury trial. The effect is, that a
citizen of New Hampshire may be constitutionally deprived of a
jury trial, although such a mode of trial was invariably enjoyed in
New Hampshire in this class of cases up to the very moment of
the adoption of the constitution ; in other words, the constitution
reduces New Hampshire to the English level.

Equally strong objections exist to construing the exception as
referring to the practice in other states of the Union. Upon that
construction, the rule would be swallowed up in the exception.
It has been said, and we think with considerable truth, that this

construction " would deny to the defendant his right of jury trial in almost every case." There was then great " diversity of practice " among the different states as to trial by jury. Some states denied it in one case, and some in another. To except from the constitutional guaranty all the cases in which the right had ever been denied in any state might have resulted in leaving few, or no, cases to come within the operation of the general guaranty. In the Massachusetts convention of 1788, while debating the adoption of the Federal constitution, a wish was expressed to insert in that constitution a provision for jury trial with an exception similar to that we are now considering. But to this it was answered, that " the exception of all cases where a jury have not heretofore been used would include almost all cases that could be mentioned, when applied to all the states, for they have severally differed in the kinds of causes which they have tried without a jury." 2 Elliott's Debates 114. So in the Federal convention of 1787, when it was proposed to provide that " trial by jury shall be preserved as usual in civil cases," the objection was raised that trial by jury " is *usual* in different cases in different states." 5 Elliott's Debates 550.

But this 20th article of the Bill of Rights contains internal evidence, of the most conclusive description, that the practice intended to be referred to is the practice of New Hampshire, and not the practice of England or of New York. This article gives power to the legislature hereafter to dispense with a jury, if it sees fit, " in cases arising on the high seas and such as relate to mariners' wages." Of course, therefore, the framers of the constitution did not understand that these admiralty cases were already excepted under the words " cases heretofore otherwise used and practised." But they would have been so excepted if the exception had been intended to refer to the practice then existing in England, and not to the practice then existing in New Hampshire. At that time it was the practice to try admiralty cases without a jury in England, and in some of the United States (1 Kent Com. 372, 376) ; but it was the practice in New Hampshire to try this class of cases by jury. Does not this reference to admiralty cases, as coming within the constitutional guaranty and not within the exception, clearly prove that the framers of the constitution meant to except only those cases which it was the *New Hampshire* practice to try without a jury,—not those cases which it was the *English* practice to try without a jury? If admiralty cases were understood to fall within the exception, then the power specially given to the legislature to dispense with a jury in such cases was entirely superfluous.

The time, or date, of the practice referred to in the exception is as unmistakable as the place of the practice. " Heretofore " means " at and immediately preceding " the time of adopting the constitution. It does not refer to a practice which had then been completely disused for at least half a century ; a practice which

had become so completely obsolete that the ablest lawyers of the day were not aware that it had ever existed. In 7 Pick. 308, *Parker*, C. J., said, as to this point, under the Massachusetts constitution,—"We are inclined to think that the word 'heretofore,' in the exception, could hardly be applicable to a practice which had ceased to exist nearly a century before the constitution was adopted."

There is a direct decision of this court to the point that this clause looks to the practice at the time of the adoption of the constitution, and not to the practice at any previous date. This was the *ratio decidendi* in *Baker* v. *Holderness*, 26 N. H. 110, 114. The controversy there in question was one of a class which had been tried by jury up to the year 1786, and tried without a jury from 1786 to 1792. It was held, that the constitution did not guarantee the right of jury trial in such a case, inasmuch as at the time of the adoption of the constitution it was the use and practice to try such a case without a jury. The test adopted was the practice existing in 1792, and not the practice in 1785 and for many years before that date. (Whether the practice of dispensing with a jury in that class of controversies from 1786 to 1792 was or was not a violation of the Constitution of 1784, is a matter which does not concern our present inquiry.)

The same test which was applied in *Baker* v. *Holderness* was also applied (with the opposite practical result) in *Copp* v. *Henniker*, 55 N. H. 179, 191, 192. We are aware that this case has recently been overruled; but the reversal was not placed upon a ground which throws any doubt upon the particular reasoning for which we now cite that opinion. *Ladd*, J., there said, that if the practice up to 1786 was to try a particular class of cases without a jury, and that practice was changed in 1786 so as to try such cases with a jury, and this latter practice continued from 1786 to 1792, then the constitution of 1792 guarantees the right of jury trial in that class of cases. He expressly says that "the right to a trial by jury, existing in this class of cases from 1786 to the adoption of the constitution, does not leave this class among the cases in which it has been 'heretofore otherwise used and practised,' but shows it to be among the cases in which this mode of procedure is to be held sacred." In a word, the test is the practice in 1792, and not the practice from 1719 to 1786.

If we are to adopt the other construction,—if we are to say that the phrase "heretofore otherwise used and practised," instead of being confined to the practice existing in 1792, refers to and includes any practice which had ever prevailed, at any time, from the first settlement in 1623,—then what is to hinder the legislature, to-day, from enacting that in all important cases there shall be a right of appeal from the jury courts to a higher tribunal, and that all questions of fact shall be decided in this appellate court without a jury? Such was the law and practice for nearly a century prior to 1776.

If the exception in the constitution is not limited to the practice in 1792, but includes all cases which there was ever at any previous time a practice to try without jury, why does not the constitution permit the legislature to resuscitate the old court of appeals, or create a new judicial tribunal equivalent thereto ? Of course, no sane man supposes that the constitution intended to permit any such performance, but we put the case as a *reductio ad absurdum* of the theory we are combating. The true doctrine is that endorsed by *Foster*, J., in *King* v. *Hopkins*, 57 N. H. 334, 355 : " . . that the repeal of the right of appeal to the governor and to the king at the beginning of the Revolution, and the continued abolition of such appeals from 1776 to 1792, leaves the constitution to be construed as if no such right of appeal had ever existed." By parity of reasoning, it would seem that the abolition in 1776 (if not earlier) of a merely nominal court of chancery ought to leave the constitution to be construed as if no such court had ever existed.

It is said by Judge *Bell*, in 27 N. H. 512, that " Equity, as a great branch of the law of their native country, was brought over by the colonists, and has always existed as part of the common law in its broadest sense in New Hampshire." There is a sense in which this statement is true, and another sense in which it is not true. There is an obvious distinction between principle and procedure. Those principles of equity which can be completely adopted and carried into execution by a court of common law, are, and always have been, part of the common law of New Hampshire. But the peculiar procedure of equity was not part of the common law of New Hampshire at the time of the adoption of the constitution, and cannot now be made so, except so far as this procedure is consistent with constitutional provisions. Equity procedure can be introduced by the legislature only in subordination to the constitution ; not as a superior external force, suspending or overriding that instrument. The generation which adopted the constitution was not enthusiastically in favor of establishing a court of equity, even under the most explicit constitutional restrictions. Among the amendments proposed in 1791–'92 was one (No. 57) providing for the establishment of a court of equity. This amendment was accompanied by an express proviso that " no power shall be granted to any such court incompatible with the Bill of Rights and constitution," and was prefaced by a hint that the establishment of a court of equity might serve the purpose of leaving no excuse for legislative or executive usurpation of judicial functions. The amendment, in full, was as follows: " For the more effectually preserving the proper separation of the three great powers of government, agreeably to the 37th article in the Bill of Rights, the power of hearing and deciding in causes of equity shall be vested either in some judicial court or courts, or in some court to be established specially for that purpose: *Provided*, no power shall be granted to any such courts incompatible with the Bill of Rights

and constitution; and the powers of said courts shall be limited and defined by express laws,—and no suit in equity shall be sustained where clear and adequate remedy may be had at law." But the proposed amendment, though thus carefully guarded, was not adopted. It failed to receive a two-thirds vote (1883 yes, 1340 no). 10 Prov. Pap. 123, 124, 142. This rejected amendment required the establishment of a court of equity, or the conferring of equity powers on existing courts. Notwithstanding its rejection, the legislature was undoubtedly left at liberty thereafter to establish a court of equity, which should proceed in conformity with the constitution. But there is no sufficient evidence to justify the belief that the people intended to leave the legislature at liberty to establish an equity practice which should be in direct violation of important constitutional provisions.

Everything that is peculiarly desirable in a court of chancery " may be obtained without violating the constitution." See argument of Richard Fletcher, 7 Pick. 366. ". . . a reasonable construction " of the constitutional provision " does not require that a suit in chancery shall be tried just as a suit at common law would be, and . . . there is no necessity that the whole case shall be put to the jury. The most that can be made of the article is, that all controverted facts deemed essential to the fair and full trial of the case shall be passed upon by the jury, if the parties or either of them require it. And whether the facts proposed to be so tried are essential or not, must of necessity be determined by the court. There may be many facts stated in a bill and denied in an answer, and also facts alleged in the answer, which are wholly immaterial to the merits of the case, and such facts the court may refuse to put to the jury; just as in an action at common law, if a party offers to prove facts which are irrelevant, the court may reject the proof,—and as immaterial issues, even after verdict, may be rejected as nugatory. The right of the party to go to the jury is preserved, if he is allowed that course in regard to all such facts as have a bearing upon the issue for trial." *Parker*, C. J., 7 Pick. 368.

Certain constitutional provisions have received a judicial construction, which gives them a wider application than some of the framers of the constitution may have anticipated. In applying or expounding a general principle, courts have sometimes held that the fathers " builded better than they knew." But this method of interpretation cannot avail the present plaintiffs. For, if any such broad method of interpretation is to be applied here, it must be applied to the general constitutional guaranty of jury trial, and not to the exception of "cases heretofore otherwise used and practised." The former is a broad general rule or principle, clearly intended to have a wide scope. The latter is concerned only with a matter of fact. The ultimate limit of this exception is to be found, not in the inherent, expansive power of a general principle, but within the narrow confines of an historical fact.

*Edgar Aldrich*, for the plaintiffs, orally. The bill, as originally drawn and as amended, presents several distinct and different grounds of equitable jurisdiction, and several distinct and different reasons why equitable relief should be granted. There were no allegations of nuisance in the bill as originally drawn, and as amended there is no allegation of a public nuisance. The allegation that the plaintiffs are members of the public is merely for the purpose of stating their title,—in other words, for the purpose of stating their right to use the water of the Connecticut river. The only allegation as to nuisance is the following : " And now [March 6, 1888] the plaintiffs further say, that the acts and purposes complained of have been completed, and the defendants have constructed a dam of the character described, which is a nuisance, and should be abated." And the prayer was amended so as to call for abatement or for a regulation of the right of use, as equity might require. The allegation of nuisance was merely adding a distinct and independent ground for equitable relief.

Thereupon the defendants say by demurrer,—" The defendants say that the plaintiffs' bill aforesaid does not show ground for the relief prayed for ; and, as one cause of demurrer thereto, they specify and point out the allegations in said bill contained, which show that the right therein supposed and charged to be infringed by the defendants is alleged to be a public right in the use of the Connecticut river, and the grievance therein set forth and charged is the maintenance of a public nuisance, for the abatement whereof a bill in equity, at the suit of a private person, cannot by the laws of the land be maintained." So it will be seen upon examination that the demurrer assumes what the bill does not, in fact, set forth as to the character of the nuisance and the character of the right.

Following this, the plaintiffs, as a matter of precaution, upon leave, joined the attorney-general. Now, suppose the allegation of nuisance is waived or stricken out : there still remain allegations which make a case for equitable cognizance. Or, suppose the demurrer is sustained as to the public character of the nuisance : it is the same. Upon a hearing, the use of the water may be regulated without trying the question of nuisance either by court or jury, because there is other merit in the bill. It seems to me that we are all unreasonably exerting ourselves to jump the bridge before we get to it. " Sufficient unto the day is the evil thereof." I submit that the case presented sets forth one of the most plain and common grounds for equitable interference, and one of the oldest known to equity jurisprudence, namely, the regulation of the use of water in which the parties have a conceded common right and title.

It will be seen further on, that courts of equity from time immemorial in England, and in this country as long as courts of equity have been known, have regulated such use without the allegation

or proof of nuisance, and in innumerable instances have tried and determined the question of nuisance when there were other grounds for equitable jurisdiction in the bill, and in a vast number of instances have tried and determined the question of water rights and of nuisance as an independent question. The question of nuisance, when you get to it, might be so plain that the court would say, There can be no serious controversy or disputed fact here; or the peril to life and property might be so imminent as to warrant the interference of the court, and, from its inherent common-law power, might warrant an order for its removal.

Extravagant suppositions are sometimes valuable as illustrations. Suppose an obstruction is erected across a river at the outskirts of a city, and it is plain and indisputable that it is unwarrantable, unnecessary, and a nuisance, and it is known that an irresistible flood ten hours away is approaching, and, upon encountering this obstruction, unless a passage-way is given, will be stayed just enough to give it uncontrollable force, and, as it breaks and passes on, a hundred thousand lives and millions of property may be destroyed,—and a petition is filed for relief: would it be claimed that you must first try this question of right—of nuisance—by jury? " There are nuisance cases where final injunctions have been granted without any previous jury trial of the questions of fact; but the explanation is, that in those cases there were no disputed questions of fact for a jury to try. The facts were not in controversy, and the case either was too clear for argument, or else turned on a question of law which would not have been submitted even if the case had been pending in a court of law."

I am aware of the great number of cases where it is said that the right must be plain, or the evidence clear and positive, or the right must be first established at law, and I shall claim further on that the case at bar is not of that class; for the right and title of the parties are conceded, and established, for the purpose of equitable jurisdiction, and the relief sought merely relates to the manner of the exercise of the rights. If there were a question of title,—if the plaintiffs' rights were in dispute, whether the water belonged to him (as in *Burnham* v. *Kempton*, 44 N. H. 100),—this right would doubtless have to be determined at law, unless it were a clear case of imminent peril or of threatened irreparable injury, and other exceptions, perhaps.

Now we come to the case in hand. What is it? The plaintiffs say,—(1) That the Connecticut river is a public highway. This is true as a matter of law, and it is conceded to be such by the defendants, and is therefore established. So there is no legal right in controversy as to that phase of the case. (2) It is alleged that the plaintiffs, as a member of the public, have a right to use the same for purposes of navigation. This is conceded by the defendants, and therefore established. This was also conceded in the oral argument. So there is no question of right or title here.

(3) It is claimed, on the other hand, that the defendants, as riparian owners, have a right to use the water. This is conceded—therefore not in controversy ; that is to say, there is no question of fact as to the defendants' right to use the water in question. By the answer, certain extraordinary powers of control are claimed. Upon these questions there is controversy; but they involve law, not fact. If there were an open and disputed question as to whether the 'Connecticut river were a public highway, and if the plaintiffs' right as a member of the public to use such river for purposes of navigation were in dispute; or, if the plaintiffs claimed to own land adjoining a river not navigable, and so had a right to use the water, and their title was in dispute,—quite likely such questions of disputed rights would have to be settled at law before a court of equity would interfere. But, as I have said, all these questions of right are not in dispute, but are conceded.

The defendants claim, as a matter of law, that the rights of the parties are equal. This is a question of law, and not of fact. We claim that the superior right is in the member of the public having occasion to use a natural highway for purposes of navigation. One is a natural right, while the other is an acquired right. The right of the riparian owner is subject to the right of navigation. But of course each right must be exercised in a manner reasonable to the other, having reference to the importance and the nature of the business of each. This is a question which arises after a trial of the facts. See Coul. & F. Wat. 33 ; Wood Nuis. 86, 93 ; *People* v. *Vanderbilt*, 28 N. Y. 396; *Jolly* v. *Terre Haute Co.*, 6 McLean 237 ; *Ins. Co.* v. *Curtenius, ib.* 209. It would also seem that the legislature, granting the Mills-Olcott charter in 1807, had in view the superior right of navigation, because by s. 7 of the act it is provided that nothing therein " shall authorize the erection of any dam across said river so as to prevent the free passage of lumber down Connecticut river as heretofore used and enjoyed." While we concede that each right must be exercised reasonably with reference to the other, still we claim that upon the question of reasonableness, the question of the first superior right is to be considered.

Now, what is in controversy here? There is no question of right and title, as I have said. The simple question is, whether the right of one is exercised reasonably with respect to the other ; and, in short, the plaintiffs say that the use the defendants put upon the water makes it difficult for the plaintiffs to do business. And this, of course, is a question as to manner. Now, what would be reasonable one year would not be reasonable another. What would be reasonable one day might not be reasonable the next, because the reasonableness is ever varying with the changes in the height of the water. In times of high water it might be reasonable for both to use the river at the same time ; while at an ordinary pitch of the water the draught which the defendants

make through their canal, carrying the water out of New Hampshire and discharging it below the falls, at the same time running the mill on the New Hampshire side, might operate as an absolute destruction of the plaintiffs' enterprise.

What distinct question would you submit to a jury? The right and title not being in controversy, would you ask a jury to find whether the defendants should run both their mills in low water or in high water? How would you submit such a question to a jury, and what good would such a finding do? There would need to be some order regulating the use. Would you ask the jury to find the height of the dam? There is no necessity for this, as said in the *Wheeling Bridge Case*, 13 How. 568: the height is not reasonably in controversy; it can be ascertained by measurement. Would you ask them to find whether there is a sluice-way? There is no occasion for that, because it shows for itself. Would you ask them to pass upon the reasonablenesss of the one there, if there be one? This would not necessarily determine the manner of use, because what would be reasonable for one season might not be reasonable for another season.

The question of right and title being out of the controversy, how is it possible to regulate and establish the manner in which this water shall be used, except by an order of court reaching to the future? Such an order would, of course, be open to modification and change, as future exigencies or developments might demand. The plaintiffs say, as one ground for relief, that the damages resulting from the defendants' use would be irreparable. They say, also, that it would require a multiplicity of suits to define the manner in which this water should be used under varying circumstances.

As we have before contended, it is the peculiar province of courts of equity to determine such questions, and that such rights have been regulated in equity for a very long time. We shall only submit two or three authorities in this connection, but shall refer to this branch of the case again further on. Indeed, we need not go outside of our own jurisdiction. Judge *Sargent*, in *Burnham* v. *Kempton*, 44 N. H. 100, uses the following language: " Courts of equity have jurisdiction of that class of cases where there is an admitted common right, among several owners of the same privilege, to regulate the common uses, to determine the extent of their respective rights and the proper mode of exercising and enjoying them, as tending to prevent litigation and as affording a more complete and perfect remedy than could be obtained at law, and as furnishing, in fact, the only adequate means of ascertaining and determining the respective rights of the parties."

The ground on which relief was refused in that case was, that the defendant's right was disputed altogether. It was not claimed that he had any title, unless it came by user. This was denied. The suggestion of Judge *Sargent* was to the effect that if his title

was not in controversy, relief would follow as familiar equity. This broad proposition, it will be seen further on, is abundantly supported by the best authority here and in England. " Another ground of equity jurisdiction is the regulation of common rights in water." Gould Waters, s. 540. In *Lyon* v. *McLaughlin*, 32 Vt. 424, Judge *Barrett* says,—" It is agreed that both parties have rights to the privilege of water under their respective deeds." So far it is like the case at bar, because it is conceded that both parties have a right to use the water of the Connecticut. The holding is as follows : " When the invasion of a right in the use of a water-course is threatened and intended, which is necessarily to be continuing and operative prospectively and indefinitely, and the extent of the injurious consequences is contingent and doubtful of estimation, the appropriate remedy is by a bill in chancery praying for an injunction against such invasion, on the ground that it will cause irreparable injury to the orator. The uncertainty of the extent of the prospective injury, and the impossibility of ascertaining the measure of just reparation, render such injury irreparable in a legal sense ; and therefore courts of equity will entertain jurisdiction of such a bill, and grant the proper remedy, notwithstanding the respective rights of the parties to the use of the water are in dispute, and depend entirely upon the legal construction of their title deeds. . . . The case discloses that the parties have rights in common to the use and enjoyment of the water-privilege created by said dam. They are in controversy as to the character and extent of their respective rights, and as to the proper mode of exercising and enjoying them. This relation of the rights of the parties in reference to the subject-matter of it is the ground of a familiar head of equity jurisdiction, as furnishing the only adequate means of ascertaining the respective rights of the parties, and of affording an ample remedy between them." See, also, Ang. Wat., s. 444, *et seq.*

*Belknap* v. *Trimble*, 3 Paige 601, is to the effect that " when several mill-owners have a common right to an artificial use of water for their respective mills, a court of chancery has jurisdiction so to regulate the common use of the water as to preserve the rights of each. That is, where the rights are established or admitted, the use may be regulated by a court of chancery." *Webber* v. *Gage*, 39 N. H. 182, is still stronger. In *Bemis* v. *Upham*, 13 Pick. 170, the opinion was by the late Chief-Justice *Shaw*, in the course of which the learned judge says, under the statute of 1827,—" The statute authorizes the court to hear and determine in equity any matter touching waste or nuisance in which there is not a plain, adequate, and complete remedy at law." This statute, it may be observed in passing, is similar to our statute of 1867. But I assert here that these statutes were quite unnecessary, for the reason that waste and nuisance are matters over which courts of equity have exercised control from the earliest English equity period.

Chief-Justice *Shaw*, after alluding to the inadequacy of legal remedies, and the difficulty of regulating the rights at law, and the hardships that might follow an absolute abatement if it were found to be a nuisance, uses the following strong and powerful reasoning—"whereas, a decree in equity can extend to all parties having an interest and bind them, and it may be effectual and perpetual. Instead of requiring an entire prostration of the nuisance, it may be modified and adapted to the just rights of the parties; it may order an abatement in part, determine the height to which the dam may be kept, the terms on which it may be kept up, the mode of using the water, and other incidents, and thus it may be more beneficial for both parties than a mere and absolute abatement."

The case of *Bardwell* v. *Ames*, 22 Pick. 353, is valuable in this connection. That was a case arising on the Connecticut river at South Hadley falls, and it was conceded that the parties both had rights in the water, but the extent and limit of the rights were in dispute. The court say,—"Indeed, it appears to us that the proceeding in equity is peculiarly fitted to ascertain, settle, and adjust the relative rights and obligations of the parties so situated, and to secure and enforce them, and that an action at law which could only look to the past and inquire into damages actually sustained, and for these could only award a sum of money, without protection of the right for the future, would be neither adequate in its nature nor complete in its effects."

So we say the case is one cognizable in equity, whether the obstruction is distinctly found to be a nuisance or not. Yet we must insist that the allegation of nuisance does not oust the court of jurisdiction; that the case should proceed in the ordinary way. When it is reached by the trier, the question of nuisance may be so plain and palpable to the plaintiffs that the court may say it is not reasonably in dispute, and therefore not for the jury. It may be found to be in that class of cases referred to by Judge Smith in his argument, where from the very nature of things no serious controversy of fact can exist. Or the court may say it is so plain and palable for the defendants that it is not reasonably in dispute, and therefore not for the jury; or, again, if the case does not turn on other points, the court may say as a matter of discretion, not as a constitutional right (*Bellows* v. *Bellows*, 58 N. H. 60), after hearing the evidence and seeing the situation, that this particular issue as to nuisance is not so seriously in controversy that it should be determined by a jury; or, again, if the use should be rightfully regulated on grounds other than nuisance, or if the particular issue of nuisance should be sent to a jury as discretion, or if that issue should be deemed plainly against the plaintiffs without a jury, then it is reasonable to assume that the defendants would not complain of outraged justice. The time to meet this question of right of trial by jury is when it is denied, not before. That question can-

not reasonably be determined at this stage of the proceedings. Moreover, it is a question to be determined by the court at the trial term.   *Dole* v. *Pike*, 64 N. H. 22; *Davis* v. *Dyer*, 62 N. H. 231.

Although it is not necessary that the obstruction be found as a matter of fact to be a nuisance, in order that the rights of use in question be regulated, inasmuch as the learned counsel have given the constitutional question of right of trial by jury in equity causes such prominence in argument, both by brief and orally,— the question being treated as of such immense importance, as he puts it, in his argument,—we shall invite the attention of the court to some considerations upon that branch of the case.   But, indeed, I may say here, that if all that has been said, since *Marston* v. *Brackett*, were to be blotted out, and if we were to return to that case for guidance in the matter at hand, there would not necessarily be a trial by jury.   Because all that Chief-Justice *Parker* says (*Marston* v. *Brackett*, 9 N. H. 349) is, that he thinks the parties are entitled to a trial by jury upon certain issues, if they are deemed material to the decision.   And it may transpire that this issue of whether the dam constitutes a nuisance may not be material to the regulation of the rights.   The learned counsel, Judge Smith, says,—" They may construe the phrase ' heretofore otherwise used and practised ' as referring either (1) to the actual practice in New Hampshire, or (2) as referring to the actual practice in the English chancery, which would presumably have furnished the rule for New Hampshire chancery practice, if any had existed.   We are ready to meet the plaintiffs on either ground."   Referring to New Hampshire proceedings, he says,— " Now, we propose to take a much broader ground, viz., that there is a constitutional right of jury trial in equity cases generally.   .   .   .   Our construction of the exception is, that it refers to the use and practice existing in New Hampshire in 1792, not to the use and practice existing in some other jurisdiction in 1792, nor to the use and practice existing in New Hampshire at some antecedent date.   .   .   .   .   Equity causes were not tried without a jury in New Hampshire in 1792, for they were not triable at all in this state."

If these reactionary arguments are to prevail, it is certain that the intelligence and business of the age will receive something of a shock.   Of course, it is needless for me to say that these propositions are contrary to precedent and authority in this state.   Indeed, it is conceded that the authority, understanding, and practice for many years have been against the position taken.   The grounds of these radical arguments are, that the various courts of the state, passing on these questions, have been guilty of gross legal error, and have been false to history.

The ingenuity and energy with which he sets out in argument to demonstrate his propositions, demand a compliment to the versatility

and power of his genius. He easily demolishes the judicial utterances of Judge *Bell* in *Wells* v. *Pierce*, 27 N. H. 512; and the commendation of Judge *Ladd*, in *Copp* v. *Henniker*, 55 N. H. 186, who, in refering to this question, said that *Bell* was in his day " the highest authority in all matters of our provincial judicial history," does not save him.

The opinions of Judge *Ladd*, in *Perkins* v. *Scott* and *Copp* v. *Henniker*, displayed an historical research and a breadth of judicial reasoning and logic which helped to build for him a reputation as a jurist not limited to the state which he honored while a judge of her highest court, nor to the country to which he belongs, but a reputation reaching beyond, meriting and receiving the judicial plaudits of the great country from which we have been borrowing our jurisprudence. But the structure builded so strongly was easily demolished by his associate. Counsel then passed to the court which rendered the opinion in *Bellows* v. *Bellows, supra,* which goes with the rest; and the serio-comic part of the exhibition is presented at this point in the argument, when Judge *Ladd* mounts the ruins of his own judicial structure, and passes on with the flood at its height, lustily and enthusiastically cheering the author of his ruin.

But, to be serious, it is a little remarkable, to say the least, that all these respectable authorities should be historically and judicially wrong, and that it should remain for a man in the closing years of the nineteenth century to right them. But I will say right here, that I regard it as utterly immaterial to a decision of the questions necessary to adjust and regulate the water-rights involved in this case, whether the allegation of a nuisance remains in the bill or is withdrawn; whether the attorney-general is a party or not; whether courts of equity existed in New Hampshire immediately preceding the convention of 1792, with general equity powers or with limited equity powers, or whether such court did not exist at all;—because, under the constitution (Part II, *art.* 4), the general court was forever clothed with full power to erect and constitute judicatories and courts of record, or other courts; and under *art.* 20 of the Bill of Rights in question, all controversies between parties are to be tried by jury, except in cases where it had been theretofore otherwise used and practised. The general court, under the constitution, having such power to create courts, and having in 1832, and by later acts, created courts of equity with general powers, the question now presented is, To what usage and practice did the Bill of Rights refer? And we say, as to this, unquestionably the reference is to the usage and practice of the English courts of common law and chancery. And if we establish this position, then the remaining question is, whether it was used and practised in England previous to the adoption of our Bill of Rights to try causes like the one at bar without the intervention of a jury.

A careful reading of *art.* 4 shows that it was intended to give the legislature the most complete power to create courts, of whatever name or description, necessary to administer ample and full justice to future generations. It provides that such courts so created shall be for hearing, trying, and determining all manner of crimes, offences, pleas, processes, plaints, actions, causes, matters and things whatsoever, arising or happening within this state. Such courts and judicatories so established are granted full power and authority to administer oaths, etc., for the better discovery of truth. Broader scope could not be given.

It may be observed here, in passing, that courts of law already existed with full common-law powers, and the query is made why this sweeping authority should be given the legislature to create other courts from time to time with jurisdiction over the matters and controversies enumerated in *art.* 4, Part II of the constitution, if it was intended to limit and restrict their powers to strictly common-law matters and common-law modes of procedure. There will be no question but that *art.* 20 of the Bill of Rights, which provides that " in all controversies concerning property, and in all suits between two or more persons, except in cases in which it has been heretofore otherwise used and practised, the parties have a right to trial by jury," is broad enough to include controversies about water-rights and suits in equity. And while our position will be that the term "hitherto used and practised" had reference to the English chancery practice, we shall maintain that there is unmistakable evidence that a court of chancery existed in New Hampshire down to 1792, and that equity proceedings must have been used and practised in this state prior to the convention. Yet we shall also contend, that whether there was little or a great deal of business before that court is of no consequence upon the question of the construction of the exception in *art.* 20 of the Bill of Rights, as we shall see further on. Now, in the first place, as to this matter, we say that the people, not only in this state but in all the states, have understood that courts of equity have the power to administer equity according to the ordinary course of such procedure, and without the intervention of a jury except at discretion. [Counsel here referred to the act of January 3, 1792, concerning the abatement of certain nuisances, and to *s.* 6 of the same act.] So it would seem that in 1792, in matters of nuisance, questions of fact were determined by road surveyors and selectmen, and by the superior court justices without the intervention of a jury. At this point I desire to call attention to the ancient statute of 1718, cited by Judge Foster, counsel for the defendant in *State* v. *Saunders*, it being claimed by Judge Smith that such statute bears upon the questions involved in this case. He, however, concedes that it would probably be argued that "notwithstanding the above statute, the provincial court of appeals, composed of the governor and his council, had a theoretical equity jurisdiction in cases of nuisance,

and was entitled to proceed without a jury." In reference to this statute and similar ones, I maintain that it merely gave courts of law concurrent jurisdiction over matters of nuisance. And in view of the fact that English criminal magistrates, courts of law, selectmen, and highway surveyors in this country were exercising control over such matters, the policy was declared that in such proceedings, namely, proceedings at law, and by other tribunals not having equity powers, the fact should be determined by a jury. This could have had no reference to courts of equity, or to any nuisance which from its peculiar situation was cognizable in equity proceedings. As illustrating that this act, which had reference in terms to the court of general sessions of the peace within this province, applied solely to proceedings at law, it may be said that it does not give such courts exclusive jurisdiction, but provides that it shall and may be lawful to and for the court of general sessions of the peace within this province to cause inquiry to be made therein by a jury, meaning, merely, that in all proceedings at law a jury would decide. Such would be the practice in legal proceedings to-day.

The judiciary act of 1692 further illustrates that they had in mind at that time the distinction between proceedings at law and proceedings in equity. That act created certain courts of law, but provided "that no person's right of property shall be by any of the aforesaid courts determined, except where matters of fact are either acknowledged by the parties, or judgment be acknowledged or passeth by the defendant's fault for want of plea or answer, unless the fault be found by a verdict of twelve men of the neighborhood, as is ought of right to be by the law." This, of course, had reference to proceedings at law. And if a nuisance question was presented in that court it would necessarily be triable by jury.

But to show that the distinction was marked, even then, by the section following, a court of chancery was created with full powers, in the words following : "And it is hereby enacted by the authority aforesaid, that there shall be a court of chancery within the province, which said court shall have power to hear and determine all matters of equity, and shall be accounted and esteemed the high court of chancery of this province." And the next section provides that the governor and council shall be said high court.

Judge Foster, in his brief in State v. Saunders, seems to have confused the various independent sections, and has placed the guaranty of trial by jury in the act of 1692, as following the provision creating the court of equity, while in fact the guaranty precedes that section, and has reference in terms to the "aforesaid courts," meaning courts of law, while the court of chancery is created as an independent court, with jurisdiction over all matters of equity, and, as we shall see, with remedies according to the English chancery practice.

That law courts with jury had concurrent jurisdiction with equity courts without a jury in 1718 or 1792 presents no new or novel idea. Such doctrine is true now as regards many subjects and many

situations. The plan of the colonists in the beginning, and the plan on which they operated down through, was to build up so far as possible the judicial system approved and practised by their mother country. In the commission to John Cutt, first president (Sept. 18, 1679), after describing his duties and that of his council as a "settled court of record," the forms and proceedings of the mother country are recognized. The commission provides,—

"So always y$^t$ y$^e$ forms of proceeding in such cases, and y$^e$ judgment thereupon to be given, be as consonant and agreeable to y$^e$ Laws and Statutes of this Our Realm of Eng$^d$, as y$^e$ p$^r$ent state and condition of our subjects inhabiting within y$^e$ limits aforesaid, and y$^e$ circumstances of y$^e$ place will admit."

Cranfield, by his commission, was clothed with authority to "erect, constitute, and establish such and so many courts of judicature and public justice within the said province and plantation within your government as you and they shall think fit and necessary for the hearing and determining of all causes, as well criminal as civil, according to law and equity." 1 Prov. Pap. 9, 14, 25, 376, 437.

Reference has been made to that section of the judiciary act of 1692 (3 Prov. Pap. 183, 186) which provides "that no person's right of property shall be by any of the aforesaid courts determined, except where matters of fact are either acknowledged by the parties, or judgment be acknowledged or passeth by the defendant's fault for want of plea or answer, unless the fault be found by the verdict of twelve men of the neighborhood, as it ought of right to be by the law." It will be observed that this section has been cited by opposing counsel, and commented upon as a provision giving a right of trial by jury as to controverted facts in equity. That such a position is not sound will be seen by a critical examination of all the provisions of this act. It will be seen that this section provides that no person's rights of property shall be by any of the aforesaid courts determined. This reference is, of course, to courts enumerated in that part of the act preceding, which were all courts of law, and were the quarterly courts of sessions, court of common pleas, supreme court of judicature, etc.

These courts were common-law courts, with jurisdiction to hear, try, and finally determine all actions and causes of actions, and all matters and things triable at the common law, and to settle questions of law arising. The supreme court of judicature was "fully Impowered and Authorized to have cognizance of all pleas, civall, criminall, and Mixed, as fully & amply to all Intents and purposes whatsoever as the court of King's Bench, Common Pleas, and Excheq$^r$ within their Magesties' kingdom of England have or ought to have." So we argue that this provision requiring the fault to be found by a jury in the quarter sessions had reference to proceedings at law, and none other.

What makes my position, that this reference is to proceedings

at law, absolutely certain, is, that in the same judiciary act, in the very next section (3 Prov. Pap. 186, *par.* 3), it is provided as follows:

" And it is hereby Enacted by the Authority aforesaid, That there shall be a court of Chancery within this province, which said court shall have power to hear and determine all matters of Equity, and shall be acco$^{tt}$ed and Esteemed the high court of Chancery of this Province :—

" And be it further Enacted by the Authority aforesaid that the Governor and councill be the said high court of Chancery, and hold & keep the said court, and y$^t$ the Governor may depute, nominate and appoint in his stead a Chancellor, and be assisted with such other persons of the Council as shall by him be thought fitt and Convenient, together with all necessary officers, clerke, & · Registers as to the said high court of Chancery are need full."

It will be seen also that by the act of Aug. 7, 1699 (3 Prov. Pap. 221), while it in no way repealed or abridged the powers of the court of chancery enacted by the act of 1692, certain equity powers were given to courts of law to relieve from legal oppression resulting from the verdict of a jury; or, in the words of the act, such courts " are hereby impowered and authorized to Moderate the rigour of the Law. And on consideration of such cases according to Equity and good Conscience to change such Forfeiture and to enter up Judgment for the just Debt and Damages, And to award Execution accordingly." .

The courts so empowered were the justices of the Inferiour Court of Common Pleas and the Superior Court of Judicature, and the reference was to forfeiture or penalties under agreements, covenants, etc. This was for convenience, and to save going from one court to the other in this particular class of cases. This cannot be understood, as already stated, as taking away the powers of the court of chancery, because then, as now, as to many matters, it was convenient to have concurrent jurisdiction.

Judge *Bell*, in *Wells* v. *Pierce*, 27 N. H. 512, in referring to the act of 1692, which act provided for the establishment of a court of chancery within this province, which should have power to hear and determine all matters of equity, and shall be esteemed· and accounted the high court of chancery of this province, and that the governor and council be said high court of chancery, says,— " It is not known that this law was ever repealed, and it is supposed that the governor and council, who composed the courts of appeals, continued to exercise chancery powers till the Revolution." Referring to these acts, Judge *Ladd*, in *Copp* v. *Henniker*, says,—" The act of 1699, being published in the editions of 1716 and 1771, was, of course, well known to Judge *Bell ;* and when he says that it is not known that the act of 1692 was ever repealed, his meaning evidently is that it is not known to have been repealed in express terms, or by implication, except to the slight

extent to which its provisions were incompatible with those subsequently adopted." The same judge (*Copp* v. *Henniker*, 55 N. H. 176, 185), referring to the act of 1692, says that the act provides,—" 3. That there should be a separate court of chancery, in which no provision was made for trial by jury." And Mr. Shirley says that the records of the governor and council " were indifferently termed the records of the court of appeals and of the court of chancery." *Perkins* v. *Scott*, 57 N. H. 60.

In 1727 the provincial house of representatives makes mention of " the court, sometimes called a court of appeals and sometimes the court of chancery." *Ib.*, 57 N. H. 54. Judge Smith does not claim that this court was abolished until June 28, 1776.

This act was not prompted by reason of any arbitrary exercise of power by courts of equity, as will be seen by reference to the preamble of the act of January 5, 1776. It was the appeal from court to court which protracted suits, and the appeal to the court of appeals and to the king of Great Britain, which was complained of as depriving the people of the colony of their great, inestimable, and inherent right of trial by jury. See Preamble, *Perkins* v. *Scott*, 57 N. H. 67.

In the act of parliament of June 24, 1677, which was later adopted by this province, and published in Province Laws (edition of 1771) 257, we find it provided, concerning wills relating to real estate in that part of Great Britain called England and his majesty's colonies and plantations in America, that the credit of any witness attesting the execution of any will or codicil in such cases shall be considered by the court and the jury, etc., " or of the court of equity in which the testimony or attestators of any such witness shall be made use of," thus recognizing the court of equity at that time, 1771.

By an act passed about 1718, adopted by order of the governor and council of the province about 1769, published in Province Laws (edition of 1761) 18, 20, 22, the right of appeal was given to all parties from the judge of probate, upon all decrees and orders relative to wills and distribution of estates, to the governor and council for their determination. The governor and council, as has been seen, were the high court of chancery, created by the judiciary act of 1692, which corresponds to our supreme court of probate. This act is cited in *Patrick* v. *Cowles*, 45 N. H. 555, in which case the court holds, Judge *Sargent* delivering the opinion, I think, that the right of trial by jury does not exist in such causes. And *Brooks* v. *Heath* holds that the right of review does not exist in equity proceedings. In this case the opinion of the court was by Judge *Ladd*. It is conceded by counsel that the high court of chancery, created by the act of 1692, was in existence until June 28, 1776, in theory if not in practice, at which time it is claimed that such court was abolished. Grant, for the purposes of argument, that this be true, still the reasoning of Judges *Gilchrist*

and *Parker*, in *State* v. *Rollins* in 8 N. H., as to *art.* 90, Part II of the constitution, is broad enough to clothe our courts of equity, under the act of 1832, with full English chancery powers.

Now, suppose that this high court of chancery was abolished June 28, 1776—and I do not concede this, in view of the holding in *State* v. *Rollins*, as to what acts and laws remained in force under *art.* 90 of the constitution, and in view of the further fact that the preamble goes for "the courts of appeals in this colony," and not courts of equity;—but suppose it was repealed in the era of revolution, and assume that the exercise of power in this court was not among the grievances complained of, and after sixteen years covering the war and a few years following, which was a period of turmoil, excitement, and uncertainty: is it reasonable to assume that the framers, when providing for a jurisprudence, and referring historically to a practice and usage theretofore existing, intended the crude and uncertain period of war judiciary, rather than the great system of jurisprudence of the centuries preceding? It seems to me that the people of this state have a right to rely upon the judicial utterances of the last half century. Judge *Bell*, in *Wells* v. *Pierce*, speaking of courts of equity, says,—"The limits of their jurisdiction in these cases are coextensive with those of the court of chancery and other courts of equity in England. Equity, as a great branch of the laws of their native country, was brought over by the colonists, and has always existed as a part of the common law in its broadest sense in New Hampshire." This question seems to have been fully considered by Judge *Bell* in that case.

But great stress is placed upon the message sent to the legislature by Governor Bell in 1821. While this is an official message, it is simply the opinion or assertion of one man, a political and executive officer, and, of course, not conclusive. While such utterances are entitled to a fair measure of credit, they are not conclusive by any means. The opinions of lawyers and executives differ as to jurisdiction of courts, as to remedies and procedures. Disputes arise as to what is within and what is without the jurisdiction of courts. Ask a practitioner to-day as to whether a given case is one to be adjusted in equity or settled at law: he may answer clearly, In equity;—another of equal prominence may say, Not in equity at all, for such questions can only be settled at law.

Suppose, for illustration, that the Connecticut River Lumber Company had never come into existence, and that the Olcott Falls Company had never had an existence, and that the discussions involved in the present case had never been precipitated, and that Judge *Ladd* were to be called upon forty years hence to express an opinion, official or otherwise, upon the question of equity jurisdiction and procedure at the time of the adoption of the constitution: he would, with confidence, give utterance to the assertions and opinions in *Perkins* v. *Scott* and *Copp* v. *Henniker*. And now the sit-

uation is changed. Thirty years hence, if Judge Smith were required to give utterance, his opinion, presumably, would be otherwise. Hence we argue that personal and official executive utterances should be received with caution. Reference is also made to the opinion of Judge *Parker*, in *Marston* v. *Brackett*, 9 N. H. 336. But, so far as it appears, no historical investigation was made in that case ; the court did not consider the question as to what system of use and practice the exception in *art.* 20 referred, whether English or Provincial. The only authority referred to in the opinion is *Charles River Bridge* v. *Warren Bridge*, 7 Pick. 369.

Judge *Ladd*, in speaking of Chief-Justice *Parker* and his opinion in *Marston* v. *Brackett*, 9 N. H. 336, decided in 1838, says, "that until this case it had not been intimated in this state, or anywhere else, that there was a right of trial by jury in equity proceedings. I venture to say, that if such a right ever existed in this state, it was after, and not before, the observation of Chief-Justice *Parker* in that case. It is not necessary, in the view I take, to inquire whether that observation established such a singular and anomalous doctrine in this state or not. It is enough that up to that time all the books and cases, wherever the common law prevails, are the other way." *Perkins* v. *Scott*, 57 N. H. 81.

In *Copp* v. *Henniker*, 55 N. H. 210, 211, Judge *Ladd* uses the following strong language : " The researches of Judge *Bell* brought to light material facts that were unknown to his father when he said, in his message to the legislature of 1821, that ' Our ancestors, who adopted in general the laws of that country from which they originated as the basis of their code, omitted to introduce into practice that part of the system which appertains to chancery jurisdiction.' If Judge *Parker* had understood this branch of our provincial history as Chief-Justice *Bell* understood it, it would seem that it would not have been held (as it was, without consideration, in 1838) that the constitution guarantees the right of jury trial in cases within the jurisdiction of chancery." In speaking of the act of 1692, he adds,—" Judge *Bell*, the highest authority on all matters of our provincial judicial history, says that it is not known that this law was ever repealed, and that it is supposed the court of chancery continued to exercise its powers till the Revolution." *Ib.*, 55 N. H. 186.

In speaking of this question, in *Perkins* v. *Scott*, 57 N. H. 81, and of the bearing of the actual practice upon the question of the right of trial by jury, Judge *Ladd* says,—" It adds very little to the argument, one way or the other, so far as I can see, whether any provincial court ever, in fact, exercised chancery powers, making use of the forms of proceedings usually employed for that purpose in England, and latterly in this country "—thus agreeing, in this respect, with Judge *Parker*, in *State* v. *Rollins*, 8 N. H. 563, who, in speaking of *art.* 90 of the constitution, says that actual use is not the test.

Supposing that the power to enforce specific performance had been exercised by any tribunal either in the province or the state, or supposing that it had not, Judge *Ladd* says,—"If it was a power never used nor practised in the province before the constitution in any form, then, to determine the true application of the terms 'heretofore used and practised' as used in the Bill of Rights, we must go to the common law with respect to the new right and power thus conferred ; and, doing that, we find it not to be a case in which it had been used and practised anywhere before the constitution, to have a trial by jury as matter of legal right." *Perkins* v. *Scott*, 57 N. H. 81, 82. So we see that we are greatly indebted to the judicial learning, the historical research, the strong and forcible reasoning, and the logical deductions of Judge *Ladd* for the condition in which we find this question.

In 1876 this question was again considered, and the court, as then constituted (and it is supposed, after consideration), held, in *Bellows* v. *Bellows, supra*, that the constitutional right of trial by jury in chancery cases does not exist as a constitutional right in New Hampshire. This question was again discussed by the present chief-justice in *Wooster* v. *Plymouth*, 62 N. H. 203, where it is said,—" The exception of ' cases in which it has been heretofore otherwise used and practised ' (*art*. 20) is neither a reservation nor a grant of jury trial in any case, but an exception of cases in which the right is not reserved. The essentials of that method of adjudication are shown by common-law principles and by history." See cases cited.

In *Davis* v. *Dyer*, 62 N. H. 236, it is said by Judge *Allen*,—" It must be considered as settled in this state that cases within the equity jurisdiction of the court were, previous to and at the time of the adoption of the constitution, a class which it had not been the practice to try by jury, and to which the right guaranteed by the Bill of Rights was not extended and did not apply. There is not and never has been any absolute constitutional right of trial by jury for equity causes. . . . The other cases before cited, all decided [citing *Perkins* v. *Scott* with approval] that there was no absolute constitutional right of jury trial in causes within the equity jurisdiction of the court." It seems to us that this question should be considered as settled, and that parties should understand that their rights will be regulated in accordance with the doctrine so often promulgated.

Regarding the question whether there were courts of equity with full chancery powers in this state in 1792 as entirely immaterial, we shall endeavor to establish two propositions: 1. That in construing the exception " heretofore used and practised," reference should be had to the previous practice in England. 2. That the right of trial by jury in equity causes like the one in question, involving the regulation of water-rights where both parties had a conceded right and title, did not exist as a matter of right in Eng-

land, and that it was not used and practised to try such causes by jury. Undoubtedly the term "hitherto used and practised" had reference to the uses and practices of the past, in this country and in England, but more essentially to established rules of practice in England. If there was no use or practice here, and the framers had intended to save the right of jury trial in all controversies, why not say so? They could have expressed themselves very decidedly, and in a few words, as, for instance, "The right of trial by jury in all controversies between parties concerning property shall be forever inviolate."

Does any one claim that this exception had reference to controversies as to wills and accounts only? If such had been the intent, it could have been expressed in unmistakable terms. " All controversies except as to wills and accounts" would have clearly stated the intention. The fact that special classes of cases are not expressed, shows that the exception was intended to be of broader scope. But the fact that they qualified this guaranty and made a general exception of those cases where it had been theretofore used and practised otherwise, shows unmistakably that they did not intend what counsel claim, but, on the contrary, wisely provided that the legislature might create courts ample to administer justice for all time and under all circumstances; and the only limitation or restraint which they placed upon that branch of the government was to say, Cases which have hitherto been tried by jury, shall be tried by jury in the future. It was the English jurisprudence which was referred to. It was not the steady and ordinary course of the English common-law and equity jurisprudence that estranged our forefathers and precipitated the Revolution, but executive usurpations and parliamentary encroachments. It was not among their purposes to establish a new jurisprudence, but it was designed to adopt and perfect that of the mother country.

The language of this exception, " heretofore otherwise used and practised," should be received in its ordinary sense, because there is no historic reason for putting upon it an unusual meaning. It is manifest that it was intended to preserve the right of jury trial except as to those classes of rights and controversies which had been theretofore otherwise adjusted. As has been already said, it will not be contended that the general provision is not broad enough to include equity causes. But we say that the exception was intended to except equity causes from the operation of the general provision. And, instead of undertaking to enumerate in the constitution the particular cases in which courts of equity should have jurisdiction, it left that to be judicially determined by the courts of the future according to the practice and usage which had theretofore obtained, in the jurisprudence after which we were forming our system, and the term " heretofore " can only be viewed as having reference to the English system of common law

and equity. Legal rights cannot be ascertained or measured by narrow, particular periods of time. In the ascertainment of right, courts are continually adhering to precedents, ancient and modern.

Is it contended that rights, remedies, and proceedings should be ascertained and measured by the usage practised on the day of the adoption of the constitution? This would be absurd. Well, then, if that particular day was not the guide, what period will you take? Will you take one year, or two years, or ten years, or the quarter of the century preceding? This would be equally absurd. The term " heretofore " had reference to the past—to the past history of common-law and equitable rights and proceedings —to the whole history.

Here is a position from which, it seems to me, there is no escape. If the historical argument of opposing counsel is true, that, technically, no court of equity existed in the province at the time of the adoption of the constitution (which I do not concede), and his further argument is sound, that the exception in the 20th article of the Bill of Rights must be construed as having reference to that particular period (which I do not concede), then it follows, as a matter of course, that the right of trial by jury exists in all equity proceedings, upon all issues, although for hundreds of years previous it had been used and practised differently in England. It seems to me that the broader and more reasonable view is, that these people understood that they were building from the common-law and equity jurisprudence of England. They did not assume to define all the powers of the courts, or to create all the courts that future generations should need to settle their disputes, though they did provide that the general court should forever have full power and authority to " erect and constitute judicatories and courts of record, or other courts, for hearing and trying all processes, causes, matters, and things whatsoever," etc. Constitution, Part II, *art.* 4.

As is well known, *art.* 90, Part II of our present constitution, down to the proviso, was in the constitution of 1783, and this was based upon somewhat similar phraseology in the act of April, 1777, entitled "An act 'for the reëstablishing of the general system of laws heretofore in force in this state.' " It will be observed that this article has reference to practice in the courts of law. It will be observed, also, that the language is more explicit in the direction of restriction than the exception in *art.* 20 of the Bill of Rights. Mark the difference. In the Bill of Rights the language is " except in cases in which it has been heretofore otherwise used and practised ;"—no reference to the practice in the province, or to this country ;—while *art.* 90 provides that " all the laws which have heretofore been adopted, used, and approved in the province, colony, or state of New Hampshire, and usually practised on in the courts of law, shall remain and be in full force until altered and repealed

by the legislature, such parts thereof only excepted as are repugnant to the rights and liberties contained in this constitution."

I will not comment at length upon the very able and comprehensive opinion of Judge *Parker*, in *State* v. *Rollins*, where it was held that an indictment for the English common-law offence of false imprisonment and kidnapping was sustainable in this state, although there was no statute or express law here creating such an offence, but will quote one paragraph of the opinion which has reference to *art.* 90 in question : and it will be seen that this indictment was sustained on the ground that the English law, existing before the Revolution, was continued in force by virtue of *art.* 90. The court says,—" It is perfectly apparent that the body of the common law, as previously in force, was comprehended in this enactment. That was a part, and a very important part, of the general system of laws which were to be reëstablished by the act. If it was not as a body comprehended in the act, it must either have become entirely nugatory,—which cannot be supposed, for without some parts of it the administration of justice could not have been continued,—or it must have remained in force by some inherent vigor of its own ; for there is nothing to indicate that a separation was then to be made in it, and such parts only of it as could be shown to have been actually used in the courts of justice to be adopted, and the residue, which was in force before, although not shown to have been used, to be rejected. If any part of it was within the act, the whole body of it previously in force was so, except such parts as were incompatible with the new form of government." *State* v. *Rollins*, 8 N. H. 562, 563.

In *Pierce* v. *State*, 13 N. H. 536, it was contended that questions should not be put to the jury as to whether they had formed opinions as to the law in the case, because, as it was claimed, the juror or jurors were judges of the law in the period before 1792, and that therefore they were entitled, under the constitution, to that kind of a jury trial. This is the case, as will be remembered, where John P. Hale said the friends of free government and popular rights are on one side, and those of legitimacy, aristocracy, etc., on the other. It will be in vain for the court to throw themselves before the car which carries on the progress of free principles. The questions involved were deemed of sufficient importance and gravity to call for the opinion of two members of the court, namely, *Gilchrist* and *Parker*.

Judge *Gilchrist* says,—"At the time of the adoption of the constitution, the common law was the law of the state, so far as it was applicable to our institutions and the circumstances of the country." *Ib.*, 13 N. H. 542. In speaking of the kind of jury intended by the constitution, he says,—"As a common-law question, this must be determined by the authorities. Wherever they lead us, it is our duty to follow. Whatever result they may establish, it is our duty to declare." *Ib.*, 13 N. H. 543. And the learned judge proceeds to

an examination of the English authorities, for the purpose of ascertaining the kind of jury system used in the law courts of England.

Judge *Parker*, in discussing this same question, says,—" So far as I am aware, it is not known at the present day [1843] what was the doctrine of the courts here upon this point before the Revolution. It is well understood, however, that the administration of justice [before the Revolution] was in general of a very inartificial character. . . . it is very clear that we cannot resort with much safety to the rulings or decisions of that time for the purpose of determining a contested question involving legal principles. Even after the Revolution and the adoption of the constitution, although perhaps substantial justice was administered in most cases, little can be claimed for the courts on the score of their scientific administration of the law, according to strict legal rules. . . . If, therefore, we do not look with the utmost confidence to the period immediately succeeding the Revolution for precedents, it is not a matter of reproach to the men who were then engaged in laying broadly and deeply the foundations of a government." *Ib.*, 13 N. H. 557.

Judge *Parker* practically admits that the jury had to some extent been judges of the law in both civil and criminal cases, but says,— " It is obvious, from this brief review of some portion of our early jurisprudence, that it cannot furnish a rule for the action of the courts at the present day." *Ib.*, 13 N. H. 558, 560.

Later, in 1869, this doctrine was forcibly reiterated and emphasized in *State* v. *Hodge*. The opinion in that case was by the present chief-justice, who speaks of the doctrine of Judge *Parker*, in *Pierce* v. *State*, as a novelty at the time, but expresses the wonder that there could ever have been any doubt of its soundness; and says that the system (jury system) inaugurated by Judge Parker in 1842, contrary to the practice previous to 1792, was and is to be accepted as a fundamental theory of the constitution, an ancient principle of the common law, and the true construction of the Great Charter. The court say,—" History discarded the old practice as a test of the right and duty of the jury to decide the law. We are not at liberty to adhere to it [the old practice] as a test of the right and duty of the court to decide the fact. If the application of this doctrine in its whole length and breadth should clear the law of a great mass of facts which encumber it, the result would be not only an ideal vindication of constitutional principle, but also a practical improvement, tending to facilitate the study and administration of the law, and to make it a more intelligible and rational system of general rules—a point of no small consequence in a society which undertakes to found its institutions upon popular intelligence." *State* v. *Hodge*, 50 N. H. 510, 523, 524.

It may be proper to observe, in passing, that the court at that time embraced other eminent constitutional judges, such as the late Chief-Justice Bellows, the Hon. Jeremiah Smith and the Hon.

William Spencer Ladd, now of counsel for the defendants in the case at bar, who concurred in the opinion. Now, what is the import of that opinion in *Pierce* v. *State*, which both the counsel for the defendants, as members of the court in 1869, fully indorsed? Simply this, and nothing less,—that the constitutional guaranty of jury trials (although there is no reference to the past) reaches beyond the actual jury as practised and used in the province and state prior to 1792, and embraces the jury known and used in the English common-law system.

Judge *Foster*, in *King* v. *Hopkins*, 57 N. H. 346, 348, 350, after speaking of the imperfect jury practice prior to 1792, makes the following forcible statement: "So the constitutional conventions of 1783 and 1792 must have had the same intent as those judges— Dudley, Farrar, and others. They must have intended such a jury trial as that of the common law of England, under which they had always lived, and which they adopted,—not precisely that trial in every unimportant detail, but precisely that in substance and so far as its essentials were concerned."

Judge Smith and others, in the convention of 1792, did not understand the "sacred right" and "inestimable privilege" of trial by jury to mean such a trial as overturned all law before such judges as "never read, and never would read" the "sages of the law." The "sacred right" and "inestimable privilege," not conferred, but confirmed, by the Bill of Rights, was, in the mind and intention of those who declared it, the common-law jury trial, in all its essential and time-honored attributes. And it is not possible that any other kind of jury trial can be sustained as the true legal construction of the constitution.

The authorities are numerous that construe common-law terms in a constitution according to their common-law signification. Our constitution is to be construed by the light of the common law. A system of jury trial, such as our English ancestors never knew, might have been created by our constitution-makers; but if they had chosen such a creation, they would have conferred upon their creature some distinctive and recognizable mark. Instead of this, they used a familiar term to express their idea;—but if any one will seek for a definition of the term, he must draw from that great fountain, the common law; and in doing this, he must bear in mind, as I said a little while ago, that this right of jury trial is not conferred, but confirmed, by the constitution; that it is not the beginning of a law for the state, but that it assumes the existence of a well understood system, which is to be continued in force and "held sacred." Cool. Con. Lim. 60. If any common-law term has a settled and definite signification, it is "trial by jury."

The argument seems ridiculously narrow, that when the framers gave the legislature full and complete power (under *art.* 4, Part II) to erect all kinds of courts, so that all processes and remedies should be open to the people as their interests and demands might

in the future require, and that all kinds of causes and complaints might be heard and justice speedily administered ; that after doing all this for future generations, they should make a sudden turn, and strictly limit the power and practice of the courts so erected to the condition of courts already in existence, and to the period just preceding and following the Revolution ; that no other processes or methods should be used; that the term " hitherto used and practised " was to be cut short; and that the courts for all times should draw their methods and powers from that limited judicial fountain,—this, I say, seems to me simply ridiculous. This would be giving power to the legislatures for the mere purpose of at once destroying its practical utility and operations. I contend that *art.* 4, Part II of the constitution, shows that the framers of the constitution realized that they had not erected a complete judiciary; that they intended to leave that to future legislatures, as necessities might arise ; while they also intended to protect the jury trial, as it had grown and formed into a system in England. No other argument can stand the test of reason and thought for a moment.

Drawing from the whole country for precedent for his argument, the only dictum counsel finds in support of it is that of Judge *Ladd,* in *Copp* v. *Henniker,* 55 N. H. 191, 192. But this dictum had reference to an actual practice in the province. Now, suppose there was no " practice " to do a certain thing in a certain proceeding in this province : then where does the " heretofore " carry you ? Nowhere ? Or is it reasonable to suppose they meant some system somewhere ? If there was a system of equity jurisprudence in England, time-honored and well understood, in which it had been " used and practised " to regulate certain classes of controversies and certain classes of rights without a jury, and if it be true, as argued by the other side, that such proceedings had not been " used and practised " here at all prior to 1792, is it any less probable that the exception " heretofore otherwise used and practised " had reference to such well understood practice and usage in English courts of chancery, than that the guaranty of trial by jury, without any allusion whatever to practice or usage theretofore, had reference to the well known and time-honored jury system of England described by Judge *Parker* in *Pierce* v. *State,* 13 N. H., and by Judge *Foster* in *King* v. *Hopkins,* 57 N. H., rather than the crude and inartificial jury system which was in actual use and practice in the colonial, provincial, and early state periods of our history, as held in these cases ? To argue that it is less probable, is to argue the term " heretofore otherwise used and practised " meaningless verbiage, referring to practice nowhere, and that the authors of it were a set of narrow, senseless old gentlemen—an argument which ought not to prevail against the acknowledged historic wisdom and rugged common-sense of the men who constituted that illustrious body. In other words, if the guaranty part

of the clause as to jury trial means a jury trial of the law courts of England, according to the common-law practice, why does not the exception, which is the other part of the same clause, by force of the same reasoning, mean the equity trials of England according to the chancery practice of that country? Or, again: If the system of equity was practised here prior to 1792, inartificially or imperfectly, as the jury system was practised, or if it was practised to a limited extent, is it less probable that the exception refers to the more perfect system of England than that the guaranty, without any backward reference whatever, means the more perfect jury system of England as administered under the rules of the common law rather than the inartificial actual jury practice of the stormy period of the Revolution, as it is sometimes expressed in books? Or, still again: If full chancery powers existed in New Hampshire at the time of the adoption of the constitution, we still maintain that the exception referred to the practice here and in England.

It is said by the court, in *King* v. *Hopkins*, 57 N. H. 348,—"It may be that the New Hampshire practice before 1792 as a historical fact, and the jury trial of the common law as a principle, should both be considered in the effort to ascertain what kind of a trial the framers of the constitution meant and intended in 1792 by jury trial." And if this reasoning be true as to law courts, why not as to courts of equity? Still again: If there was no practice here at all, as claimed by the other side, then the reference must have been to English practice alone,—and the legislature having the power under the constitution to create such courts, when created such courts would take the modes and usages of the system to which the exception referred. As bearing upon the probable intention, if it be true, as claimed by counsel, that there had been no exercise of chancery practice in New Hampshire for a half century prior to 1792, it is reasonably certain that the denial of jury trial in such proceedings was not a grievance against which our forefathers were revolting; nor could it have been the grievance stated against the British Crown in the Declaration of Independence, "for depriving us in many cases of the benefits of trial by jury." If his argument is true, the grievance referred to in the Declaration must have been the denial of jury trial in causes other than equity. There is nothing in history, there is nothing in our jurisprudence, there is no peculiar principle in our institutions, which make equity proceedings, according to the ordinary course in England, repugnant to the people of this country.

One other position taken by counsel in his argument, where he undertakes to lay upon a party the burden of showing as fact that cases in equity were triable without a jury in New Hampshire prior to the adoption of the constitution, needs to be noticed. Of course, if our argument be sound, that the reference was to English jurisprudence, this question is of no practical importance; but if it

be otherwise, we should say it is not a question of burden of proof, but one to be settled upon judicial and historical examination. The argument that the right, being reserved to the legislature by *art.* 20, to change the mode of trial in cases arising on the high seas and such as relate to mariners' wages, shows that the exception as to cases otherwise used and practised had reference to practice in New Hampshire, is erroneous. It shows the reverse. At least, it does not show what is claimed for it. It is asserted that it was the actual practice in New Hampshire to try such cases by jury. That being so, the general clause preserving such right might put it beyond the power of the legislature to provide other methods. It might have become a vested right. This proviso means, that the legislature should have the right in this class of cases, triable at law, to withdraw the right of trial by jury, and has no reference whatever to the class of rights embraced by the exception. No danger comes from the suggestion as to the power of the attorney-general, as an officer of the public, to make the proceeding civil or criminal. The attorney-general does not, by instituting the proceeding, determine any question of right. If he thinks the remedy at law by indictment adequate, he may institute such a proceeding. Or, if he deems the remedy at law inadequate, he may set forth his allegations in equity by information, as has been done for hundreds of years. But this does not determine the rights of anybody. It becomes a question of jurisdiction, and it is for the court to say, from the nature of the case, whether it is a case where the legal remedies are adequate, or whether, upon approved and well understood principles, it is a cause cognizable in equity. There is nothing new, startling, or novel about this.

Now, as bearing upon this question of whether the framers were referring to the practice in England, we may well inquire as to the constructions which have been put upon similar safeguards by the various courts of this country. We shall get light there. Take, for instance, the jury safeguard, where the constitutions make no reference to the past practice or to any system, merely providing that the right of trial by jury shall be held inviolate. The courts have invariably held this to mean the common-law jury of England. For instance, note again on this point the language of Judge *Ladd*, in *Copp* v. *Henniker*, 55 N. H. 193, where, in quoting from *East Kingston* v. *Towle*, 48 N. H. 64, he says,—" The trial by jury secured to the subject by the constitution is a trial according to the course of the common law." See, also, *Opinion of the Justices*, 41 N. H. 550; 2 Sto. Const., *s.* 1779, *n.* 2; Sedg. Stat. Law 493, *n.* 2d ed.; Cool. Con. Lim. 319; *State* v. *Peterson*, 41 Vt. 522; see 27 Vt. 359. Judge *Bell* says (in 27 N. H. 512) "the question whether this court [a court of equity] will lose their jurisdiction because there is an adequate remedy at law, is to be decided here as it would be in England." Thus showing that upon this subject of adequacy at law, reference should be made to the practice of England.

[Counsel commented on *Robinson* v. *Campbell*, 3 Wheat. 212–221, *United States* v. *Howland*, 4 Wheat. 108, 115, and *Herbert* v. *Wren*, 7 Cranch 370–376.]

*Pratt* v. *Pond*, 5 Allen 59, is not against the reasoning of the foregoing cases, although it might at first so seem. The only suggestion of consequence there is, that when the jurisdiction depends upon inadequacy of remedy at law, the question of adequacy is to be determined under the statutes of Massachusetts and their course of practice. This term, of course, is quite different from one referring to a practice and usage hitherto obtaining, as our Bill of Rights in substance does. [Counsel quoted from Prof. Jur., *ss.* 84, 87.]

In three states—Ohio, Kansas, and Vermont—the guaranty is most strongly expressed in the following language : " The right of trial by jury shall be inviolate." Even in these states the same interpretation prevails, and I propose to refer to the decisions of these states first.

In Kansas, in 1866, the court, speaking through its chief-justice, said, in *Kimball* v. *Connor*, 3 Kan. 432,—" The plaintiffs in error insist that the act relating to proceedings in the county of Douglass, approved February 9, 1864, is unconstitutional and void because it does not authorize the trial by jury. This presents the question whether this is a case within the meaning of the constitutional provision—Bill of Rights, *s.* 5—'The right of trial by jury shall be inviolate.' It is unnecessary to determine whether the investigation provided for in the act referred to is strictly a ' trial.' Admitting for the purposes of this case that it is a trial, it will not follow that the act is in contravention of the constitutional provision. That provision does not require every trial to be by jury. Nor does it contemplate that every issue which by the laws in force at the adoption of the constitution of the state was triable by jury, should remain irrevocably triable by that tribunal. Trial by jury is guaranteed only in those cases where that right existed at common law. Such is the meaning of the constitutional provision referred to ; and in statutory proceedings, proceedings in chancery, etc., the legislature is fully competent to dispense with the jury."

This provision of the Vermont constitution was under consideration in *Plimpton* v. *Somerset*, 33 Vt. 291, where it was said,— " In all these, and other similar cases which might be noted, the immemorial practice of proceeding to trial without a jury, in the common-law courts of England and of this country, has been held conclusive to show that they are not, within the terms of the constitution, ' proper for the cognizance of a jury,' and were not intended to be therein included." In the course of the same opinion it is said,—" The constitution was intended to provide for the future as well as the past, to protect the rights of the people, . . . whether those rights then existed by the rules of the common law, or might from time to time arise out of subsequent legislation. All the rights, whether then or thereafter arising, which would prop-

erly fall into those classes of rights to which by the course of the common law the trial by jury was secured, were intended to be embraced within this article. . . . It is the nature of the controversy between the parties, and its fitness to be tried by jury according to the rules of the common law, that must decide the question."

The case of *Lessee of Cochran's Heirs* v. *Loring*, 17 Ohio 409, is in more respects than one a noticeable and valuable case, as well in respect to its historical references as to the strong language used by Judge *Hitchcock* in disposing of the question. [Counsel quoted from the case at length, and commented on it.]

Our purpose in citing these reasonings is to show that, among the states, guaranties similar to our Bill of Rights are understood to have reference to the long established English system.

*Klonne* v. *Bradstreet*, 2 Handy 78, was a bill in equity to foreclose a mortgage. There it was distinctly held that the parties are not entitled as a matter of right to a trial by jury, but the granting or the withholding it is in the discretion of the court.

In *Carlisle* v. *Foster*, 10 Ohio St. 198, was a bill in chancery for the enforcement of a trust and for an account by the trustee: "It was, therefore [says Chief-Justice *Brinkerhoff*], a matter of discretion in the court below whether it would submit any question of fact, and if so, what questions involved in the case were to be tried by jury."

*Ellithorpe* v. *Buck*, 17 Ohio St. 72, was an action under the code which abolished the distinction between actions at law and suits in chancery, and under which the civil action was substituted for both. An action was brought by a party claiming legal title and possession of real property, to determine the interest of a party claiming an estate there adverse to him, and to enjoin such party from committing irreparable injury to the property by cutting timber thereon. *Held*, there being no issue of fact arising in the pleading "for the recovery of money, or of specific real or personal property," neither party has a right, under the 263d section of the code, to demand a trial by jury; but the issues are properly triable to the court, although the location of the boundary line between the adjoining lands of the respective parties is the matter in dispute.

In New Jersey, under a constitutional provision "that the inestimable right of trial by jury shall remain confirmed as a part of the law of this state without repeal forever," where the question was taken that the right of trial by jury was secured in all cases, the court, as early as 1793, through *Kinsey*, C. J., in *Wood* v. *Tallman*, N. J. Law 153, held that the constitution does not extend the right to a trial by jury to cases which did not fall within its province before the existence of that charter; the chancery prerogative and the spiritual courts have always proceeded without the intervention of a jury; and the orphans' courts, being

invested with those powers, as defined and limited by the act of assembly, may exercise them as before without any violation of the right of trial by jury. See, also, *Scudder* v. *Company*, N. J. Eq. 696; *McGear* v. *Woodruff*, 4 Vroom 216; *Howe* v. *Plainfield*, 8 Vroom 145; *State* v. *Doty*, 3 Vroom 403, 405; *In re Lower Chatham*, 6 Vroom 497.

In *Howe* v. *Plainfield*, 8 Vroom. 148, the court say, quoting approvingly from Mr. Justice *Strong* in a Pennsylvania case, "its measure [right of trial by jury] is therefore to be sought in the usage which prevailed at the time when it was asserted. But never in England was there any usage, and, consequently, was there any right, in the subject that every litigated question of fact should be submitted to a jury. In all that large class of cases which are cognizable in courts of equity, there never was any right of trial by jury, nor did the right extend to many other civil and criminal proceedings.

In Pennsylvania, the Bill of Rights declares that "trial by jury shall be as heretofore, and the right thereof remain inviolate;" in effect, precisely the same as *art.* 20 of the New Hampshire Bill of Rights.

The opinion of Mr. Justice *Strong*, in *Byers* v. *Commonwealth*, 42 Pa. St. 89, 94, is worthy of special note. The head note states the substance of the decision, and is in the following language: "The constitutional provision relative to trial by jury was intended to preserve the right as it existed at the formation of our state government, and not to increase or extend it, and must be construed with reference to the statutes that were in force in England and in the province of Pennsylvania, at the adoption of the first constitution of the state."

But I desire to call the attention of the court to the reasoning of this case. Judge *Strong* says,—"The objection is based upon a misconception. We inquire not now after the mode in which such a trial was conducted. Our business at present is to ascertain how far the right to a trial by jury extended,—to what controversies it was applicable. All looked to preservation, not extension. It is the old right, whatever it was, that was to be preserved. None of the powers of government or constitutions under which we have lived have contemplated any extension of the right by and the limits in which it had been enjoyed previous to the settlement of the state or the adoption of the constitution. But never in England . . . in all that large class of cases which are cognizable in equity, was there right of trial by jury." Mere quotations will not do justice to the strength of the opinion in this case.

In New York, the provision in the constitution of 1777 is, that " the trial by jury in all cases in which it has been heretofore used shall remain inviolate forever." This was held in the court of appeals as intending the common-law jury. *Wynehamer* v. *The People*, 13 N. Y. 378. It does not include equity cases.

It was said, in *Rathbun* v. *Rathbun*, 3 How. Pr. 141, "A trial by a justice of the supreme court at a special term of an equity case is clearly within the implied exception of the constitution," citing approvingly *Lee* v. *Tillotson*, 24 Wend. 337.

In *Empire City Bank*, 18 N. Y. 210, it is said that a trial by jury is preserved by the constitution; but in controversies cognizable in courts of equity a jury trial was never in general resorted to.

I shall not follow the investigation of the equity practice in the various states further at this time, except to refer to Judge *Ladd's* criticism of *Marston* v. *Brackett* in *Copp* v. *Henniker*, 55 N. H. 211, where he says that this doctrine seems to be acknowledged nowhere but in New Hampshire; and to the remark of Mr. Pomeroy, in his notes to Sedg. St. Law 489, 2d ed., that the New Hampshire doctrine is purely exceptional, and must depend upon an early practice in that state peculiar to itself. See, also, Pom. Eq., *ss.* 299, 308. There was no peculiar or exceptional practice in New Hampshire justifying the opinion in *Marston* v. *Brackett*, and it can only be accounted for upon the ground suggested by Judge *Ladd* in *Copp* v. *Henniker*, 55 N. H. 211, that it was without consideration.

I now come to the second point, which is the English chancery jurisdiction and practice. And in the first place I desire to call attention to Judge Smith's treatment of the questions involved in this case. In his discussion of the English practice, he treats the question as distinctly one of nuisance, common to the whole public, and as though the right and title were neither conceded nor established, in utter disregard of the fact that the bill presents other questions as to the regulation of water-rights, in which the parties have an unquestioned and conceded right of use, and in which the plaintiff has a special interest beyond that of the general public. The nuisance question may or may not become a question in this case. At all events it is not the sole and only question. I shall refer to this further on, but desire that the distinction should be borne in mind.

Courts of equity have exercised jurisdiction over water-rights, rights of purpresture, and nuisance and waste in connection with such rights, and over nuisance as an independent cause, from the earliest periods.

For the purposes of my position in the case at bar, it is not necessary for me to maintain, and I do not, that the class of statutory nuisances covered by the so called "nuisance act" in New Hampshire may be tried without the intervention of a jury. Nor do I oppose the idea. I do, however, maintain that the grounds do not run on the same lines; that there is and ever has been a distinction between nuisances created by statute, as well as common-law nuisances, such as in creating and maintaining conditions prejudicial to health, with a money penalty or imprisonment

attached, and *quasi* nuisances, such as are involved in water-rights or rights of purpresture.

One class of nuisances embodies the element of crime either *per se* or *prohibitum*, with penal punishment in the line of the criminal administration of justice, while the other may be a nuisance, or may be a mere infringement of a right common to the public, and against which courts of equity furnish redress to a person sustaining special injury. It can be said, however, that there were in England certain classes of nuisances and misdemeanors which were restrained without trial by jury. The ground, I believe, was, that when the thing complained of was a nuisance *per se*, the court would say that a man should not devote his property to such uses. While I do not argue against jurisdiction in the liquor nuisance cases, or for the jury trial in such proceedings, I do say that the two cases should not be confounded. They are on different lines.

But to resume as to the case in hand: A distinction has been made from the earliest times between a plaintiff who has no special interest beyond that of a member of the public to abate the nuisance, and a plaintiff who is suffering special injury by reason thereof. Lord *Eldon* said, in 1812, in *King* v. *Dewsnap*, 16 East. 196 (a proceeding by indictment),—"I did not expect that it would be disputed at this day that though a nuisance may be public, yet that there may be a special grievance arising out of the common cause of injury which presses more upon particular individuals than others not so immediately within the influence of it."

In regard to nuisances, the jurisdiction of courts of equity, says Story (*s.* 921), "seems to be of a very ancient date, and has been distinctly traced back to the time of Queen Elizabeth," citing Ed. Inj., *c.* 11, *p.* 224. In the text of Eden on Injunctions, published in 1821, *p.* 259, the author says the jurisdiction of courts of equity in cases of purpresture and nuisance is undoubted; that it is founded on the right to restrain the exercise, or the erection, of that from which irreparable damage to individuals or great public injury would ensue. The extensive notes of Mr. Waterman (to *c.* 11, *p.* 259), in Wat. Ed. Inj., are valuable. And the distinction there taken is, that a public nuisance is one that annoys all the members of the common public alike, and that, although the injury may be to an interest which is open to the public, if it lay more heavily upon a particular individual, he may have his remedy by private suit in equity.

In cases where there is no special damage to single individuals more than is common to the public, the remedy must be by indictment, or by information in equity by the attorney-general. Nuisances, he says, are of two kinds,—those which are injurious to the public at large, and those which are injurious to the rights and interests of private persons. With regard to public nuisances, he says the jurisdiction seems to be of very ancient date, and to be on

the irreparable damage to individuals, or on the great public injury which is likely to ensue. The jurisdiction, he says, is applicable not only to nuisances strictly so called, but also to purprestures, citing 2d Inst. 38, 272; Harg. L. T. 84, 87.

Blackstone (*vol. 3, p.* 73) says that the court of commissioners of the sewers, having chancery powers and jurisdiction to overlook and repair sea-banks and sea-walls, and the cleansing of rivers, public streams, etc., may proceed either with or without a jury, and remove obstacles, impose rates, and various other things. The fact is, that they usually proceeded without a jury, and while the high court of chancery was frequently called upon to restrain the action of this court of commissioners, it seldom, if ever, interfered.

Eden says (*p.* 266) that the commissioners of sewers, in the exercise of their duty to repair sea-banks and sea-walls, survey rivers, public streams, ditches, &c., have authority to inquire of all nuisances and offences committed by the stopping of rivers, erecting mills, not repairing banks and bridges, &c. These commissioners were latterly appointed by the court of chancery. See, also, *Dore* v. *Gray*, 2 T. R. 358 (1788); *Yeaw* v. *Holland*, 2 W. Bl. 717.

The case of *Robinson* v. *Lord Byron*, 1 Bro. Ch. 588, was a mandatory injunction against maintaining and using dams, wires, shuttles, flood-gates, and other erections so as to interrupt the flow of water of a stream which flowed to the plaintiff's mill.

Lord Chancellor *Eldon*, in 1802, in the course of his opinion in *Universities of Oxford* v. *Richardson*, 6 Ves. 706, in commenting upon *Lord Byron's Case*, says,—" Suppose in the case of Lord Byron there had been a variety of mills upon the stream : I do not say that they would have a concurrent right in the use of the water, though they would in this sense, that each was to have it, but the court would have enjoined at the instance of any one, as he would have a complete title in himself." Thus Lord Chancellor *Eldon*, on whom the defendants rely in their argument with such confidence, recognizes the power of courts of equity to adjust water-rights, and no question is made as to the propriety of the exercise of power in such cases. And his ground is, that there is no question of title ; and I maintain that the jurisdiction of such courts fully to hear and to regulate water-rights, where the title or right to use is conceded or established, is unquestioned.

In my examination of this question, I have not found an intimation by any writer to the contrary ; nor have I seen a query by any court as to the propriety of exercising such power. Indeed, it is frequently—I ought to say always—said, that it is the only court that can adequately relieve from conditions and complications existing with reference to such interests. There is greater inherent necessity for full power in such cases than in matters of account, or any of the other matters commonly understood as within the province of courts of equity.

In *Mayor of London* v. *Bolt*, 5 Ves. 130, Lord Chancellor *Lough-*

*borough* granted an injunction against a public nuisance in the city of London, but did it reluctantly, for the reason, as he said, that the Lord Mayor had ample jurisdiction to order the abatement.. No other question was made by the chancellor.

Mr. Eden (*p.* 261), after speaking of the jurisdiction of the court of exchequer to try and determine purprestures, says that a bill was filed praying that the defendant might be restrained from making any further erections, and that those might be abated, which decree was made accordingly. *Attorney-General* v. *Richards*, 2 Anst. 603. The same thing was done in regard to Bristol Harbor (*B. H. Case*, cit. 18 Ves. 214, *Attorney-General* v. *Forbes*, Redes. Pl. 117); and an injunction was lately granted to restrain a purpresture and nuisance upon the Thames river. *Attorney-General* v. *Johnson*, 2 Wils. Ch. 87. Upon the same principle is the case mentioned by Lord *Hardwicke*, of an information by the attorney-general to restrain the stopping up of a highway behind the royal exchange. (Amb. 104.) This was a proceeding in equity upon information. Mr. Eden says (*p.* 262),—"The jurisdiction in these cases might have been supported on the ground of public nuisance, even if the cause complained of had not at the same time been purprestures; the interposition in cases merely of public nuisance being by no means a modern branch of equitable jurisdiction."

There is a precedent for this in the time of Queen Elizabeth,. which appears to have escaped observation. *Bond's Case*, Moore 238. Accordingly, no less than three of the above applications on grounds of public nuisance were at the suit of private individuals (*Baines* v. *Baker*, Amb. 158, 3 Atk. 21, 751), and Lord *Hardwicke*, in one of them, noticed the irregularity, which does not appear to have formed a very serious objection. (See *Corning* v. *Lowerre*, 6 Johns. Ch. 439, which was by information and bill combined.) "All obstructions in public rivers by which the current is weakened, or the placing of timber or other bulky materials by which navigation is impeded, are nuisances." Eden 265.

In Bacon's day (5 Bac. Abr., Nuis. A), exhibiting horses in the streets was a nuisance, and might be abated. But I venture to say that in these modern days it would be deemed exceedingly arbitrary and in violation of sacred rights if the court should order that horses should not be exhibited or shown in the streets. "As navigable rivers are deemed highways, it is a nuisance to divert part of the river whereby the current of it is weakened, and made unable to carry vessels of the same burden as it could before; also the laying of timber in a common river, though the soil belong to the party, is as clearly a nuisance as if the soil was not his, if thereby the passage of boats, etc., is obstructed." Bac. Abr., Nuis. A, ed. 1852, *p.* 227; Noy 103; 3 Keb. 640, 759.

It will be noted in this connection that Judge Smith takes the ground that the plaintiffs in the case at bar are not entitled to

relief, because the soil underlying the waters of the Connecticut river is owned by the riparian proprietors. The diversion of water by obstruction· is a nuisance. It may be purely a private nuisance, or it may be in character public, with special injury to an individual, which makes it for purposes of remedy a private nuisance. The books are full of cases of equitable relief where remedy at law is inadequate. The court of chancery has also a concurrent jurisdiction with courts of law over nuisances private in character where there is no irreparable injury. There are many cases of application on this very subject of diverting streams.

In *Finch* v. *Resbridger*, 2 Vern. 390, the Lord Keeper held that after a long enjoyment of the water-course the right was to be presumed unless disproved by the other party, and the plaintiff was quieted in the enjoyment of his possession by injunction. In *Bush* v. *Western*, Prec. Ch. 530, a plaintiff who had been in possession for a long time of the water-course was quieted by injunction against the defendant, who had diverted it, though the plaintiff had not established his right at law, and the court said such bills were usual. See, also, 1 Vern. 120, *East India Co.* v. *Sandys*, 1 Vern. 127, 1 Vern. 275, 1 Ves. 476, 2 Ves. 414, 2 Atk. 391, 2 Ves. 453, 16 Ves. 338. Mr. Drewry's work on Injunctions, published about 1840, recognizes the jurisdiction of a court of equity to grant relief against nuisances. He lays down the doctrine, that where a nuisance is purely public, the proper course is by information filed by the attorney-general. He says, *p.* 240,—" Where a case of nuisance is made producing private injury to the plaintiff, although it may also produce public injury, a bill for an injunction may be filed by the party suffering the private injury, and the attorney-general need not be made a party." *Crowder* v. *Tinkler*, 19 Ves. 617; *Spencer* v. *Company*, 8 Sim. 193. The same point was taken in *Sampson* v. *Smith*, 8 Sim. 272, where a demurrer was filed, alleging the act complained of to be both a private and a public nuisance, and the demurrer was for want of parties, the plaintiff being a private individual and the attorney-general not being joined. The demurrer was overruled, the vice-chancellor holding that the bill containing allegations of private nuisance, the allegation of public nuisance was immaterial, and did not make the attorney-general a necessary party. In *Crowder* v. *Tinkler*, 19 Ves. 618, Lord Chancellor *Eldon* says,—" I incline to think that an injunction should be granted in this case under the head, not of nuisance, but of danger to property." And he refers to *Lord Byron's Case*, where an injunction was granted restraining the diversion of water. Later, the question came up before the same Lord Chancellor on notice to dissolve the injunction. After discussion he says, upon the question of injunction,—" If the subject was represented as a mere public nuisance, I could not interfere in this case, as the attorney-general is not a party. The complaint is therefore to be considered as not a public nuisance simply,

but that being so in its nature is attended with extreme probability of irreparable injury to the property of the plaintiff, including danger to their existence, and on such a case clearly established I do not hesitate to say an injunction would be granted." Snell's Principles of Equity, *p.* 496, states the doctrine in a few words. Speaking of public nuisances pure and simple, it is said,—"As a general rule a suit of this nature is instituted by the attorney-general, or he is made a party as representing the public. But when a private person suffers a special and peculiar injury, distinct from that of the public in general, in consequence of a public nuisance, he will be entitled to an injunction and relief in equity, and the attorney-general is not a necessary party to the action"—citing *Wood* v. *Sutcliffe*, 2 Sim. N. S. 163, *Corning* v. *Lowerre*, 6 Johns. Ch. 439.

"The ownership of the crown in the soil of the shore is subservient to the public right of navigation, and cannot be used in any way so as to derogate from and interfere with such right. The grantees of the crown take subject to this right, and any grant to a subject so as to be detrimental to the public right is void as to such parts as are open to such objections, if acted upon so as to effect nuisance by working injury to the public right. *Attorney-General* v. *Parmeter*, 10 Price 378, 412; *Gann* v. *Whitstable*, 11 H. L. 192; *Attorney-General* v. *Burridge*, 10 Price 350. All such nuisances may be abated on information." Coul. & F. Wat. 33.

In this country, a purpresture, if there is any such thing here (and it is of little consequence whether you call it purpresture, or nuisance, or a mixture), is coextensive with the American idea of navigable waters, and extends to inland rivers and streams. While the state does not retain any part of the soil, it does retain the right of public use. Gould Wat., *s.* 168; High Inj., *s.* 759; *New Orleans* v. *United States*, 10 Pet. 662; *Mohawk Br. Co.* v. *Railroad*, 6 Paige 554; *Attorney-General* v. *Company*, 6 Paige 133. "The diversion or obstruction of a water-course has been the subject of frequent equitable interference by way of injunction both in England and America. . . . Another ground of equitable jurisdiction is the regulation of common rights in waters . . . And equity will call all the parties before it, if necessary to determine their respective rights and obligations by one decree." Gould Wat. 534, 540. This ground of jurisdiction does not depend upon nuisance or purpresture. "The jurisdiction in this class of cases," says Gould, "rests upon the inadequacy of legal remedies and the prevention of a multiplicity of suits."

"Equitable jurisdiction includes rights and interests in their nature equitable, as not being absolute, but qualified, conditional, r collateral, and in their nature rather of charges on, or qualifications of, some legal and absolute right." Finl. Jud. Sys. 108. It may be said that water-rights, where each must be exer-

cised reasonably with reference to the other, are peculiarly within the reasoning of Finlason. At the common law any encroachment upon a public stream was considered to be a purpresture,—that is to say, the making of that several and private which ought to be common to many. 2 Inst. 38. And Glanvil calls the diversion of water from its right course a purpresture. Lib. 9, *c.* 11. But it should be observed that the power of the commissioners of sewers succeeded to the original jurisdiction possessed by justices appointed for the above purposes, and that their authority extended to alter and amend all annoyances of the description which we have mentioned, "according [to use the words of the statute] to their wisdoms and discretions." 23 H. 8, *c.* 5, *s.* 3; Woolr. L. W. 196.

The position taken by Judge Smith, that the chancery powers and practice in England have been enlarged within fifty years, may be true if comparison is made with the period since about 1820. But it is also true that equity process was used more summarily and with greater vigor previous to 1800 than for the few years succeeding. Lord *Eldon* seems to have been a conservative man, and to have moved cautiously, and abridged somewhat remedial process during his day.

As to the numerous cases cited by counsel in support of his proposition that the defendants are entitled to a trial by jury whether the English or the provincial practice prevail, I have this to say, that they are not in point. In every instance, so far as I have been able to examine them, the question was either a distinct question of nuisance, or the title was in doubt; and in no case cited where the regulation of water-rights was a question, either independent of or connected with an alleged nuisance, was the relief denied. For instance, the *Portsmouth Bridge Case*, in 17 N. H. 200, was in favor of the town rather than a party aggrieved, and was a distinct question of nuisance. Yet the court does not deny jurisdiction, but says under such circumstances the case must be clear.

*Attorney-General* v. *Cleaver*, 18 Ves. 211, in Lord *Eldon's* day, was a distinct nuisance case. The nuisance complained of was an offensive trade. There was no allegation of irreparable damage, multiplicity of suits, or conceded rights. It was a pure question of fact whether the nuisance was offensive to the public. So as to 2 Sim. N. S. 133. The question was one of nuisance simply, with no allegation other than that the defendant was accustomed to ring a bell. Yet the chancellor says that equity has jurisdiction, and the fact that it is a simple question of nuisance is not a ground of demurrer; but the fact that it is a distinct question of nuisance with no imminent peril or irreparable injury alleged, may be equitable ground for refusing an injunction until the plaintiff gets a verdict at law. That is all this question amounts to in the defendants' direction; while the chancellor goes full length,

citing numerous authorities in favor of the doctrine that the plaintiff having a special grievance may have his bill, and the attorney-general may join by way of information in equity. *Soltau* v. *De Held*, 2 Sim. N. S. 133, 151.

*Lord Cottenham's Case*, in 1 Craig & P. 299, was a bill to enjoin the defendant and the commissioners of sewers from issuing a precept. There were questions of legal right and construction. The injunction was continued, but title to the office being in dispute, it was suggested that the plaintiff forthwith bring an action at law to settle the right. There is no analogy here.

In *Elmhirst* v. *Spencer*, 2 Macn. & G. 45, the thing complained of was the diversion of a stream, but there was no allegation of irreparable damage or multiplicity of suits, and there was a distinct question of nuisance; and it did not appear that any actual damage had occurred or was likely to occur to the plaintiff, while an injunction would suspend the defendant's business. The head-note discloses all that is shown by the case, that a court of equity will not exercise its jurisdiction by injunction against an alleged nuisance without a previous trial at law, or without its being clearly proved that the plaintiff has sustained such substantial injury as would have entitled him to a verdict for damages in an action at law, leaving it to be inferred, of course, that if the plaintiff had suffered an injury such as would have entitled him to a verdict, its jurisdiction would be asserted. The temporary injunction was dissolved because the plaintiff had no case on his bill of evidence.

The case of *Gas Co.* v. *Broadbent*, 7 H. L. Cas. 600, was a nuisance case, and the complaint was that the defendant had moved his gas-works nearer than he had a right to. This involved legal questions as to rights, etc., and seemed to have been similar in this respect to *Burnham* v. *Kempton*, in New Hampshire, where the court says that if the plaintiff's title was conceded, there would be no doubt as to the right of the court to regulate the use. "When he [the plaintiff] has established his right at law, I apprehend that, unless there is something special in the case, he is entitled to an injunction." And it may be observed here that there were no allegations of irreparable damage, multiplicity of suits, imminent peril, or regulation of conceded rights, as in the case under discussion. 7 H. L. Cas. 612, Lord *Kingsdown*. The case of *Irwin* v. *Dixion*, 9 How. 10, was one of disputed title. My brother's quotation shows that.

The *Wheeling Bridge Case*, 13 How. 568, cited by the defendants, is a valuable case in many respects. The opinion was by *McLean*, J. There was no question of irreparable damage. It was a mere question of obstructing a navigable river. The question whether the bridge was a nuisance or an obstruction to the navigation of the Ohio river was in dispute. It was claimed it was no serious obstruction; that only seven steamboats out of two hun-

dred and thirty which ply on the river as far up as Pittsburgh were obstructed; and that the obstruction arose from the height of their chimneys, which might be lowered at small expense, and that by the introduction of flues the chimneys might be shortened. As to its being no obstruction, the court said that on this point there was no doubt,—the jury in such a case could give no aid to the parties, and find the bridge to be a nuisance; and hold that where there is a private injury (irreparable in its character) from a public nuisance, the court of equity will interfere by injunction.

[Counsel here discussed,—1. The irreparable damage feature of the bill. 2. The allegation as to multiplicity of suits. 3. And alluded to that feature of the answer which attacks the plaintiffs' business, and insisted upon the right of the plaintiffs to utilize the property they own. The plaintiffs must know whether they can have a right of way when needed for purposes of navigation, and whether they can have all the water of the Connecticut in its natural channel.]

In view of the complaints of the defendants as to this proceeding, I desire to say that if such a dam had been constructed over the navigable waters of England in the period of 1792, to which counsel are pleased to refer, it would have been abated in an hour by the court of commissioners, upon affidavits and view, without a jury. The case of *Bush* v. *Western*, Prec. Ch. 530, cited by the defendants, was in favor of a party who had been in possession of a water-course for sixty years, and was a bill for perpetual injunction to quiet the plaintiff's possession, which the defendant had interrupted by making a cut or channel through his own land. The defendant objected, upon the ground that the right was not first settled at law. The court, upon the ground that the plaintiff's case was clear (not, however, conceded or established), held that such proceedings were usual, citing *Lord Aylesford's Case*, and decreed for the plaintiff. *Finch* v. *Resbridger*, 2 Vern. 390, was a water case, and to the same effect. My brother does not quote quite correctly, or, at least, with sufficient fulness, from s. 854 of 2 Story, as to Bills of Peace. The quotation should be,—" Courts of equity, therefore, having the power to bring all the parties before them, will at once proceed to the ascertainment of the general right, and, if it be necessary, they will ascertain it by an action or issue at law." The question of necessity is to be determined by the court. The first part of the paragraph above quoted would seem to have been overlooked. It probably is not necessary for me to take the point, that in any matter within the jurisdiction of the court to try to regulate, all other questions will be determined. This is a familiar doctrine in New Hampshire, and it is not necessary to cite authorities in support thereof.

The point taken by the defendants, that the king owned the soil under these waters, is of no moment. It makes no difference whether, as a legal question, the government (in other words, the

public) owns the soil, as in England, or whether the government reserves the right of use to the public, as in this country. The question here is, and the only question is, as to how, it was used and practised to regulate water-rights in which members of the public were interested, prior to 1792, whether in courts of equity, or by action at law with a jury. It is the practice, and the practice only, that we have to look at. Whether you call them purprestures or nuisances, or both, or whether the title to the soil was here or there, is of the merest consequence in the world.

The question is, how such rights were settled,—whether at law, or in equity. And if we establish our claim that the exception in *art.* 20 referred to the English practice, and if we find, upon examination of such practice, that water-rights in which the public were interested were invariably settled in equity upon a bill in equity, or by information in equity, or both, depending upon whether the grievance was specially burdensome to individuals, or rested upon the public at large, then our position is sound, that this class of cases is within the exception in *art.* 20, and that the right of trial by jury does not exist.

In the case of *Attorney-General* v. *Burridge*, 10 Price 350, the same question was raised. This was an information in the nature of a bill in equity, and was to the same effect. The point is distinctly held, that the court has jurisdiction and may determine the question itself, or in its discretion make an issue for the jury. *Richards*, Lord Chief Baron, says (*p.* 374),—" This is, in my opinion, a very proper proceeding for the purpose and object of the suit, and there are precedents for it without number. . . . where, however, if the court cannot determine without such assistance [a jury], an issue may be properly directed to assist, not to control, the determination of the court. In such cases a jury is always a necessary medium for dispelling doubt or dificulty." *Bond's Case*, Moore 238, decided in the Exchequer 29 Elizabeth (1687), is disposed of by brother Smith by saying that the land on which the pigeon-house was erected was crown land.

When we are looking to the ʼquestion as to where and how it was practised to try these questions, what difference does it make whether the land belonged to the king or to Sallyette Brown ? The title in the crown merely goes to the matter of who should be plaintiff,—whether the attorney-general for the public at large, or in the name of the private party who had a special injury. In either case the practice was to present the grievance in equity, and for equity to grant relief without a jury. Such was the use and practice, and it matters little as to what court. The question, as I have said, is, How was it used to regulate such rights— with a jury, or without? It is the fact in this respect that determines whether they are within the exception, or within the granting part of the clause. In *Attorney-General* v. *Forbes*, 2 Myl. & C. 123, Lord Chancellor *Cottenham* reviews this question of jurisdiction

and practice. This was a case of apprehended nuisance. The case of *Attorney-General* v. *Company*, 6 Paige 133, 135, was simi-lar to the one at bar. It was alleged that the Cohoes company had cut through the embankment of the Mohawk river in New York for the purpose of drawing water from the canal for the supply of their mills, and it was claimed that if they were not restrained the plaintiffs would be deprived of the necessary supply of water to carry on their business. There was a temporary injunction, which was afterwards made perpetual on hearing. The court said, in the course of the opinion, that the court of chancery has juris-diction to restrain any purpresture, or unauthorized appropriation of the public property to private use.

It will be observed, that in none of the English cases as to regulation of water-rights, or of nuisance, or of purpresture, was the trial by jury in equity thought of or claimed. Whatever claims were made about it were made as to the jurisdiction of courts of equity over such subjects, and by way of objection that the fact should be settled by proceedings at law. And the practice was universal as to water-rights, and as to all nuisances when the peril was imminent, or the injury irreparable in character, to hear and determine in equity without a jury. And I do not remember of seeing a case where an issue of fact relative to such right was tried by jury in such a proceeding.

Now, we claim the practice to have been, as to cases within the jurisdiction of such courts, not to frame and direct issues of fact to be tried by a jury, except in cases where, upon the evidence and hearing, the chancellor had doubt, and where his conscience was not settled,—and then the verdict was not conclusive or bind-ing; and there are numerous instances where the chancellor de-creed otherwise than the verdict.

Mr. Proffat (Jury Trials, s. 90), in speaking of the English right of trial by jury in equity proceedings, says,—"As a matter of right, a jury trial could not be claimed in a court of equity except in two instances. These cases were where an heir-at-law was sought to be divested of his inheritance under a will, and the other case was where the right of a rector to the tithes of his par-ish was contested. The granting of an issue for a trial by jury was in all other cases entirely a matter for the discretion of the court." See, also, Dan. Ch. 1075; *Van Alst* v. *Hunter*, 5 Johns. Ch. 148; *Cahoon* v. *Levy*, 5 Cal. 294; *Rogers* v. *Rogers*, 3 Wend. 503; *Middleton* v. *Sherburne*, 4 Y. & C. Ex. 358; *Sneed* v. *Ewing*, J. J. Marsh. 460; *Short* v. *Lee*, 2 Jac. & W. 464, 496; *Har-rod* v. *Harrod*, 18 Jurist 853; *Gray* v. *Haig*, 20 Beav. 219; *Robinson* v. *Anderson*, 7 De G. M. & G. Bank. 239; *Young* v. *Fernie*, 1 De G. J. & S. Bank. 353; Jer. Eq. 298, 299; 2 Dan. Ch. 1289.

The practice has been universal, where the title or right to use is clear, or where the right is conceded or established, to hear,

determine, and regulate the manner of using water. The jurisdiction is grounded in the inherent necessity of the situation, upon inadequacy of remedy at law, and upon the ground that it promotes justice to the parties and avoids a multiplicity of actions at law. And it has been the practice of American courts of equity to abate, or order the removal or non-use of, obstructions upon proceedings to that end.

I would call attention to the cases cited as to relief in favor of the paramount right of navigation in Maine, New Hampshire, and Massachusetts; also, in favor of the proposition that courts of equity will afford relief from danger arising from a threatened public nuisance to a person who may suffer a special injury thereby, or to abate those already existing.

Bispham, Principles of Equity 20–25, speaks of the class of states in which, after the separation from the British crown, courts of equity were created by the constitution, fashioned after the high court of chancery, which he calls the first class; and the second class are states where the courts have been created by the legislatures under the constitution, and administer equity according to the course and practice of chancery. As has been already observed, in 1867 the legislature of New Hampshire (unnecessarily, as we claim) added the subjects of waste and nuisance to those already enumerated as within the jurisdiction of courts of equity.

Mr. Pomeroy, in his work on Equity Jurisprudence, says, *s.* 299, that while the equitable jurisdiction of New Hampshire is not, in extent, exactly commensurate with the English court of chancery, yet so far as it does extend, and with respect to all matters embraced within its scope, it is identical with the jurisdiction held by any court of general equitable powers.

One other claim made by counsel for the defendants is, that, while there were no equity courts in New Hampshire and hence no public equity suits to abate public nuisances, there was a perfectly efficacious remedy by indictment.

My answer to this is, that if there was an equity court in New Hampshire with general powers, the proceeding by indictment was merely cumulative; and whether there was a court of equity or not in the province, the exception, in *art.* 20, of cases from the guaranty of jury trials could not have had reference to public prosecutions by indictment, which at common law were triable by jury.

Bispham says, *s.* 443, discussing English and American purprestures, that in this country a bill in equity to abate a public nuisance, filed by one who has sustained special damage, has succeeded to the former mode in England of an information in chancery, prosecuted on behalf of the crown, to abate or enjoin a nuisance; and that the jurisdiction of courts of chancery over such matters is well established in this country.

The difference in the mode of procedure comes from title in the

crown; but in both instances the practice was to try purprestures in equity. And the use and practice are what we are after.

So I take issue with counsel for the defendants on his claim that the constitutional right of trial by jury exists in New Hampshire in all causes in equity, and maintain that it never existed as a matter of constitutional right as to any cause or question within the jurisdiction of such court.

Even under *Marston* v. *Brackett* the right was in a sense qualified, as it was for the court to say what was deemed essential and material to the decision. But *Marston* v. *Brackett* was contrary to authority and reason, because the exception in the Bill of Rights had reference to the English system of practice in equity, and trial by jury never existed there as a matter of right even in nuisance cases. As to distinct nuisance questions, if the cause embraced the element of irreparable damage or multiplicity of suits, the court always exercised jurisdiction; and in nuisance cases where these elements were not involved, and it was a distinct and sole question of fact whether the nuisance existed, the court frequently exercised jurisdiction and control, and at other times did not; but it was always a matter of discretion, depending upon emergency and imminency of peril.

And as to water-rights, it was the universal and unquestioned practice in courts of equity to determine and regulate without a jury the manner of use in all cases where the plaintiff's title was either conceded, or established at law. So we say, drawing our light from and being governed by the English rules of practice, such right of trial does not exist in New Hampshire.

In Connecticut, though a bill in equity for an injunction against a public nuisance in navigable waters will not generally be sustained in favor of a private individual having no special interest, yet, where the party complaining will sustain an injury distinct from that done to the public at large, and especially if it be irreparable and a court of law cannot afford adequate relief, this relief will be granted. *Frink* v. *Lawrence*, 20 Conn. 117. The court, per *Waite*, J., said, — "We have had occasion, in several recent cases, to consider the question whether a private individual can sustain a bill in equity for an injunction against a public nuisance in navigable waters. *Bigelow* v. *Bridge Co.*, 14 Conn. 565; *O'Brien* v. *Railroad Co.*, 17 Conn. 372; *Seeley* v. *Bishop*, 19 Conn. 135. And we held that such relief will not be granted, unless it appears that the party complaining will sustain special or peculiar damage — an injury distinct from that to the public at large. But, on the other hand, it was conceded that if such damage would accrue, the relief might be granted. Indeed, such now seems to be the well recognized rule in equity, especially where the object is to prevent some irreparable injury, for which, under the circumstances of the case, the law cannot afford adequate remedy." *City of Georgetown* v. *Canal Co.*, 12 Pet. 98; *Corning*

v. *Lowerre*, 6 Johns. Ch. 439; *Crowder* v. *Tinkler*, 19 Ves. 616; 2 Sto. Eq. 203, 204.

I submit a few authorities upon the question of regulation of water-rights and of mandatory injunctions. Gould Wat., *ss.* 552–555; *ib., ss.* 127–129; *ib., ss.* 534–540; *Walker* v. *Shepardson*, 2 Wis. 284, and authorities cited on 390; *River Imp. Company* v. *Lyons*, 30 Wis. 61; *People* v. *St. Louis*, 10 Ill. 351; *Minke* v. *Hopeman*, 87 Ill. 451; *Mayor* v. *Jaques*, 30 Geo. 506; *Attorney-General* v. *Hunter*, 1 Dev. Eq. 12. A case in New York was so like the one in question, and the relief granted was of such practical utility, that I feel justified in stating it: "In the early settlement of the city of Rochester, on the Genesee river, in western New York, a gentleman named Brown owned the bed of the Genesee river immediately above the main fall,—a perpendicular fall nearly one hundred feet high, within the limits of the city,—and also a strip of land extending from these falls along the west bank of the river for a mile or more. He built a dam across the river a few rods above the falls, and constructed a mill-race or canal leading from this dam about a mile down the river, on its west side, parallel to and a few hundred feet from the river bank, which was through this whole length a perpendicular cliff nearly one hundred feet high. One of the finest water-powers in the country was thus obtained and utilized. The space between this mill canal and the west bank of the river he divided into a large number of mill lots, perhaps one hundred in all, varying in width, each abutting at its front end on the mill canal, and at its rear end on the perpendicular bank of the river. These lots, together with the right to draw a certain amount of the water from the mill canal, were from time to time conveyed in fee to different grantees, each grantee covenanting to use only the amount of water specified in his deed of conveyance. In process of time, all the lots had thus been sold and conveyed in fee, and Brown, the original owner, retained no interest whatever in the property. A continuous line of mills and manufactories had been built on these lots along the bank of the river; many of the lots had passed to subsequent grantees, and there were perhaps one hundred different proprietors of mill lots, all holding under the original conveyances from Brown. There was, of course, no privity of contract between these various grantees and lot-owners, and since Brown had conveyed each lot in fee, and had retained no reversionary interest whatever, there was no privity of estate among the various grantees and proprietors of different mill lots. When the Genesee river was high, there was an ample supply of water for the needs of all the mills and manufactories. But during a large portion of each year, while the natural flow of the river was lessened, the supply of water through the mill canal was diminished; and in consequence of this the lot-owners on the upper part of the canal diverted and consumed more of the water than the proportionate amounts to which

they were entitled. This practice of unlawful consumption was carried on to such an extent that the supply of water was largely cut off from the lots on the lower part of the canal, and a very serious loss was thereby occasioned to the owners. For all this injury there was no adequate remedy at law. In this condition the owner of a mill at the lower end of the canal brought a suit in equity, making all the other proprietors and occupants of mills bordering on the canal defendants, and setting out facts showing the titles and water-rights of each separate and individual lot, for the purpose of obtaining a decree establishing and quieting the title of each proprietor on the canal to divert and use the waters. Such a decree was rendered. It established the right of each proprietor to use the proportionate amount of water conveyed by his original deed; it definitely fixed these amounts; it determined the number of feet or inches of water which could be drawn from the canal for each lot, and the size of the opening through which the water could flow; and it provided for constructing permanent barriers and gates for each lot, by means of which the amount drawn from the canal for the use of the lot might be controlled and regulated. In order to make the decision final and perpetual, and to secure and protect the rights of all thus determined, the decree provided for the appointment and maintenance of a perpetual commission, representing all the proprietors on the canal, who should possess the power to inspect the water-supply gates and openings of each lot, and to preserve inviolate the water-rights and the water-supply of each lot as they had thus been finally established by the decree of the court.

" It is true, the stream in this case was an artificial canal; but as there was no privity of contract nor of estate among all the different lot-owners on the canal, their relations with each other, so far as the jurisdiction of equity is concerned, were virtually the same as those which subsist between the different riparian proprietors upon any natural stream. The principle is the same in both cases. We have no doubt that on the same principle, in a suit brought by one private riparian proprietor against all the other similar proprietors upon any given stream, a court of equity might establish their rights as among themselves to use the water for irrigation, the amounts which each could divert, and the order, times, and seasons of his diversion, and might appoint a perpetual commission, representing all the proprietors on that stream, which should have power to carry into effect the provisions of the decree." Pom. Rip., *s.* 154.

[A very full oral rejoinder by Jeremiah Smith to the foregoing argument of Mr. Aldrich is necessarily omitted.]

BLODGETT, J. In the original bill the lumber company were sole plaintiffs. Their complaint is, that they annually exercise the public right of floating logs down Connecticut river, and that the

defendants have obstructed the way by a dam at Olcott falls. The prayer is for a decree restraining the defendants from maintaining the dam without suitable sluice-ways; for a provision in the decree determining the dimensions and character of the sluice-ways; and for general relief. The defendants demurred on the ground that the alleged grievance is a public nuisance, for the abatement of which a suit cannot be maintained by a private person. This objection has been avoided by an amendment joining the attorney-general as plaintiff, and the demurrer is overruled without considering the question whether the bill can be maintained by the lumber company. *Dover* v. *Portsmouth Bridge*, 17 N. H. 200, 215; *Griffin* v. *Sanbornton*, 44 N. H. 246; *Smith* v. *Putnam*, 62 N. H. 369, 373; *Milarkey* v. *Foster*, 6 Oreg. 378, and notes in 25 Am. Rep. 533; *State* v. *Wheeling Bridge*, 13 How. 518, 561, 562, 564, 566, 567; *Knickerbocker Ice Co.* v. *Shultz*, 116 N. Y. 382; *Steamboat Co.* v. *Railroad*, 30 S. C. 539; Gould Wat., *ss.* 121–127, 547; Wood Nuis., *ss.* 645–701, 819. If that question becomes material in the progress of the case, it will be examined when its decision is necessary. The mode of trial on a bill in equity for the abatement of a nuisance is not an open question. *State* v. *Saunders*, 66 N. H.

"The channel of a public navigable river is properly described as a public highway." *Colchester* v. *Brooke*, 7 A. & E. N. S. 339, 373. "A stream may be a public highway for flotage when it is capable, in its ordinary and natural stage in the seasons of high water, of valuable public use. . . . It is a public highway by nature, but one which is such only periodically, and while the natural condition permits a public use. . . . The public right is measured by the capacity of the stream for valuable public use in its natural condition." *Thunder Bay Booming Co.* v. *Speechly*, 31 Mich. 336, 343–345; *Gaston* v. *Mace*, 33 W. Va. 14; *Koopman* v. *Blodgett*, 70 Mich. 610; *State* v. *Gilmanton*, 14 N. H. 467, 479; *Carter* v. *Thurston*, 58 N. H. 104; *Collins* v. *Howard*, 65 N. H. 190; Gould Wat., *ss.* 54, 86, 107–112; Ang. High., *ss.* 53–72. The Connecticut river is a natural highway for floating logs. *Thompson* v. *Androscoggin Co.*, 54 N. H. 545, 548, 549; *Conn. R. L. Co.* v. *Columbia*, 62 N. H. 286, 287.

At Olcott falls the public has a right of passage for logs as free and convenient as would be afforded by the river in its natural condition, unless the highway has been wholly or partially discontinued by law. The riparian proprietors, incorporated or unincorporated, in the exercise of their private rights, may change the natural condition of the stream, so far as changes are possible without an infringement of the public right. The riparian title, including a right of altering the channel and using the water, does not include a right of total or partial discontinuance of the changeable way of which the capacity of the stream in its natural condition is the measure. "Any person owning the land upon both

sides of such a river can maintain a ferry or bridge or dam for his own use, provided he does it so as not to interfere with the public easement, without any authority from the legislature, and even in defiance of a legislative prohibition. In such case he would but be making a proper use of his own property. . . . What rights did the legislature give the plaintiff by its act of incorporation? It made it a corporation, and gave it the corporate right to build its bridge. For that purpose only a corporation was not needed, nor was legislative sanction needed. But being authorized by the legislature to build the bridge, it could not be complained of for any necessary interference with the public easement which was under legislative control; for that which is authorized by law cannot be a public nuisance. . . . The legislature did not empower it to interfere with the stream, except so far as it was necessary for the building and maintenance of its bridge." *Chenango Bridge Co.* v. *Paige*, 83 N. Y. 178, 185, 186; *Groat* v. *Moak*, 94 N. Y. 115, 128; *Sewall's Falls Bridge* v. *Fisk*, 23 N. H. 171, 177; *Hooksett* v. *Amoskeag Co.*, 44 N. H. 105, 110; *Eastman* v. *Amoskeag Co.*, 44 N. H. 143, 160; *Com.* v. *Alger*, 7 Cush. 53, 99; Ang. High., ss. 237–241.

"The statute gives a general authority to the sessions to lay out highways, but the statute must have a reasonable construction. This authority, therefore, cannot be extended to the laying out of a highway over a navigable river, whether the water be fresh or salt, so that the river may be obstructed by a bridge. A navigable river is, of common right, a public highway; and a general authority to lay out a new highway must not be so extended as to give a power to obstruct an open highway already in the use of the public." *Com.* v. *Coombs*, 2 Mass. 489, 492; *Arundel* v. *M'Culloch*, 10 Mass. 70; *Com.* v. *Charlestown*, 1 Pick. 180. In Connecticut, under a general power to lay out highways, a road may be laid across navigable water where a suitable bridge will not be a serious obstruction of navigation. *Groton* v. *Hurlburt*, 22 Conn. 178, 186–189; *Brown* v. *Preston*, 38 Conn. 219. Such cases are consistent with the rule that authority to lay out a new highway does not warrant an unnecessary obstruction of an old one. A toll gate of a turnpike unnecessarily obstructing a free road is a public nuisance. *Wales* v. *Stetson*, 2 Mass. 143. A franchise to build a railroad between certain points does not include a right to build it unnecessarily on or along a street. *Springfield* v. *C. R. R. Co.*, 4 Cush. 63; *Com'rs* v. *Holyoke W. P. Co.*, 104 Mass. 446, 449.

The charter of the Franklin Falls Co. authorizes them to establish and carry on various manufactures "in the improvement of the water-power of the Winnipiseogee river." Laws 1863, *c.* 2797. In *State* v. *Franklin Falls Co.*, 49 N. H. 240, it was held that the defendants could not lawfully maintain a dam that would prevent the passage of migratory fish from the sea to the lake. Their right to carry on manufacturing business "in the improvement of the

water-power" included a right to maintain such a dam and make such a diversion of the water from the natural channel as would not infringe any public right of way. Sometimes the water was "not more than sufficient to carry the machinery;" and the company's works could be enlarged to such an extent that no water would ordinarily run over the dam. But the requirements of their business were not held to be material. They could build a stairway for the ascent of fish, as they could build a sluice-way for the descent of logs. The necessity of building a dam and diverting the water to their wheels was not deemed a necessity of discontinuing the public right of a fishway. The right of riparian owners to improve and use the power of the river, with or without a charter, was undisputed; but it was not suggested by the defendants that their charter discontinued the right of way, or authorized its discontinuance; and such a construction not being claimed, the legal ground on which it must be rejected is not stated in the decision.

Whether a river is a highway for fish or for logs, or for both, a grant of the advantages of a corporate organization to persons engaged in the improvement and use of the water-power for manufacturing purposes does not show that a total or partial discontinuance of the way was intended by the legislature. *Com.* v. *Essex Co.*, 13 Gray 239, 248; *Com'rs* v. *H. W. P. Co.*, 104 Mass. 446, 450. It merely shows that the franchise, asked by the grantees and given by the state, is a corporate capacity to exercise common-law rights of riparian owners. A grant to these defendants of a right to do, as an incorporated body, what they could do as unincorporated partners, was necessary because "corporations are artificial persons, created for specific purposes, and invested with such and only such powers as are conferred by law. While natural persons may do with themselves and their property whatever is not forbidden, artificial persons cannot rightfully do anything that is not expressly or by necessary implication permitted by the law of their being." *Pittsburgh R. Co.* v. *Lyon*, 123 Pa. St. 140, 150; *Case* v. *Kelly*, 133 U. S. 21. An act authorizing certain persons merely to form themselves into a corporation would be useless. Without an authority conferred by statute upon the Olcott Falls Co. to do something, they could do nothing. *Pierce* v. *Emery*, 32 N. H. 484, 512. In addition to a mere act of incorporation, a grant of power was indispensable to enable them, as a corporation, to engage in the improvement and manufacturing use of Olcott falls. Without such a grant, they would be restrained by injunction, at the suit of one of the members, from carrying on that business; and on *quo warranto* brought by the state, their unanimous usurpation of corporate franchises would be suppressed. They are a corporation for a manufacturing purpose, and can purchase and hold a limited amount of real estate, improve the water-power, make and maintain, on and across the river at the falls, all such works as are necessary and proper to accomplish the object of their

incorporation, and carry on such kinds of manufacturing business as they choose.    Laws 1848, *c.* 674; Laws 1881, *c.* 183.    In the grant of powers without which they could not lawfully acquire or lawfully exercise the private riparian rights that are subject to the public easement, there is no incidental relinquishment or diminution of the easement.

The language of such a grant would be the same if the river were not a highway.    Of itself alone, it has no tendency to prove that the subject of highway discontinuance was in the mind of the legislature.    If the question of discontinuance is presented to that body and decided in the affirmative, there will naturally be some clear and positive evidence of the decision in the statute.    It can not be assumed that an exercise of the discontinuing power is concealed, either accidentally or designedly, under an ordinary grant of corporate capacities, expressed in terms equally appropriate whether the river is or is not a highway.    The acts from which the defendants derive their powers contain no express discontinuance of the Connecticut easement, and no express grant of power to discontinue it either wholly or partially.    Their incidental power of discontinuance cannot be implied from anything less than necessity; and the case shows no ground for the implication of a discontinuance, or a grant of discontinuing power.    In the method of finding the fact of legislative intention by weighing competent evidence, and not by applying technical rules (*Boody* v. *Watson*, 64 N. H. 162, 189), there is no occasion to resort to the authorities that employ a strict rule to confine business corporations to the privileges plainly given them in their charters.    Under that rule, the defendants' claim that the public right has been affected by their acts of incorporation could not be sustained.    *Charles River Bridge* v. *Warren Bridge*, 11 Pet. 420, 544–548; *Jersey City* v. *Hudson*, 13 N. J. Eq. 420, 425; *Selman* v. *Wolfe*, 27 Tex. 68; *Syracuse W. Co.* v. *Syracuse*, 116 N. Y. 167, 178; Sedg. Con. 291–296.

Under authority given by statute, an owner of a lot situated on the margin of the tide-water of East River extended the dry land into the water.    Before the extension, a street had been laid out over the lot to the river.    It was held that the filling of the river by the land-owner "carried with it a necessary and legal extension of the street over the new made land" to the edge of the water.    The ground of decision was, that the legislature intended to confer a privilege on the owner of the land, but not to destroy the right of the public to reach the river through the street; that the act should not "be so construed as to work a public mischief unless required by words of the most explicit and unequivocal import;" that the language of the act did not necessarily or naturally import that the right of passage from the street to the river should be destroyed by filling up the river; that "in an act designed chiefly, if not exclusively, to subserve individual interests, the

words used must leave no doubt that the legislature intended to annihilate or abridge an important public right, before a court should put such a construction upon it as would have that effect;" and that public rights are not to be destroyed by equivocal words or provisions. *People* v. *Lambier*, 5 Den. 9, 15–17. Whether the extension of the street was rightly or wrongly implied, it illustrates the tendency of the authorities to employ the doctrine of necessary implication in the maintenance rather than in the abridgment of public rights. As the statutes do not show a legislative assent to a total or partial discontinuance of the Connecticut highway, an assent implied from necessity, if it can be shown by extraneous evidence in some cases, must, to say the least, be satisfactorily proved. And as the facts of a case of necessity are not alleged in pleading, there is no issue on which such evidence is admissible.

In the answer, the defendants say that the "falls, when the river ran in its natural course there, were impassable in low stages of the water by logs;" "that the defendants' works, by ponding back the water, entirely cover and flow out a bad and rocky fall above, where otherwise logs would lodge upon and among the rocks forming great jams, requiring great labor and expense to break,—all which is saved to them in the way described;" that the defendants did, "at very large expense, construct in said dam, in the best place for the passage of logs, a sluice-way of ample and convenient size and construction, being eighteen feet wide and four inches deep at the top of the dam, and fitted the same with an apron of plank thoroughly covered with iron plates, so designed and located as to conduct logs safely into the deep-water channel below; and in the iron facing on the top of their dam, throughout its entire length, made holes for the insertion of iron pins to hold flashboards of any width desired, and at each side of said sluice-way, at the top of the dam, they inserted ring-bolts for the attachment of booms to guide logs into said sluice-way; and so it is by means of the appliances thus provided in the construction of their dam and sluice-way, all the water flowing in the river may, at any time, with trifling labor and expense, be turned, and compelled to pass through the sluice-way, whereby logs will be easily and conveniently floated over the dam and falls, and passed into the deep water below;" and "that the works of the defendants, in their present condition, greatly facilitate rather than impede the passage of logs over said falls, and diminish rather than increase the expense thereof."

By these averments, the defendants deny the necessity of constructing the dam in such a manner as to abridge the public right of log flotation. On this disclaimer it is assumed that the dam with a sluice (including an apron) of proper form, size, and location, and other suitable appliances for turning logs and the whole river through the sluice, would not injure, but would improve, the

way for the use made of it by the lumber company in June of each year. And as the benefit that might be derived from a manufacturing diversion and use of the water is no more a necessity of highway discontinuance in this case than it was in *State* v. *Franklin Falls Co.*, there seems to be no occasion for serious controversy.

If the consent of the state that "highways may be laid out across any stream or body of water" (G. L., *c.* 67, *s.* 10) had been unqualified, it might have been claimed that it included authority to impair the right of navigation. For that reason the legislature added the prohibition "but no road or bridge shall be so laid out if the reasonable and proper construction thereof may prevent the use of such waters for navigation for boats or rafts, or for running timber." The charters of the Concord, the Northern, and the Boston, Concord & Montreal railroads, authorizing the erection of bridges across certain rivers, contain a proviso that the bridges shall be so constructed as not unnecessarily to impede navigation. Act of June 27, 1835, *s.* 15; Laws 1844, *c.* 190, *s.* 2; Laws 1844, *c.* 191, *s.* 2. Such provisos may be useful for the purpose of avoiding a question of interpretation. They would be serious defects, if they introduced the erroneous construction that, without them, unnecessary obstruction of highways would be authorized by the general law and by ordinary acts of incorporation.

The act of 1807, incorporating the White River Falls Company, contains a proviso that nothing in that act shall authorize the company " to erect any dam . . . so as to prevent the free passage of lumber down Connecticut river as heretofore used and enjoyed." It is alleged in the bill that the defendants derive their powers from that act, and from the acts of 1848 and 1881. In their answer the defendants say they constructed their works in the exercise of powers granted by the acts of 1848 and 1881; but they do not deny or explain the fact, well alleged in the bill, that they derive their corporate powers from the act of 1807, as well as the acts of 1848 and 1881. "All facts well alleged in the bill, and not denied or explained in the answer, will be held to be admitted." 8th Chancery Rule, 56 N. H. 605.

There was a special reason for reserving the right of free passage in the act of 1807. That act incorporates a canal company, and gives them power to improve the navigation at the falls by a locked canal, and to take toll for the use of the artificial way. But, for the benefit of all who should prefer a free passage in the old way to the use of a canal on payment of toll, the right of free passage in the old way is reserved. It is recited in the preamble that the "erecting locks and cutting canals on White River falls [now called Olcott falls] and Connecticut river, so that the same shall be navigable for boats for the transportation of lumber, goods, wares, and merchandise, would be of great public utility," and that " Mills Olcott, of Hanover, has petitioned the general court for the

exclusive privilege of locking the same." Thereupon it is "enacted that the said Mills Olcott and his associates, their heirs and assigns forever, be invested with the exclusive privilege of cutting canals and locking said falls, and rendering said Connecticut river navigable for boats and lumber, from the head of said falls at the upper bar, so called, to the foot of the falls at the lower bar of the same, commonly called Phelps bar." It was apparently feared that under their exclusive powers the canal company would claim a right to levy toll upon all lumber passing down the river at that point, or to make such alterations in the channel as would compel lumbermen to resort to the canal, for the use of which the company is entitled to a toll. The avoidance of all controversy on this subject is the apparent purpose of the reservation of the public right to a free passage of lumber in the old way. From the abundant caution exercised in the insertion of a proviso to prevent all possible contention between the canal company and the lumbermen on the question of highway discontinuance, it does not follow that the old highway for logs would have been discontinued if it had not been expressly reserved. However that may be, the reservation in the charter of the canal company has no tendency to show that the subsequent grants of corporate power for manufacturing purposes are a total or a partial discontinuance of the old way. Under those grants, which did not authorize the grantees to exact toll, there was no reason to anticipate a claim of toll, and therefore no occasion for such a reservation of the right of free passage as was made in the grant of canal powers.

The act of 1848, *c.* 674, *s.* 3, contains the proviso that "this grant shall not be held or construed to impair any rights, powers, and privileges heretofore granted by the legislature of this state within the limits aforesaid." The same section shows that the limits are the " falls from the head thereof at the upper bar to the foot of the same at the Phelps bar, so called." The fourth section of the act is,—" Said corporation is hereby authorized and empowered to purchase, hold, and enjoy all the corporate and other rights, powers, and privileges heretofore granted and now enjoyed within the limits of this grant, subject to all the duties and liabilities now legally binding on said corporate rights, powers, and privileges." Upon the proviso saving the powers granted by the charter of 1807, the grant of authority to the defendants to purchase, hold, and enjoy those powers, subject to all the duties and liabilities by which they continued to be restricted in 1848, and the admission of the defendants, in pleading, that their powers are derived from the act of 1807 as well as the acts of 1848 and 1881, the conclusion seems to be inevitable that the defendants are holders of corporate power granted by the charter of 1807, and that this power is subject to the reservation of the public right of free passage of lumber down the river as used and enjoyed before 1807. In the absence of evidence there is no presumption of law

or fact that the natural highway was altered before 1807, and until evidence of a change is introduced the continuance of a natural state of things may be inferred.

The defendants contend that the phrase "subject to all the duties and liabilities now legally binding on said corporate rights, powers, and privileges" does not include the inability "to erect any dam . . . . so as to prevent the free passage of lumber down Connecticut river as heretofore used and enjoyed." They argue that "all the duties and liabilities" thus retained and perpetuated are obligations of an affirmative nature,—to permit logs to pass through the canal on payment of toll, to pay debts and the like,—and not restrictions of authority. But it would be a violent construction to draw a line between the affirmative and the negative duties and liabilities of the canal company, and hold that by "all the duties and liabilities now legally binding on said corporate rights, powers, and privileges," only those of an affirmative nature were designated. It is not probable that the legislature employed that inferential distinction as an implied release of the canal company's grantee from one of that company's incapacities, and an implied grant of power to discontinue the highway.

Whatever else the proviso in the act of 1848 may mean, it must be held to express the legislative will that the defendants, if they bought the powers of the canal company, would hold them subject to the proviso of 1807, and that, as a canal company, they should erect no dam so as "to prevent the free passage of lumber down Connecticut river as . . . used and enjoyed" before the grant of the canal company's charter. The words "subject to all the duties and liabilities now legally binding on said corporate rights, powers, and privileges," do not specially refer to that company's duty of allowing a free passage of lumber, but evince a general resolve to annul none of the limitations of their powers; and among those limitations is the public right of free passage for lumber down the river. By purchasing the old company's franchises the new company acquired no authority to erect a dam that would infringe that right. This lack of authority is among the incapacities unnecessarily reënacted by the fourth section of the charter of 1848. The defendants could not obtain, by purchase from the canal company, a power of highway discontinuance that had not been granted to that company.

As a canal company, the defendants can build a dam that will turn the whole stream into a canal for the use of which they are entitled to toll; but if a lumberman chooses a free log-way which they choose not to give him in the canal, he is entitled to one over, through, or around the dam, as good as he would have in the old undammed channel, at the time he is ready to use it. As a manufacturing company, the defendants can also turn the river to their wheels through a flume. How much of it shall run through the canal for a transportation purpose, how much through the flume

for a manufacturing purpose, and how much over the dam, is for them to decide, with this qualification,—their control is subject to any public right of way that the legislature have not relinquished.

On the question whether any such right has been released by grants of manufacturing powers, the intention of the legislature can be seen in a supposed case, in which the defendants use a canal as a canal company, and a flume as a manufacturing company. At the lower end of the flume they have a saw-mill, in which one man is employed. In June a lumberman arrives at the falls with a drive. There is water enough to carry his logs over the falls in the natural channel if there were no dam there. All the water, turned into the canal, would afford a more convenient passage. All the water, turned into the flume, would work the saw-mill. The whole of it is necessary for either of the three purposes to which it may be applied. The flume gate is open, and the mill in operation. There is no water in the canal, and none running over the dam. The lumberman demands a passage through the canal and tenders the toll. His demand must be complied with. The canal, like a turnpike or a railroad, is a highway. As a canal company, the defendants have not been relieved from the highway duties and liabilities of their predecessors. The canal gate must be opened and the flume gate must be shut, although for a time the mill will be stopped, and its operator thrown out of employment.

As soon as the defendants have performed this canal duty, another lumberman arrives and demands a passage for his logs without payment of toll. Whether the defendants furnish it in the canal, or through a sluice over the dam, the flume gate remains shut, and the mill and its operator remain idle, while the highway demand of the second lumberman is complied with. Whether the number of his logs is ten or ten million, whether their passage stops the mill an hour or a month, and whether the number of the mill operatives is one or one thousand, the lumberman is entitled to a free way as good as he would have if no dam had been built and no water had been diverted from the ancient channel. There is nothing in the statute to indicate an intention that the public right shall be restricted to the passage of a fixed number or a reasonable number of logs, or shall depend upon the extent of the defendants' manufacturing industry and the number of persons engaged therein. If the legislature had meant that the public right might be indefinitely impaired, as it would be if a judicial tribunal were authorized to decide each case upon the comparative importance of the logging business of the lumbermen and the manufacturing business of the defendants, it is not probable that they would have been silent on that subject. The reduction of the highway from one measured by the power of the undiverted stream to carry logs over the unobstructed falls, to one measured in each particular case, or, in this case, by an appraisal of the logging and manufacturing interests, is a piece of legislation that cannot be

inferred from the fact that the statutes contain no allusion to so extraordinary an alteration.

On the question whether a wharf in the port of Newcastle is a nuisance, evidence is not admissible to show that the public inconvenience caused by its obstruction of the Tyne is balanced by the public benefit derived from the delivery of coal in the London market in a better condition and at a reduced price in consequence of the shipping facilities afforded by the wharf. The contrary doctrine, maintained by a majority of the court in *King* v. *Russell*, 6 B. & C. 566, 569, 570, 590, 591, 593, 594, 597, 598, and by a minority in *State* v. *Wheeling Bridge*, 13 How. 518, 591, 605, has not prevailed. The true view was presented by counsel in *Rex* v. *Ward*, 4 A. & E. 384, 394. "Nor is the principle a just one, that a nuisance in one place may be compensated by any degree of benefit conferred in another; as if a gasometer created a nuisance in Southwark, and it was answered that the gas-lights connected with it were beneficial to a street in London. No comparison can be instituted between accommodation to one' set of persons and loss of rights to another." The necessity of slaughter-houses in this country does not legalize the diffusion of an intolerable stench from a structure of that kind in the centre of Manchester. The violation of a public right enjoyed by a portion of the community is not justified by offsetting an advantage accruing to others. The state's abandonment of the whole or a part of the Connecticut easement, in consideration of the receipt of a public benefit of equal or greater value, is an exchange which the riparian owners cannot make without the state's consent. *King* v. *Ward*, 4 A. & E. 384; *Jolliffe* v. *W. L. Board*, L. R. 9 C. P. 62, 88; *Attorney-General* v. *Terry*, 29 L. T. 716, 22 W. R. 200—*S. C.*,.on appeal, L. R. 9 Ch. 423, 432; *State* v. *Wheeling Bridge*, 13 How. 518, 577; Gould Wat., *s.* 94; Ang. T. W. 203–223; Ang. High., *ss.* 233–235. A bridge across a navigable river may be a more important highway than the river, and "it is for the municipal power . . . . to decide which shall be preferred, and how far either shall be made subservient to the other. *Gilman* v. *Philadelphia*, 3 Wall. 713, 729; *The Clinton Bridge*, 10 Wall. 454; *Miller* v. *Mayor*, 109 U. S. 385, 394–398. "The legislature alone could determine the question of comparative public convenience, and either refuse to lay out a highway which would impede navigation, or grant it upon terms, conditions, and reservations, as the public interests might in their judgment require for the protection of the navigation." *Charlestown* v. *Com'rs*, 3 Met. 202, 206; *Com.* v. *Essex Company*, 13 Gray 239, 247; *Com.* v. *Charlestown*, 1 Pick. 180, 185, 187. By an exercise of legislative power, authority can be given wholly or partially to discontinue a public way. on land or water. The Connecticut easement is public property that can be abandoned by due action of the government. But no power has been conferred on the defendants or on the court to exchange any part of

it for public benefits derivable from the defendants' manufacturing enterprise.

The forests, formerly owned by the state, were held by the body politic in trust, in a certain sense, for the common benefit of the people. When the state sold them, the proceeds, like money raised by taxation, went into the vendor's treasury for public, not for private, use. When the title was in the state, it was not held for the several benefit of everybody who desired the timber for the construction of houses or ships. The public right of navigation in navigable water, salt or fresh, is held by the state in a different trust. It is a right that all may receive for private profit. The state, as trustee, holds the legal title. The state, and the people as individuals, have the use. The object of the trust is evidence tending to show that the common right of navigation is not unnecessarily extinguished by a mere conveyance of land, or by a mere creation of an imaginary being called a corporation.

" The dominion and property in navigable waters " is " held by the king as a public trust." " When the Revolution took place, the people of each state became themselves sovereign, and in that character hold the absolute right to all their navigable waters and the soil under them for their own common use." *Martin* v. *Waddell*, 16 Pet. 367, 401, 410. " By the principles of the common law the title to navigable waters and the soil beneath is vested in the crown in trust for the public. . . . By the charters under which these colonies were planted there was vested in the grantees not only the crown's title to the lands granted, but its rights and jurisdiction in and over the navigable waters and seashores, to be held, as by the crown, in trust for the public." *Clement* v. *Burns*, 43 N. H. 609, 616, 619. " By the common law the king was held to be owner and proprietor of the soil under the sea, its shores, and all tide waters, and as such could grant the right of property therein to a subject, though this was not usually done without the previous execution and return of a writ *ad quod damnum*, to ascertain whether such grant would cause any injury to any public right. But it was further held at common law, that, beyond a right of property, the king's prerogative extended to the dominion and control of the shores of the sea, as a power held in trust for the security and protection of the public rights in the navigation and fisheries; that these were among the regalia or incidents of sovereignty which could not be alienated by a royal grant alone. . . . . Supposing, then, that the commonwealth does hold all the power which exists anywhere to regulate and dispose of the seashores and tide waters, and all lands under them, and all public rights connected with them, . . . it must be regarded as held in trust for the best interest of the public, for commerce and navigation, and for all the legitimate and appropriate uses to which it may be made subservient. . . . Two distinct rights are regarded, viz., (1) The *jus privatum*, or right of property

in the soil, which the king may grant, and which may be held by a subject, and the grant of which will confer on the grantee such privileges and benefits as can be enjoyed therein, subject to the *jus publicum;* (2) The *jus publicum*, the royal prerogative by which the king holds such shores and navigable rivers for the common use and benefit. . . . This royal right, or *jus publicum*, is held by the crown in trust for such common use and benefit, and cannot be transferred to a subject, or alienated, limited, or restrained, by mere royal grant, without an act of parliament. The king's grant, therefore, although it may vest the right of soil in a subject, will not justify the grantee in erecting such permanent structures thereon as to disturb the common rights of navigation; and such obstruction, notwithstanding such grant, is held to be a public or private nuisance, as the case may be." *Com.* v. *Alger*, 7 Cush. 53, 82, 83, 90. " The king takes this right of soil in trust for the public, so far as fishing is concerned; and although the king may grant away this right of soil to another, yet his grantee will take it subject to the same trust; and, by such grant, however comprehensive in its terms, the public . . . cannot be deprived of their common right." *Weston* v. *Sampson*, 8 Cush. 347, 352; *Dunham* v. *Lamphere*, 3 Gray 268, 271; *Moore* v. *Sanford*, 151 Mass. 285; *Free Fishers* v. *Gann*, 11 C. B. N. S. 387, 417; Aug. T. W. (2d ed.) 22–25, 27, 64; Gould Wat., ss. 17, 18, 20, 21. " The right of soil . . . must in all cases be considered as subject to the public right of passage, . . . and any grantee of the crown must of course take subject to such right." *Colchester* v. *Brooke*, 7 A. & E. N. S. 339, 374.

A legal reason for the king's inability to surrender navigation is the establishment of the trust by usage and universal understanding for the maintenance of the common right. For the same reason the right is not destroyed by the state's conveyance of the basin or bed in which the navigable waters rest, or through which they flow. No federal question being raised, this case is to be determined by the local law, which regards the people and the state as holding the beneficial interest in an easement, the legal title of which is vested in the state as trustee. Acting as a body politic and trustee, the beneficiaries, by their legislative agents, can authorize an extinguishment of the trust, and an abandonment of the trust estate. *Wales* v. *Stetson*, 2 Mass. 143, 146; *Com.* v. *Charlestown*, 1 Pick. 180, 185. But there is a natural presumption that if the legislature intended to do this, their purpose will be distinctly expressed, as in the provisions for the discontinuance of highways and the assessment of damages therefor. G. L., c. 71. " An intention to discontinue such a highway [as the Androscoggin] cannot be inferred from a public grant of the land under and around it,—a mere alienation of the ownership of the soil by an ordinary form of conveyance. A sale by the state of all its ungranted land could not be construed as a relinquishment and abolition of the public rights

of navigation in Piscataqua river, or lake Winnipiseogee." *Thompson* v. *Androscoggin Co.*, 54 N. H. 545, 548. Such a sale was authorized by *c.* 42, Laws 1867. When the soil under the Connecticut at Olcott falls passed from the king or the state to the first grantees (under whom the defendants claim), it did not cease to be subject to the easement. An express reservation of the public trust and common use was unnecessary. And the nature of the trust which would have made that reservation superfluous in a state grant of the land to the defendants, had the same effect in grants of corporate capacities deemed appropriate for other purposes than the total or partial discontinuance of the highway. Like the riparian rights comprised in the land title, the franchise of their artificial body to exercise those rights is subject to the easement held in trust for common use.

The express refusal of the legislature to allow the defendants as a canal company to extinguish the old free way if they furnished a new and better one through a canal subject to tolls, has no tendency to show that the legislature intended, for the sake of the most insignificant mill, to authorize them to stop the old way without providing a new one. If they can stop the passage of logs a single day in the dry season because they need all the water on that day for an up-and-down saw, they can discontinue the old way entirely by building and operating mills large enough to require all the water every day. They do not claim a power of total and absolute discontinuance; and in the statutes on which they rely there is no mention of any discontinuance, total or partial, permanent or temporary, to be accomplished by a manufacturing diversion of the water. There is no expression of a legislative intent to introduce such an uncertainty and such a prolific source of litigation as a corporate power of discontinuing the highway, to some extent, by turning a reasonable amount of water from the natural channel for manufacturing purposes. The acts of 1848 and 1881 enable the defendants to act as a corporate body in the exercise of riparian rights that existed before those acts were passed, and do not curtail the measure of the public right of flotation which the common law finds in the natural capacity of the stream. If a temporary interruption is unavoidable in the erection or repair of a dam, the right of incorporated or unincorporated riparian owners to bar the way for that purpose without such a license from the state as is given by municipal governments for the occupation of streets during the erection or repair of buildings is a question that need not now be considered. The general rights of the riparian owners and the public may be subject to various qualifications. So far as this suit is concerned, the public right of way is not impaired by the acts of 1807, 1848, and 1881. It is a right to a way of which the floating capacity of the undiverted river, in its natural channel, is the measure. The defendants' right is to use the river and its bed without an invasion of the public easement.

Both rights are established by law. Neither of them can be altered by the trial and determination of any issue of fact. The only question of fact is as to the manner in which the public and the defendants can enjoy their settled titles and exercise their indisputable rights. The prayer of the bill is for a necessary regulation of the common use of the river for commercial and manufacturing purposes by a specific decree that cannot be rendered in a suit at law.

When the defendants were preparing to build the dam, the question necessarily arose by what sluice and by what appliances they could avoid an infringement of the public right; and this question they were not compelled to decide at their peril. On their amicable bill, in which the attorney-general, as the representative of the state, would be defendant (*Sampson* v. *Smith*, 8 Sim. 272, *Tasker* v. *Lord*, 64 N. H. 279, 283), and of which notice would be given to persons specially interested, the defendants could have obtained a provisional decree of regulation, operating like a partition, marking the boundary line between the public and the private right, and enabling them to construct their works in a manner authorized by law. The proceeding would have been in the nature of an *ad quod damnum*. *King* v. *Montague*, 4 B. & C. 598; *King* v. *Russell*, 6 B. & C. 566, 588, 600; *Nichols* v. *Boston*, 98 Mass. 39, 41; Gould Wat., ss. 21, 43. The decree, virtually laying out a log-way over the projected dam, would have afforded adequate protection against suits at law for damages, and efforts to abate an alleged nuisance by chancery suits, criminal prosecutions, and force without legal process. If it were found by experiment, after the completion of the dam, that either or both of the water-rights required an alteration, justice would be done on application of either party. An unalterable judication would not be made in a matter in which changes might be rendered necessary by results and circumstances that could not be foreseen and provided for. Either party might be plaintiff and either might be defendant. And if this bill is necessary for a regulation of the manner of exercising the common rights by constructing and using a sluice and other appliances, it is not barred by the defendant's erection of a dam.

" Courts of equity have jurisdiction of that class of cases where there is an admitted common right among several owners of the same privilege to regulate the common use, to determine the extent of their respective rights, and the proper mode of exercising and enjoying them, as tending to prevent litigation, and as affording a more complete and perfect remedy than could be obtained at law, and as furnishing, in fact, the only adequate means of ascertaining and determining the respective rights of the parties." *Burnham* v. *Kempton*, 44 N. H. 78, 100; *Ranlet* v. *Cook*, 44 N. H. 512, 515; *Bean* v. *Coleman*, 44 N. H. 539, 542; *Lawson* v. *Company*, 59 Wis. 393; Gould Wat., s. 540, and cases there cited. The

ground of equity jurisdiction in many other cases is the want of an adequate process at law for finding lost boundaries (Sto. Eq., *c*. 11) and locating private ways. In *Gardner* v. *Webster*, 64 N. H. 520, the defendant had conveyed land, reserving a right of way across it to "the 'Point,' so-called." In the opinion, the court say, "The location and limits of the reserved way are not specified. . . . The defendant is entitled to a reasonably convenient and suitable way across the land conveyed to the Point. . . . The defendant's right of way through the plaintiff's pasture does not authorize him to pass over all parts of the pasture at his pleasure. Its route through that lot is determined not by the sole interest of either of the parties, but by the reasonable convenience of both. If its location were contested, the controversy might not be settled by the negative result of many actions at law. Both parties, or either of them, might need a decree in equity that would fix the route affirmatively and specifically."

In the present case, on the question of the proper form, dimensions, and place of a sluice, the jurisdiction of equity is as plain as in a partition of water-power between mill-owners, the ascertainment of lost boundaries, or the laying out of a private way. At the trial term the court can cause the log-way to be located and defined by a jury, and put upon them the duty of drawing a report containing a specification for the construction of the dam and sluice. But it has not been shown that the law of any country requires such work to be done by twelve unanimous persons. If a judicial location of a log-way over the dam is necessary, the convenience of the defendants will be consulted so far as it reasonably may be without a violation of the public right to a way as good as the stream would furnish in its natural condition, and the location will be alterable at any future time on application of either party. No location will be made unless a necessity for it is shown. It would seem that this question of necessity will be best tried and decided upon the experiments annually made at the Falls. How long the bill should be retained for a satisfactory settlement of this point is a matter to be considered at the trial term. As either party can obtain equitable relief in vacation without this suit, it is possible that the case will be properly disposed of at the next trial term, or after another annual experiment, by dismissing the bill without cost, and without prejudice, except so far as equity may require a decree for the adjustment of expenses that have been incurred by either party under interlocutory orders.

If a log-way is laid out in this suit, the public will have a right to a reasonable use of it. A controversy as to what would be a reasonable use of it, or of the stream in its natural condition, will not be a dispute about the public right in any sense that will require the right to be settled by the trial of a question of fact before the bill can be maintained for the laying out. As a fee simple in land is, for many purposes, nothing more than a right of exclusive

possession and reasonable use (*Bassett* v. *S. M. Co.*, 43 N. H. 569, 577, *Thompson* v. *Androscoggin Co.*, 54 N. H. 545, 551, 552, 555, *Com.* v. *Alger*, 7 Cush. 53, 84–87), so an ordinary public or private right of way is a right of using land or water, or both, as a way, reasonably and with due care. *Sewalls Falls Bridge* v. *Fisk*, 23 N. H. 171; *George* v. *Fisk*, 32 N. H. 32; *Graves* v. *Shattuck*, 35 N. H. 257; *Thompson* v. *Androscoggin Co.*, 54 N. H. 545, 558— 58 N. H. 108; *Hall* v. *Brown*, 58 N. H. 93, 95; *Carter* v. *Thurston*, 58 N. H. 104, 107; *Varney* v. *Manchester*, 58 N. H. 430; *Collins* v. *Howard*, 65 N. H. 190; Gould Wat., *ss.* 95, 96, 110. The entire natural capacity of the river for flotation is public property. The lumbermen, as travellers on a highway, are entitled to a reasonable and careful use of that estate. Reasonableness of use and care, attached as a limitation to the ownership and enjoyment of corporeal and incorporeal property, does not permit the lumbermen to injure the defendants' works by negligence or an unreasonable use of the entire natural floating power of the river, nor allow the defendants to deprive the lumbermen of the reasonable use of any part of that power. Both parties are bounded by the line established by law between the incorporeal right of the public and the other rights of which the defendants' title is composed. There is no question of right or title in the sense in which those words are used, when it is said that the legal right must be established at law before it is specifically enforced in equity. If it is necessary to lay out the undeniable public way over the dam, one question may be how narrow the sluice should be at different times to secure a sufficient depth of water. The defendants are apparently as much interested as the lumber company in an economical solution of such questions. In cases like this, and *Gardner* v. *Webster*, the owner of the servient tenement may sometimes be more relieved than the other party by a laying out of the easement. An equitable power, employed in the measurement, location, and adjustment of legal rights before an attempt is made to exercise them, is often more useful than any remedial course that can be taken after a controversy has arisen on their alleged violation. In this case, the rights of all parties being known, a regulating process may not be needed.

*Case discharged.*

CARPENTER, J., did not sit: the others concurred.